No. 25-60202

# In the United States Court of Appeals
# for the Fifth Circuit

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF TRANSPORTATION; UNITED STATES MARITIME ADMINISTRATION, AN AGENCY OF THE U.S. DEPARTMENT OF TRANSPORTATION; ADMINISTRATOR, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. MARITIME ADMINISTRATION; UNITED STATES COAST GUARD, AN AGENCY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN E. LUNDAY, IN HIS OFFICIAL CAPACITY AS COMMANDANT OF THE U.S. COAST GUARD,

*Respondents.*

On Petition for Review from Maritime Administration
MARAD-2019-0093

## OPENING BRIEF OF PETITIONER CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY

Amy Catherine Dinn, TX 24026801
Caroline Crow, TX 24118360
Lone Star Legal Aid
1415 Fannin
Houston, Texas 77002
T: (713) 652-0077, ext. 8108
adinn@lonestarlegal.org
ccrow@lonestarlegal.org

Mike Brown, TX 24118170
Bridgett McCoy, LA 41091
Earthjustice
900 Camp Street, Unit 303
New Orleans, LA 70130
T: (504) 910-1735
mlbrown@earthjustice.org
bmccoy@earthjustice.org

*Counsel for Petitioner Citizens for Clean Air and Water in Brazoria County*

***ORAL ARGUMENT REQUESTED***

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Citizens for Clean Air & Clean Water in Brazoria County, Texas d/b/a Better Brazoria ("Better Brazoria") certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Petitioner:**

**Counsel for Petitioner:**

**Better Brazoria**
Citizens for Clean Air & Clean Water
in Brazoria County, Texas d/b/a Better
Brazoria

Amy Dinn
Caroline Crow
Lone Star Legal Aid, Houston, TX

Michael Brown
Bridgett McCoy
Earthjustice, New Orleans, LA

**Federal Respondents:**

**Counsel for Federal Respondents:**

**U.S. Department of Transportation**
Sean P. Duffy, Secretary,
U.S. Department of Transportation

Ezekiel Peterson
U.S. Department of Justice
Denver, CO

**MARAD**
Administrator, Administrator of the
U.S. Maritime Administration

**U.S. Coast Guard**
Kevin E. Lunday, Commandant of the
U.S. Coast Guard

ii

**Applicant**

**Counsel for Applicant:**

**GulfLink**
Texas GulfLink, LLC

Tod Everage
Kean Miller LLP
New Orleans, LA

Sentinel Midstream LLC

Cresta Energy Fund I Carry, LP.

Cresta Energy Fund I, LP

*s/ Amy Catherine Dinn*
Amy Catherine Dinn, TX24026801

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Citizens for Clean Air & Clean Water in Brazoria County d/b/a Better Brazoria ("Better Brazoria") respectfully requests that the Court hold oral argument in this case, which concerns issues of first impression interpreting the Deepwater Port Act of 1974, 33 U.S.C. §§ 1500–23 ("DWPA"), and a voluminous administrative record.

**TABLE OF CONTENTS**

**Contents**                                                                             **Page(s)**

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

TABLE OF CONTENTS ...................................................................................... v

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................ viii

TABLE OF AUTHORITIES ................................................................................ x

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 4

STATEMENT OF THE CASE ............................................................................. 6

I.     LEGAL BACKGROUND .......................................................................... 6

     A.    The Deepwater Port Act of 1974 authorizes the licensing,
          construction, and operation of deepwater ports...................................... 6

     B.    Deepwater port is defined to include its offshore pipelines. ................. 7

     C.    Application Area is defined to include the entire deepwater port in
          an area where only one such port is needed. ......................................... 7

II.    STATEMENT OF FACTS ......................................................................... 8

     A.    SPOT applies for a deepwater port license. ........................................ 10

     B.    GulfLink applies to operate a port in the same area as SPOT ............. 11

     C.    SPOT and GulfLink's non-competing environmental reviews ........... 13

SUMMARY OF THE ARGUMENT ................................................................. 17

STANDARD OF REVIEW ..................................................................18

ARGUMENT ....................................................................................19

I.    Better Brazoria has associational standing under Article III........................ 20

II.   MARAD violated the DWPA by permitting two offshore oil export terminals off the coast of Freeport.......................................... 24

A.    MARAD's noticed Application Area for GulfLink did not comply with the statutory mandates of Section 1504(d) of the DWPA........... 25

1.    The DWPA instructs MARAD how to draw an Application Area for a crude oil deepwater port, but MARAD didn't follow the instructions. ................................ 26

2.    GulfLink's Application Area omitted the offshore pipelines in the definition of "deepwater port."...................... 33

3.    GulfLink's Application Area also failed to consider whether only one port was needed.......................................... 34

B.    As a matter of law under the DWPA, MARAD could only license one Deepwater Port in an Application Area, and MARAD has already licensed SPOT............................................. 38

III.  MARAD's Application Area change was arbitrary and capricious and will result in undesirable consequences inconsistent with the DWPA's criteria for deepwater ports.................................... 42

A.    MARAD's explanation lacks justification in the record...................... 44

B.    The legislative history does not support MARAD's narrowly drawn Application Area for GulfLink.............................. 45

C.    Past practice does not support MARAD's change to exclude the offshore pipelines. ......................................... 48

D.    MARAD's designation of GulfLink's Application Area failed to consider important aspects of permitting deepwater ports contemplated by Congress............................................ 51

IV.   Remand with Vacatur is the Proper Remedy. ............................................. 55

CONCLUSION..................................................................................56

CERTIFICATE OF SERVICE ..............................................................58

CERTIFICATE OF COMPLIANCE........................................................59

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| Term | Description |
| --- | --- |
| APA | Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* |
| Application Area | Application Area as defined in the Deepwater Port Act, 33 U.S.C. § 1504(d) |
| Agencies | MARAD and USCG |
| Better Brazoria | Petitioner Citizens for Clean Air & Clean Water in Brazoria County |
| bpd | barrels per day |
| COLT | Texas Crude Offshore Loading Terminal |
| DOT | Respondent Department of Transportation |
| DWPA or the "Act" | Deepwater Port Act of 1974, Pub. L. No. 93-627, 33 U.S.C. § 1501 *et seq.* |
| EIS | Environmental Impact Statement |
| GulfLink | Texas GulfLink, LLC |
| MARAD | Respondent U.S. Maritime Administration |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* |
| nm | nautical miles |
| ROD | Record of Decision |
| ROI | Region of Influence |
| Secretary | Secretary of the Department of Transportation |
| SPOT | Sea Port Oil Terminal |
| USCG | Respondent U.S. Coast Guard |

viii

| Term | Description |
|------|-------------|
| VLCC | Very Large Crude Carriers or "supertankers" are massive crude oil tankers and among the largest ships in the world, with lengths around 335 meters (1,005 feet) and capacities typically ranging from 160,000 to 320,000 deadweight tonnage and carrying approximately 2 million barrels of crude oil.[1] |

---

[1] JA0218; JA0147.

## TABLE OF AUTHORITIES

**Cases**

*Barr v. SEC,*
  114 F.4th 441 (5th Cir. 2024)............................................................ 18, 48

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.,*
  98 F.4th 178 (5th Cir. 2024)...................................................... 1, 5, 20, 21

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) .............................................................................42

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .............................................................................42

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ........................................................................ 20, 24

*Hunt v. Wash. Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .............................................................................24

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ................................................................ 18, 29, 48

*Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.,*
  545 U.S. 967 (2005). .............................................................................42

*Save Our Cmty. v. EPA,*
  971 F.2d 1155 (5th Cir. 1992)...............................................................23

*Sierra Club v. Glickman,*
  67 F.3d 90 (5th Cir. 1995).....................................................................18

*Stanley v. City of Sanford,*
  145 S.Ct. 2058 (2025) .................................................................... 28, 45

*Tex. Corn Producers v. EPA,*
  141 F.4th 687 (5th Cir. 2025)................................................................20

*Tex. Off. of Pub. Util. Couns. v. FCC,*
  183 F.3d 393 (5th Cir. 1999)................................................................19

*Texas v. EPA,*
    137 F.4th 353 (5th Cir. 2025) ................................................................28

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) .................................................................55

*UAW v. Brock,*
    477 U.S. 274 (1986) ..............................................................................24

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ..............................................................................43

**Statutes**

5 U.S.C. § 500 *et seq.* .................................................................................18

5 U.S.C. § 551(13) ......................................................................................55

5 U.S.C. § 706(1) ................................................................................. 17, 18

5 U.S.C. § 706(2) ................................................................. 17, 18, 19, 55

33 U.S.C. § 1501 ................................................................. 6, 25, 51, 53

33 U.S.C. § 1502(9) .......................................... 7, 10, 17, 19, 24, 27, 28, 34

33 U.S.C. § 1503 .............................................................. 5, 25, 41, 53

33 U.S.C. § 1504 ......................................................................................19

33 U.S.C. § 1504(c) .....................................................................................6

33 U.S.C. § 1504(d) .............. 1, 3, 5, 6, 10, 17, 25, 28, 30, 31, 32, 33, 34, 39, 49, 56

33 U.S.C. § 1504(d)(1) .................................. 7, 17, 19, 26, 27, 28, 32, 34, 35, 36, 45

33 U.S.C. § 1504(d)(2) .................................................... 7, 24, 27, 28, 35

33 U.S.C. § 1504(d)(3) .......................................................... 3, 32, 39

33 U.S.C. § 1504(f) ....................................................................................6

33 U.S.C. § 1504(h) ..................................................................................27

33 U.S.C. § 1504(i) ........................... 1, 3, 7, 8, 12, 13, 17, 25, 39, 40, 41, 46, 47

33 U.S.C. § 1505 ............................................................. 6, 39, 40

33 U.S.C. § 1509 ........................................................................53

33 U.S.C. § 1516 ..........................................................................4

33 U.S.C. § 1520 ........................................................................27

42 U.S.C. § 6212a .......................................................................31

Continuing Appropriations Act of 2016, Pub. L. No. 114-113 ..............................31

Deepwater Port Act of 1974, Pub. L. No. 93-627 ......................... 1, 4, 6, 19, 24, 43

**Regulations**

33 C.F.R. § 148.105 .....................................................................6

33 C.F.R. § 148.281 ..................................................... 6, 17, 39, 56

33 C.F.R. § 148.3 .........................................................................6

33 C.F.R. § 148.705 .....................................................................6

33 C.F.R. § 148.707 .....................................................................6

33 C.F.R. § 148.710 ....................................................................46

33 C.F.R. § 148.720 .....................................................................6

33 C.F.R. § 148.730 .....................................................................6

49 C.F.R. § 1.93(h) ......................................................................6

**Other Authorities**

S. Rep. No. 93-1217 (1974),
  *as reprinted in* 1974 U.S.C.C.A.N. 7529 ..................................... 6, 45, 46, 47, 48

## INTRODUCTION

Congress dictated, under the Deepwater Port Act of 1974, that only one offshore crude-oil deepwater port be permitted in any given Application Area off the United States coastline. 33 U.S.C. § 1504(d), (i). The U.S. Maritime Administration ("MARAD") has already approved one: the Sea Port Oil Terminal ("SPOT") in a Record of Decision ("ROD") dated November 21, 2022.[2] *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 186–87 (5th Cir. 2024) (affirming that ROD). MARAD issued SPOT's license to construct and operate a deepwater port in the Gulf off the coast of Freeport, Texas on April 8, 2024.[3]

Better Brazoria comes to court because less than a year later MARAD inexplicably approved a license for a second deepwater port,[4] Texas GulfLink, LLC ("GulfLink"), to export oil adjacent to SPOT with pipelines that intersect SPOT's. The DWPA defines "deepwater port" to include its undersea pipelines. Because MARAD failed to include GulfLink's pipelines in its defined Application Area as required by the DWPA, this Court should reverse the MARAD-issued ROD for GulfLink. 33 U.S.C. § 1504(d).

An individual offshore oil port occupies broad swaths of the coastal land,

---

[2] JA0326-419.
[3] *See* SPOT License, Record Excerpts, Tab 2.
[4] *See* GulfLink ROD, Record Excerpts, Tab 1, JA0014-96.

1

ocean surface and subsea. It requires millions of barrels of onshore oil storage, as well as offshore platforms for operations, pumping stations, crew quarters, docking for service vessels and moorings. Connecting all of these on- and offshore components are pipelines transporting crude oil. SPOT's and GulfLink's facilities can load respectively 30 and 15 Very Large Crude Carriers ("VLCCs") per month with each VLCC holding up to 2 million barrels of oil.[5] Among the largest ships in the world, VLCCs are longer than three football fields with a maneuvering distance or turning radius of 1.25 nautical miles (nm)[6] and may require additional vessels to help them stop.[7] VLCCs require space far greater than their overall length as they are tethered to moorings with anchor lines of extensive scope and can swing 360 degrees on their moorings.[8] The facilities require room not only for their daily operations but significant sea room to allow these monster ships to safely approach and depart their moorings.[9]

SPOT filed its application with MARAD on January 31, 2019,[10] and the agency publicly noticed it as complete on March 4, 2019.[11] GulfLink followed with its application on May 30, 2019, within the 90-day time period provided by the

---

[5] JA0494; JA0499.
[6] JA0218; JA0013.
[7] JA0570.
[8] JA0013.
[9] JA0492.
[10] JA0334.
[11] JA0342; JA0421.

2

DWPA for competing facilities in the same Application Area.[12] 33 U.S.C. § 1504(d)(3). Under the DWPA, MARAD should have compared GulfLink for its benefits and detriments relative to SPOT's, selecting only one of them and rejecting the other port. 33 U.S.C. § 1504(d), (i). That did not happen. Instead, MARAD announced that it was unprecedently narrowing the Application Area for GulfLink to at least 3.5 nm and omitting its pipelines from consideration. MARAD provided no reasoned justification for this decision. The only obvious reason was to avoid the preclusive effect of the DWPA on the approval of a second project in the same area. Thus, MARAD failed to engage in the comparison and selection of which facility best serves the country as required under the DWPA. *Id.*

Equally problematic, MARAD reviewed the SPOT and GulfLink applications in isolation, and in all relevant respects here, treated each as if the other did not exist.[13] Thus, MARAD did not follow the DWPA's mandate to examine or compare the various relevant economic, safety and environmental factors of two oil ports operating side by side—even after the Port of Freeport expressed serious safety concerns of just one deepwater port near the Freeport Shipping Fairways.[14] Further, the United States only produces roughly 13 million barrels of crude per day.[15] If

---

[12] JA0026.
[13] JA0617.
[14] JA0718; JA0715.
[15] JA0324.

3

built, SPOT can export 2 million bpd, and GulfLink can export 1 million bpd.[16] Combined, the two facilities can export 23% of U.S. daily crude oil production. Not so long ago the United States faced a serious shortage of crude production and banned the export of important U.S. crude supplies altogether.[17]

There are, therefore, powerful considerations, ignored by MARAD, why the Application Area provisions of the DWPA should be observed.

## JURISDICTIONAL STATEMENT

Petitioner Better Brazoria challenges MARAD's decision to approve a license for GulfLink as proposed by Sentinel Midstream, LLC to export crude oil under the Deepwater Port Act of 1974.[18] The DWPA grants this Court original jurisdiction over the case, because Texas is the nearest adjacent coastal state to the project. *See* 33 U.S.C. § 1516 (assigning circuit-court forum for challenges to deepwater port licenses).[19]

Better Brazoria also has the statutory right to bring its DWPA claims on the merits. The Act authorizes "[a]ny person . . . who is adversely affected or aggrieved by" a license decision to petition for judicial review. 33 U.S.C. § 1516. Further, that

---

[16] JA0484; JA1387.

[17] Per the U.S. government, the highest level U.S. exports have reached is 4.1 million bpd of crude oil. JA0063. The combined export capacity for SPOT and GulfLink reflects 73% of this historic maximum.

[18] JA0024.

[19] JA0032.

person must have also participated in the related administrative proceedings. *Id.* Better Brazoria is an "aggrieved" person allowing it to challenge MARAD's decision that adversely affects its members who live in Brazoria County, who will suffer GulfLink's environmental impacts. Members of the public may raise a challenge that "relates to the grant of the license, and Petitioners' environmental interests are more than marginally related to . . . the purposes implicit in the statute." *Citizens*, 98 F.4th at 197 (affirming right of community and environmental groups to challenge MARAD's energy-sufficiency determination for SPOT project under DWPA).

## STATEMENT OF THE ISSUES

1. Whether MARAD violated the DWPA's requirement to license only one crude-oil export terminal in a single geographic Application Area, *see* 33 U.S.C. § 1504(d), by approving GulfLink's deepwater port license after it already licensed the overlapping SPOT project.

2. Whether MARAD's decision to modify the defined Application Area for GulfLink was arbitrary and capricious by failing to offer any reasonable explanation for the change.

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

#### A. The Deepwater Port Act of 1974 authorizes the licensing, construction, and operation of deepwater ports.

Passed during the 1970s energy crisis with an emphasis on retaining and not depleting domestic oil supplies,[20] the Deepwater Port Act of 1974, as amended, establishes a licensing process primarily run by MARAD[21] and the related procedures for the location, construction, and operation of deepwater ports off the coasts of the United States for the import and export of oil and natural gas. 33 U.S.C. § 1501. The DWPA limits the licensing and construction to only one deepwater port in any given Application Area. 33 U.S.C. § 1504(d); *see also* 33 C.F.R. § 148.281(a) ("When more than one application is submitted for a deepwater port in the same application area under 33 U.S.C. § 1504(d), only one application shall be approved."). As part of the licensing and environmental review process, the applicant must document and the Agencies must also consider the extensive, necessary onshore infrastructure associated with the deepwater port, including onshore oil storage terminals and pipelines. *See* 33 U.S.C. §§ 1504(c)(2)(G), 1504(f), 1505(a)(5); 33 C.F.R. §§ 148.105(l), (u), (z), 148.705(b), 148.707, 148.720, 148.730.

---

[20] S. Rep. No. 93-1217, at 5-6 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7529.
[21] The Secretary of Transportation delegated MARAD authority to issue licenses for construction and operation of a deepwater port under the DWPA. 49 C.F.R. § 1.93(h); 33 C.F.R. § 148.3.

**B.      *Deepwater port is defined to include its offshore pipelines.***

The Act defines the "deepwater port" expansively to "include[] all components and equipment, including pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark[.]" 33 U.S.C. § 1502(9)(B).

**C.      *Application Area is defined to include the entire deepwater port in an area where only one such port is needed.***

Congress defined the Application Area with specificity in relation to the deepwater port as "any reasonable geographic area within which a deepwater port may be constructed and operated." 33 U.S.C. § 1504(d)(1)–(2). At a minimum, the Application Area must at least encompass the deepwater port site, including its areas of construction and operations. *Id.* At its largest, the area "shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal state." 33 U.S.C. § 1504(d)(2). The agency must assess the need for the deepwater port or any others nearby. 33 U.S.C. § 1504(d)(1). As designated, the Application Area must be drawn so that the "construction of the proposed deepwater port would eliminate . . . the need for any other deepwater port within that application area." 33 U.S.C. § 1504(i).

And the geographic limitations are further controlled by an elaborate national interest test explained in Section 1504(i) of the Act. This test forces applicants in the

7

same Application Area to compete and be judged to determine which port "clearly best serves the national interest[.]" *Id.* Serving the national interest is determined by considering the following criteria: the relative "degree to which the proposed deepwater ports affect the environment," national-security implications, construction timelines, and oil market and consumer impacts. 33 U.S.C. § 1504(i)(2), (3). And if one port is not "clearly best" under those criteria, Congress tasks the agency with choosing a winner based on Congress's preferences concerning the port's ownership structure. 33 U.S.C. § 1504(i)(2)(A)–(C).

## II.    STATEMENT OF FACTS

In 2019, MARAD received three applications for deepwater ports in the same part of the Gulf off the coast of Brazoria County, Texas:

- January 31, 2019: SPOT;[22]

- March 5, 2019: Texas COLT;[23] and

- May 30, 2019: GulfLink.[24]

Texas is the adjacent coastal state on all three projects.[25] Figure 1 illustrates the relative position of these three proposed deepwater ports,[26] which will add to the existing capacity of Louisiana Offshore Oil Port ("LOOP"), a licensed deepwater

---

[22] JA0334.
[23] JA0600.
[24] JA0026.
[25] JA0032; JA0342; JA1416.
[26] JA0498.

port operating off the coast of Louisiana exporting up to 800,000 barrels per day (bpd) of crude oil.[27]

*Figure 1: Map of Proposed Deepwater Ports off the Coast of Freeport, Texas in 2019*



Despite early, pronounced local opposition to multiple deepwater port projects [28] clustered in "close proximity,"[29] these projects moved ahead through the various stages of licensing managed by MARAD and the required environmental review process under the National Environmental Policy Act ("NEPA"), administered jointly by MARAD and the U.S. Coast Guard ("USCG") (collectively, the "Agencies")[30] as further described below.

---

[27] JA1415.
[28] JA1171; JA0717; JA0577.
[29] JA0620.
[30] JA0033-34.

### A. SPOT applies for a deepwater port license.

MARAD published SPOT's Notice of Application for a deepwater port license on March 4, 2019.[31] MARAD defined SPOT's Application Area to meet the DWPA's minimum requirements to capture the entire offshore "deepwater port", including SPOT's offshore pipelines:

> MARAD has consulted with USCG in developing SPOT's application area and designates an application area encompassing the deepwater port that is a circle having a radius of *no less than* three-and-three-tenths (3.30) nautical miles centered at SPOT's proposed platform, latitude N 28°27′59.22″ and longitude W 95°07′ 24.49″, *and 0.25 nautical miles on either side of SPOT's proposed pipeline route between the terminal and the shore*. Any person interested in applying for the ownership, construction, and operation of a deepwater port within this designated application area must file with MARAD…a notice of intent to file an application for the construction and operation of a deepwater port not later than 60 days after the date of publication of this notice, and shall submit a completed application no later than 90 days after publication of this notice.[32]

The Notice copied directly from the statutory definition and listed the parts of the deepwater port to include "all components and equipment, including pipelines, pumping or compressor stations, service platforms, buoys, mooring lines, and similar facilities that are proposed as part of a deepwater port to the extent they are located seaward of the high-water mark."[33] MARAD's Notice also acknowledged

---

[31] JA0476.
[32] JA0422 (emphasis added).
[33] JA0422; *accord* 33 U.S.C. §§ 1502(9)(B), 1504(d).

10

that the "only one deepwater port may be constructed and operated" in any given Application Area.[34]

### B.   GulfLink applies to operate a port in the same area as SPOT.

Two months later, on April 24, 2019, GulfLink sent a letter to MARAD announcing its intention to file a deepwater port application.[35] GulfLink's offshore pipeline would cross SPOT's as depicted in Figure 2 below.[36]

**Figure 2: Map of Proposed GulfLink and SPOT Intersecting Deepwater Ports (SPOT pipeline shown in dotted red, GulfLink's in solid yellow)**



---

[34] JA0422.
[35] JA0001.
[36] JA1439.

GulfLink's letter also recognized its plans "to cross the proposed offshore pipeline for the Texas COLT, LLC (MARAD-2019-0012) deepwater port project."[37] And it recognized "GulfLink's offshore pipeline technically crosses through the designated 'application area' for the pipeline portion for the COLT project."[38] The notice letter, however, did not mention SPOT's pending application or its similarly overlapping Application Area. By May 30, 2019, GulfLink had formally submitted its application, which confirmed it also overlapped with SPOT.[39]

At this point, MARAD had three deepwater port license applications to build three oil terminals just a few miles from each other along Texas' 367-mile coastline. *See* Figure 1, *supra,* at 9. Rather than evaluating which port would best serve the national interest as required by Section 1504(i), MARAD eliminated the statutorily-required offshore pipelines and shrunk the respective Application Areas to tiny, nonoverlapping dots.

On June 26, 2019, after acknowledging that only one deepwater port may be constructed and operated in a single Application Area, MARAD defined GulfLink's Application Area as "a circle having a radius of no less than three and one-half (3.50) nm centered at Texas GulfLink's proposed platform."[40] Unlike SPOT's

---

[37] JA0001.
[38] JA0001.
[39] JA0571; JA0200.
[40] JA0571.

earlier notice, this Application Area excluded the deepwater port's pipelines.[41] To justify its change in position, the MARAD stated: "[w]hile MARAD had initially included pipelines within the Application Areas of recent projects, MARAD has determined that the areas, consistent with Congressional intent, can and should be limited to the circular zones surrounding the unloading and loading points."[42] Now rather than being in the same Application Area and competing against one another, SPOT and GulfLink would proceed side by side on parallel, but independent, environmental review paths.

### C.    SPOT and GulfLink's non-competing environmental reviews

On December 10, 2019, COLT withdrew its application,[43] leaving MARAD with two competing applications to review.[44] But as revealed by the subsequent, required environmental review process, the Agencies did not review GulfLink and SPOT as competing projects based on the Section 1504(i) factors despite occupying the same designated Application Area and all these overlapping similarities:

- Both SPOT and GulfLink are offshore crude oil export terminals.[45]

- Texas is the "Adjacent Coastal State" for both projects.[46]

---

[41] JA0571.
[42] JA0572.
[43] JA0600.
[44] JA0600.
[45] JA1432; JA1387.
[46] JA0032; JA0342.

- Both will export oil: SPOT at 2 million bpd and GulfLink at 1 million bpd.[47]

- The lease blocks for SPOT met GulfLink's location criteria.[48]

- SPOT's two platforms will be 27.2 to 30.8 nm off the coast of Brazoria County, Texas.[49]

- GulfLink's one platform will be approximately 26.6 nm off the coast of Brazoria County, Texas.[50]

- SPOT's deepwater port is approximately seven nm west of GulfLink's offshore platform.[51]

- SPOT's pipeline route intersects GulfLink's pipeline route.[52]

- Offshore construction of GulfLink's pipelines will overlap with SPOT's subsea pipelines.[53]

As the first-filed application, SPOT was the first to make it to a Final Environment Impact Statement ("EIS") in July 2022.[54] SPOT's Final EIS admits that the center of GulfLink's port is only 7 nm from SPOT[55] with offshore pipelines

---

[47] JA1415; JA1387.
[48] JA1382.
[49] JA0476; JA0635.
[50] JA1378.
[51] JA1415; JA0618.
[52] JA1432; JA1441-42; JA1444; JA1415; JA0643; JA0635.
[53] JA0643.
[54] JA0453-563.
[55] JA0529.

crossing "about 9 miles from the SPOT [deepwater port] platform."[56] And that the "subsea pipelines for the SPOT Project would overlap with the route for the subsea pipelines for the Texas GulfLink Project."[57] SPOT's ROD was published in November 2022.[58]

GulfLink's review process was slower. GulfLink's Draft EIS was published for comment in November 2020.[59] The Agencies reopened the comment period in September 2021.[60] A year later, MARAD published a Supplemental Draft EIS, describing GulfLink's updated offshore air pollution controls.[61] Better Brazoria and its members submitted their concerns throughout this environmental review process. *See* Oldham Decl. ¶¶20–24, 27-28; Robinson Decl. ¶¶38–49; AJ Jinkins Decl. ¶¶10-12; L. Jinkins Decl. ¶¶8-10; Page Decl. ¶8. GulfLink's Draft EIS confirmed the "offshore construction of the proposed offshore pipelines for GulfLink would overlap with the route for the subsea pipelines for the SPOT Project."[62]

After SPOT's license issued in April 2024,[63] MARAD published GulfLink's Final EIS three months later on July 5, days before Hurricane Beryl hit the area.[64]

---

[56] JA0520; JA0523; JA0526; JA0528.
[57] JA0545; JA0543.
[58] JA0326-419.
[59] JA0035-36.
[60] JA0036-37.
[61] JA0038.
[62] JA0643.
[63] SPOT License, Record Excerpts, Tab 2.
[64] JA0041.

GulfLink's Final EIS, just as SPOT's, recognized that the offshore pipelines would "overlap with the route for the subsea pipelines for the SPOT Project."[65] And the GulfLink Final EIS also recognized that SPOT and GulfLink share a Region of Influence ("ROI") and will have similar impacts.[66]

During the Final EIS comment period ending in September 2024, MARAD received 44,732 comments overall.[67] At least one hundred and twenty unique comments raised the Application Area as a concern during the NEPA and DWPA process.[68] Specifically, Better Brazoria and its members raised concerns with the Application Area and the possibility of two massive oil export terminals with all their onshore and offshore impacts throughout the public comment process.[69] The Agencies only responded: "USCG does not define the project application area" and the "designation of an application area is outside the scope of the EIS."[70]

GulfLink's ROD issued on February 14, 2025.[71] Better Brazoria petitions for this Court's review of the ROD documenting MARAD's approval of a deepwater port license for GulfLink in the same area as the already-licensed SPOT.

---

[65] JA1464.

[66] JA1449; JA1415.

[67] JA0041.

[68] JA0040; JA1264; JA1265; JA1266; JA1267; JA1268; JA1269; JA1270-72.

[69] JA0728; JA0733-34; JA1180-86; JA1326-29; JA0684-699; JA0661-64.

[70] JA1266.

[71] GulfLink ROD, Record Excerpts, Tab 1, JA0016.

16

## SUMMARY OF THE ARGUMENT

MARAD's abrupt decision to change the Application Area to accommodate GulfLink was unlawful. First, the new Application Area failed to include the entirety of the two "deepwater port[s]," namely GulfLink's and SPOT's pipelines and other offshore infrastructure as required by the DWPA. *See* 33 U.S.C. §§ 1502(9), 1504(d)(1), (i). These are legal errors in violation of the DWPA, subject to reversal under this Court's *de novo* review. *See* 5 U.S.C. § 706(1). Second, MARAD also acted arbitrarily and capriciously. *See* 5 U.S.C. § 706(2). Even if we assume that MARAD had authority to alter the Application Area in the manner it did, MARAD's barest of explanations for doing so failed to address the statutory criterion of "need," explain why it was departing from its longstanding past practice, or reconcile the change with the statutory purposes and mandates of the DWPA.

The remedy here is vacating GulfLink's ROD. "When more than one application is submitted for a deepwater port in the same application area under 33 U.S.C. 1504(d), only one application is approved." 33 C.F.R. § 148.281(a); *see* 33 U.S.C. §§ 1504(d), (i). Because the two projects are in the same Application Area and SPOT already has a license, MARAD lacked authority to approve GulfLink's application. 33 U.S.C. § 1504(d).

17

**STANDARD OF REVIEW**

Under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*. ("APA"), a reviewing court "shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir. 1995). Under 5 U.S.C. § 706, "agency interpretation of statutes" is reviewed without deference. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 392 (2024).

Likewise, pure questions of law, like the statutory meaning of Application Area here, are reviewed *de novo*. 5 U.S.C. § 706(1); *Barr v. SEC,* 114 F.4th 441, 447 (5th Cir. 2024).

This Court may review MARAD's departure from policy and past practice in designating GulfLink's Application Area under an arbitrary capricious standard of review. 5 U.S.C. § 706(2). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Barr,* 114 F.4th at 446. A Court is authorized "to reverse an agency's action" if it "fail[s] to give a reasonable explanation for how it reached its decision." *Tex. Off. of*

*Pub. Util. Couns. v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999); *see* 5 U.S.C. § 706(2)(A).

## ARGUMENT

Better Brazoria has Article III standing to bring this suit. On the merits, Section 1504 of the Act required MARAD to license only one deepwater port carrying oil from Brazoria County-based pipelines offshore for export, yet MARAD has approved two licenses in the same Application Area. MARAD offered a couple of sentences in the notice of GulfLink's application for its about-face declaring that "Congressional intent" allowed it to omit the ports' pipelines, stating:

> Based on a review [of] the Deepwater Port Act and its legislative history, MARAD has determined that for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading. While MARAD had initially included pipelines within the application areas of recent projects, MARAD has determined that the areas, consistent with Congressional intent, can and should be limited to the circular zones surrounding the unloading and loading points.[72]

While Congress used a circle to describe the maximum size of a deepwater port, the law requires that the geographic area *include* the offshore pipelines. 33 U.S.C. §§ 1502(9), 1504(d)(1). Moreover, crossing offshore pipelines is strong indicia that the two ports occupy the same area. MARAD never provided support for its position that Congress intended a circle without pipelines. Nor is there any explanation why

---

[72] JA0572.

19

a 3.5-mile radius is sufficient. As a result, MARAD's explanation is arbitrary and capricious because it contradicts the statute and fails to provide a reasoned explanation for changing the definition of a deepwater port's Application Area.

Because MARAD lacked authority to approve GulfLink when it had already licensed SPOT, the Court must vacate MARAD's decision.

## I.    Better Brazoria has associational standing under Article III.

Petitioner Better Brazoria is a membership organization with standing to bring this case. An organization has standing to bring an action on behalf of its members when: "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Tex. Corn Producers v. EPA*, 141 F.4th 687, 695 (5th Cir. 2025).

Better Brazoria satisfies all three requirements of associational standing. On the first requirement, that members have standing in their own right, members must suffer "an 'injury in fact,'" that is "'fairly traceable' to the actions of the defendant," and will "likely be redressed by a favorable decision." *Citizens*, 98 F.4th at 186–87.

First, its members suffered injury in fact that is "traceable," "concrete and particularized," and, "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citation modified). MARAD's decision to license GulfLink's operation and

20

construction, concluding that the Project is in the national interest and does not overlap with the project area of the approved SPOT deepwater port, directly harms Better Brazoria's members' concrete interests. All members plan "to make use of the specific sites" where the environmental effects from GulfLink would allegedly be felt and "identified cognizable interests threatened by the project." *Citizens*, 98 F.4th at 188. Importantly, "[t]he Supreme Court has expressly held that a 'threatened injury' will satisfy the 'injury in fact' requirement for standing." *Id.* at 187. And this Court has also found these prospective injuries to be sufficient, such as "aesthetic and physical nuisance, negatively affecting . . . enjoyment of the declarant's property, and recreational activities on Surfside Beach." *Id.* at 188 (citation modified).

Better Brazoria's members live, work, and recreate in and near areas that will be impacted by GulfLink. AJ Jinkins Decl. ¶¶3-6; L. Jinkins Decl. ¶3; Oldham Decl. ¶¶5-6; Robinson Decl. ¶¶3-10; Page Decl. ¶2. Traffic, noise, and air pollution during construction and operation will adversely affect the local environment[73] and further diminish members' quality of life and enjoyment of the area for decades. For instance, members are concerned that traffic from construction of the tank farm and pipeline just off the main road in Jones Creek will make their daily trips to shops and work delayed and more dangerous. AJ Jinkins Decl. ¶¶14–20; L. Jinkins Decl.

---

[73] JA1392-404.

¶¶12–16; Page Decl. ¶¶9-10. Air and noise pollution from the construction and operation of GulfLink will reduce members' use and enjoyment of Jones Creek: "All of the dust from the construction, the mud on the roads, the unsightly construction, and the noise from the heavy machinery will be unbearable." AJ Jinkins Decl. ¶20. GulfLink's facilities, during construction and operation, would change the nature of Jones Creek: "I live here because I like the peace and quiet of living in the country. [GulfLink] will make Jones Creek feel like I'm living in the middle of an industrial zone." AJ Jinkins Decl. ¶20.

GulfLink also poses hazards to members' property, by placing their homes at higher risk of flooding and potentially polluting members' drinking water. AJ Jinkins Decl. ¶¶21-38; L. Jinkins Decl. ¶¶17–25. Members are concerned these changes would decrease their property values. AJ Jinkins Decl. ¶¶6, 43-51; L. Jinkins Decl. ¶19; Page Decl. ¶17. Members are also concerned about pollution from GulfLink's construction and operations, like nitrogen oxides, particulate matter, and volatile organic compounds into the ambient air, as well as noise and light pollution that will affect my enjoyment of my property in the Freeport and Surfside communities. Oldham Decl. ¶¶38-51; Robinson Decl. ¶¶51-57; Page Decl. ¶¶3, 7-10. Members also recreate in the project area and fear that "the new visual, noise, traffic, and air pollution impacts from the construction of the pipeline and onshore and offshore terminals will harm my enjoyment of recreational activities like

22

walking and bird watching on the beaches that I frequent." Oldham Decl. ¶36; *see also* Oldham Decl. ¶33-37; Robinson Decl. ¶¶22-26; Page Decl. ¶¶6, 12-14.

These changes to the communities in GulfLink's project area will be exacerbated by the presence of two deepwater ports so close together: "[t]wo of these big ports will increase the industrial presence in Jones Creek. We'll have more trucks on Highway 36, and it might attract even more industry." AJ Jinkins Decl. ¶46. One member will find herself with SPOT's and GulfLink's "pipelines…on either side of [her] home" and is "concerned about the cumulative impacts and increased risk of disaster if … surrounded by pipeline[s]." Robinson Decl. ¶12. Members also worry about the impacts of GulfLink on the already burdened "environmental justice community" of Freeport, which is the closest shoreline to SPOT and GulfLink. Oldham Decl. ¶¶48-49.

Better Brazoria's injuries would be redressed by vacating MARAD's ROD to license GulfLink, which would eliminate the need for all connected portions of the project, onshore and off. *Save Our Cmty. v. EPA*, 971 F.2d 1155, 1161 (5th Cir. 1992). A second deepwater port in the same area of the Gulf would only aggravate the above injuries and is something Congress intended to prevent from occurring by enacting the DWPA.

Better Brazoria not only meets this first requirement of associational standing by having members with standing, but the second and third requirements as well.

23

Regarding the second criteria: "the association seeks to vindicate interests germane to its purpose"—Better Brazoria is an organization with an environmental mission. *Laidlaw*, 528 U.S. at 180-81; Oldham Decl. ¶¶9–17; Robinson Decl. ¶¶27–28. Members founded Better Brazoria "to educate Freeport residents about environmental issues and to advocate for solutions to protect and improve air and water quality." Oldham Decl. ¶14. Better Brazoria also satisfies the third criteria, that "neither the claim asserted nor the relief requested requires individual members' participation," because the Court's determination of whether MARAD's decision to license GulfLink violates applicable law does not require individual participation of Petitioner's members in the lawsuit to prove separate individualized damages. *Laidlaw*, 528 U.S. at 180-81 (citing *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also UAW v. Brock*, 477 U.S. 274, 287-88 (1986) (associational standing satisfied where statutory requirements do not require evaluation of "unique facts" personal to union members).

## II. MARAD violated the DWPA by permitting two offshore oil export terminals off the coast of Freeport.

The DWPA required MARAD to include offshore pipelines in the Application Area and to deny GulfLink's application. Under the Act, the "deepwater port" includes planned offshore "pipelines" and all other components seaward of the coastal high-water mark, not just GulfLink's and SPOT's offshore loading terminals. *See* 33 U.S.C. §§ 1502(9)(B), 1504(d)(2).

24

Moreover, we must assume that in designating an Application Area for SPOT, MARAD had already assessed that there was only a need for one deepwater port in this area as required by Section 1504(d). The Agencies later acknowledged that other "facilities that could meet the purpose and need of [GulfLink]."[74] Its revision of the Application Area to accommodate GulfLink violated this statutory directive.

Further, accommodating an offshore oil terminal applicant to build a port on top of, or directly adjacent to, an approved port flatly violates the statutorily-stated purposes of the DWPA. One port alone has large environmental impacts, but building two overlapping ports only multiplies those impacts. In assessing these applications, the DWPA requires an evaluation of the national interest, navigation and safety issues, oil spill risk and other environmental impacts, economic interests, and other considerations. 33 U.S.C. § 1501 (identifying the purposes of the DWPA); 33 U.S.C. § 1503(c)(1)-(9) (deepwater port approval criteria); 33 U.S.C. 1504(i)(3)(A-D) (national interest factors).

### A. MARAD's noticed Application Area for GulfLink did not comply with the statutory mandates of Section 1504(d) of the DWPA.

Under the procedures outlined in Section 1504(d) for any crude-oil deepwater port license application, MARAD must "publish a description in the Federal Register of the application area *encompassing the deepwater port site* proposed by such

---

[74] JA0617.

application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port in that application area." 33 U.S.C. § 1504(d)(1) (emphasis added). Thus, MARAD's mandate in publishing a notice of an Application Area is twofold. First, it must give notice of the Application Area encompassing the deepwater port (as defined by the statute) based on the application submitted by the applicant for the deepwater port. 33 U.S.C. § 1504(d)(1). Second, any designated Application Area must reflect a prescribed area for the construction and operation of the proposed deepwater port which would eliminate the need for any other deepwater port in that same area. 33 U.S.C. § 1504(d)(1). That need is to be assessed at the time the application was submitted. *Id.* In acknowledging that the offshore construction of GulfLink's pipelines will overlap with SPOT's subsea pipelines,[75] the Agencies must evaluate the need for a deepwater port in this area. However, they failed to consider it.[76]

> ### 1. *The DWPA instructs MARAD how to draw an Application Area for a crude oil deepwater port, but MARAD didn't follow the instructions.*

As to the first mandate, by definition, the deepwater port includes all of the features "used or intended for use as a port or terminal for the transportation, storage,

---

[75] JA0643.
[76] JA0617.

or further handling of oil or natural gas for transportation to or from any state." 33 U.S.C. § 1502(9)(A). The statute further expands that definition to "include[] all components and equipment, *including pipelines*, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark[.]" 33 U.S.C. § 1502(9)(B) (emphasis added). Thus, the statute provides plainly that the deepwater port includes its related offshore pipelines, not just the loading terminal.[77] *Id.* And the Application Area, at a minimum, must encircle these port features. 33 U.S.C. § 1504(d)(1).

Section 1504(d)(2) also instructs MARAD on how to draw the Application Area, including its maximum extent. It reiterates that the Application Area must be "any reasonable geographic area within which a *deepwater port* may be constructed and operated." 33 U.S.C. § 1504(d)(2) (emphasis added). Again, this includes all components of the deepwater port, *i.e.,* platform and the pipelines as defined in Section 1502(9)(B). 33 U.S.C. § 1504(d)(2). It then specifies that the Application Area "shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal state." 33 U.S.C. §

---

[77] Congress' use of "deepwater port" in the DWPA consistently includes the pipelines. *See, e.g.,* 33 U.S.C. § 1504(h)(3) (requiring licensee to pay rent for its right-of-way use of the seabed by the deepwater port"… including the pipeline segment of the port); *see also* 33 U.S.C. § 1520 (authorizing regulations on "Pipeline Safety and Operation"). By contrast, when Congress intended only to refer to the "principal point of loading and unloading at the port," to set the maximum radius for an Application Area, it used that language instead. 33 U.S.C § 1504(d)(2).

27

1504(d)(2). This distance is the maximum extent of the Application Area. But in any event, this circle with a defined radius must at least include all components of the deepwater port defined in 33 U.S.C. § 1502(9)(B).

Finally, as mentioned above, any Application Area must be drawn considering "the need" for any other deepwater port within that Application Area as of the time such application was submitted. 33 U.S.C. § 1504(d)(1). Thus, the statute contemplates that an Application Area—by definition—should be drawn with consideration so that there would not be the need for another deepwater port in the same Application Area. *Id.*

By design, the Act places "strict limits on the number of oil deepwater ports the Maritime Administrator can license, based on the concept of 'Application Area' and allowing only one facility within a very large geographic area."[78] The Court must read these words in Section 1504(d) in context and with a view to their place in the overall statutory scheme of the DWPA. *Texas v. EPA*, 137 F.4th 353, 366 (5th Cir. 2025); *see also Stanley v. City of Sanford*, 145 S.Ct. 2058, 2064 (2025) (specifying that a "pattern" of similar usage on the one hand, or a "fact that another part of a statute speaks differently" are important tools of statutory interpretation).

---

[78] JA0563 (expressing Agencies' view on application area in prior deepwater port's EIS, citing to 33 U.S.C. §1504(d)).

28

Historically, Application Areas for deepwater ports have been much larger than 3.5 nm and at or near the statutory-maximum radius. Reviewing previously-noticed Application Areas for licensed deepwater ports confirms, if there were any doubt, the plain text's requirement to encircle the offshore pipelines. *Loper Bright,* 603 U.S. at 386, 394 (explaining "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning"). Just two years after the passage of the DWPA, the Department of Transportation noticed LOOP's Application Area with a 14-mile radius:

> In accordance with Section 5(d) of the Act, the application area encompassing the LOOP Deepwater Port site is that area contained within a circle having a **14 nautical mile radius** centered at geographical coordinates at latitude 28° 52' N, longitude 90° 20' W and latitude 29° 11' N, longitude 89° 50' W.

41 Fed. Reg. 3768 (Jan. 26, 1976) (emphasis added). Figure 3 visualizes LOOP's Application Area:

### *Figure 3: LOOP Application Area Coordinates Around Its Platform*



The contemporaneously published notice for the proposed SEADOCK Port, to be located near Freeport, included a 21-mile radius follows:

> In accordance with Section 5(d) of the Act, the application area encompassing the SEADOCK Deepwater Port site is that area contained within a circle of **21 nautical mile radius** centered at latitude 28° 30.5' N and longitude 95° 16.8 W and south of a line drawn between latitude 29° 01' N, longitude 95° 00' W, less the area contained within shipping safety fairways and fairway anchorages.

41 Fed. Reg. 3769 (Jan. 26, 1976) (emphasis added).

*Figure 4: SEADOCK Application Area Coordinates Around Its Platform*

As shown in Figures 3 and 4 above, both the LOOP and SEADOCK notices provide examples of Application Areas compliant with 33 U.S.C. § 1504(d). Both include the entire deepwater port site with a circular radius, including their offshore pipelines reaching towards shore. Moreover, as shown in Figure 5 below, these two

30

contemporaneously-noticed projects did not occupy the same Application Area, and the need for each port was distinct because one would serve the coast of Louisiana and the other the Texas coast. *Id.*

**Figure 5: Relative Locations of SEADOCK (left orange)**
**and LOOP (right purple)**



The SEADOCK deepwater port, similarly situated to GulfLink and SPOT, was never built.

That practice of including all offshore components continued forty years later, after the oil export ban (1975-2015) lifted.[79] MARAD noticed SPOT's Application Area in March 2019 to include all offshore components, including the pipelines:

> MARAD has consulted with USCG in developing SPOT's application area and designates an application area encompassing the deepwater port that is a circle having a radius of ***no less than*** three-

---

[79] Continuing Appropriations Act of 2016, Pub. L. No. 114-113, 129 Stat. 2987 (amending 42 U.S.C. § 6212a(a)).

and-three-tenths **(3.30) nautical miles** centered at SPOT's proposed platform, latitude N 28°27′59.22″ and longitude W 95°07′ 24.49″, *and 0.25 nautical miles on either side of SPOT's proposed pipeline route between the terminal and the shore*. Any person interested in applying for the ownership, construction, and operation of a deepwater port within this designated application area must file with MARAD…a notice of intent to file an application for the construction and operation of a deepwater port not later than 60 days after the date of publication of this notice, and shall submit a completed application no later than 90 days after publication of this notice.[80]

SPOT's Application Area included a circle with a prescribed radius and the pipelines for the project as required by 33 U.S.C. § 1504(d).[81] By issuing this notice, MARAD determined there was a need for only one deepwater port in this defined Application Area.[82] 33 U.S.C. § 1504(d)(1).

Under the DWPA, other applicants seeking licenses within the same defined Application Area must submit their application within 90 days. 33 U.S.C. § 1504(d)(3). This notice triggered application filings for COLT's and GulfLink's deepwater ports.[83] GulfLink's decision to file in this statutory window is evidence it understood it would occupy the same Application Area.[84] Likewise, COLT's Application Area, similar to SPOT's, specified a radius of no less than 3.5 nm from its designated coordinates and included the offshore pipelines all the way to the

---

[80] JA0422 (emphasis added).
[81] JA0422.
[82] JA0422.
[83] JA0001.
[84] JA0001; JA0026-27.

shore."[85] Figure 1, *supra* at 9, shows the relative location of each these ports based on their noticed coordinates.

While MARAD's Application Areas for both SPOT and COLT properly encompassed all of the components required by Section (d) of the DWPA, including the offshore pipelines, MARAD changed its practice after GulfLink applied.

> **2.     GulfLink's Application Area omitted the offshore pipelines in the definition of "deepwater port."**

In contrast with its prior notices for SPOT and COLT issued just a few months before, MARAD's June 26, 2019 notice for the GulfLink Application Area failed to comply with either mandate of Section (d) because it excluded GulfLink's pipelines:

> MARAD…designates an application area encompassing the deepwater port that is a circle having a radius of no less than three and one-half (3.50) nautical miles centered at Texas GulfLink's proposed platform, latitude N 28°32′44″ and longitude W 95°01′21″.[86]

MARAD specified a minimum radius of "no less than 3.5 nautical miles" as opposed to a maximum radius anticipated by the statute.[87] Here, the designated Application Area did not include what must be included, i.e., the "deepwater port" as defined.

The failure to include GulfLink's offshore pipelines in the definition of Application Area violates the mandates of the DWPA as a matter of law. This Court

---

[85] Deepwater Port License App.: Texas COLT, 84 Fed. Reg. 7968, 7969 (Mar. 5, 2019); JA1416.
[86] JA0572.
[87] JA0572.

should vacate the ROD based on the unambiguous construction of Section 1504(d) which requires the Application Area to include the deepwater port as defined in the statute. That definition includes pipelines. 33 U.S.C. § 1502(9)(B). Yet, MARAD's notice of application for GulfLink admittedly did not.[88] In contradiction to congressional instruction, MARAD's designated Application Area for GulfLink is invalid, and MARAD failed to discharge its statutory obligation to create and enforce one when it purported to remove GulfLink's pipelines.

### 3. GulfLink's Application Area also failed to consider whether only one port was needed.

The publication of an Application Area for GulfLink provided in Section 1504(d)(1) also requires MARAD to make a determination that there is only one deepwater port needed in that designated area. 33 U.S.C. § 1504(d)(1). In enacting the DWPA, Congress did not intend that two projects within the same area would be approved or needed, and establishing the "need" for the project was a fundamental criterion that Congress included in determining the Application Area. *Id.* The Court reviews whether that MARAD satisfied this statutory requirement in designating the Application Area based on what MARAD said in the record.

In the notice, MARAD states that it has "reasonable discretion *under 1504(d)(2),* to establish a reasonable application area constituting the geographic

---

[88] JA0572.

area in which only one deepwater port may be constructed and operated."[89] Notably, the DWPA mandate to determine an "application area encompassing the deepwater port site . . . within which [its] construction . . . would eliminate . . . the need for any other deepwater port in that application area" is found in Section 1504(d)(1), not Section 1504(d)(2). 33 U.S.C. § 1504(d)(1).

MARAD never addressed the question of "need" for multiple deepwater ports off the coast of Freeport or the ROI. First, in its designation of the Application Areas for SPOT, COLT, and GulfLink, MARAD punted on this required analysis. It selected a radius for each of "*no less than*" 3$^+$ nm, failing to state an actual radius. 33 U.S.C. § 1504(d)(2) (requiring an Application Area no larger than "a circular zone" with a radius from the center of the [platform] to the high water mark of [Texas]). MARAD's use of "no less than" raises reasonable questions: (1) is the Application Area for GulfLink actually larger than 3$^+$ nm?; and (2) if so, what was the actual radius required to be specified by the statute for these projects for notice purposes so that other applicants would know where the determined "need" for a deepwater port ends? And finally, in designating these respective Application Areas, did MARAD do any of the statutorily-required analysis of the "need" for a deepwater port in this area, much less for three clustered deepwater ports with their intersecting offshore pipelines? Figure 1, *supra*, at 9; Figure 2, *supra*, at 11. There is no analysis

---

[89] JA0572 (emphasis added).

35

in the record of GulfLink's Application Area noticed in 2019.[90] GulfLink's Draft EIS admits there are "other facilities that could meet the purpose and need of [GulfLink] that would likely result in similar, greater, or lesser impacts."[91] Yet the Agencies did not consider them further.[92] Published five years later after an extensive environmental review process, the Final EIS for GulfLink never explains whether there is such a need for GulfLink and the already-licensed SPOT. Instead, the Agencies somewhat frankly acknowledge that "it is unknown whether any of these proposed deepwater port projects will be licensed and built."[93]

And MARAD mentions nothing in the RODs for SPOT or GulfLink about this mandatory determination in Section 1504(d)(1) despite the overwhelming public comment received regarding this concern over two deepwater ports operating in the same ROI. Instead, the Agencies reviewed each project separately, without considering whether there was even the "need" to build both and to concentrate all the environmental and safety risks on Brazoria County. For example, both projects planned to access the same crude oil in the Houston region. For both projects, the Agencies assume that each port, under separate review, will replace the same expected future reverse-lightering loading from the same onshore ports."[94] Indeed,

---

[90] JA0572.
[91] JA0617.
[92] JA0617.
[93] JA1441.
[94] JA1413-15; JA0496.

36

the primary reason GulfLink wanted to locate in the Freeport area is to access the same regional pipeline network and oil-storage hub as SPOT. GulfLink's Regional Screening Analysis "considered proximity to the Houston Market heavily because current crude oil export volumes are primarily driven by excess production of crude oil from west Texas, including Bryan Mound SPR and other existing pipeline corridors in the region."[95] SPOT also focused on crude oil sources located in the Permian Basin in west Texas and the Eagle Ford Basin in south Texas.[96] Similarly, GulfLink's Final EIS acted as if SPOT's approval did not exist, stating that in the absence of GulfLink, "the purpose of the Proposed Action to fully load VLCCs offshore ... when exporting domestic crude oil would not be satisfied."[97] This willful blindness is incorrect and logically inconsistent. Even if the Agencies could assume that a new deepwater port would simply substitute for expected, future reverse-lightering trips—which we dispute as described above— surely SPOT could achieve that result in whole or in a large part without the need for GulfLink. And to the extent GulfLink were simply to add additional export capacity and induce further new VLCC traffic in the region, it would pose greater environmental harms than envisioned.

---

[95] JA1413.
[96] JA0496.
[97] JA1412.

37

MARAD's failure to properly define the Application Area, punting on the "need" analysis, and then failing to determine which best served the national interest is how we ended up with two approved deepwater ports in the same ROI in contradiction to the DWPA.

> **B.    *As a matter of law under the DWPA, MARAD could only license one Deepwater Port in an Application Area, and MARAD has already licensed SPOT.***

Throughout the DWPA there are multiple, reinforcing statements for the statutory limitation that there can only be one deepwater port licensed in a single Application Area:

- The Application Area is broadly drawn as a circle with a maximum radius extended almost to the shore of the adjacent coastal state to include all the components of the deepwater port necessary for its construction and operation;

- Any Application Area must only have the need for one deepwater port;

- As defined components of the deepwater port site, the Application Area for two proposed deepwater ports should not overlap;

- If they do overlap, any evaluated and approved deepwater port must be the one that "best serves the national interest;" and

- MARAD must not consider any other application in the same Application Area until after that application has been denied.

33 U.S.C. §§ 1504(d), (i); *see also* 33 C.F.R. § 148.281(a) ("When more than one application is submitted for a deepwater port in the same application area under 33 U.S.C. § 1504(d), only one application shall be approved.").

MARAD's failure to consider SPOT and GulfLink through the application process as competing projects contradicted the above-stated mandate in Section 1504(i). Section 1504(i) contains a multi-part, policy-laden set of guidelines requiring MARAD to pick the one winning port that "clearly best serves the national interest" by considering specified criteria. 33 U.S.C. § 1504(i)(2), (3) (listing factors like relative impacts on the environment based on the required environmental review process under Section 1505, national security concerns, timelines, and oil prices for consumers). Congress even anticipated that if there was not a clear frontrunner after performing this analysis, then MARAD must issue the license according to a specific list of priorities. 33 U.S.C. § 1504(i)(2). Congress, however, did not give MARAD discretion to make an Application Area so tiny as to preclude this comparative competition described in the statute.[98] Had it done so, MARAD could draw an Application Area so small that it would *never* include more than one applicant.

Here, SPOT and GulfLink should have been compared and the "best" one selected using the four factors listed in 33 U.S.C. § 1504(i)(3)(A)-(D). However, MARAD's excluding GulfLink's pipeline from its Application Area had a

---

[98] *Contra* JA0572.

compounding effect: MARAD then reviewed the two ports independently without regard to their comparable merits and the environmental and related impacts of building two ports instead of one in the same part of the Gulf. 33 U.S.C. § 1504(i)(3)(A) (requiring MARAD to consider the degree to which the proposed ports affect the environment based on the factors in Section 1505). The projects are in such proximity that MARAD should have deliberately conducted a *competitive* environmental review process under the DWPA of the two ports operating simultaneously, including the increased risk of collisions and catastrophic oil spills; the effect on the marine environment; the effect on oceanographic currents and wave patterns; the effect on alternate uses of the oceans and navigable waters, such as scientific study, fishing, and exploitation of other living and nonliving resources; the potential dangers to a deepwater port from waves, winds, weather, and geological conditions, and the steps which can be taken to protect against or minimize such dangers; the effects of land-based developments related to deepwater port development; the effect on human health and welfare; and such other considerations as the Secretary deems necessary or appropriate. 33 U.S.C. § 1505(a). Since MARAD did not engage in this analysis between the projects, there is no assessment made that one proposed deepwater port will harm the environment or the ROI more (or less).

40

Engaging the remaining 1504(i) factors by weighing GulfLink's proposal against SPOT's would have also exposed deficiencies in GulfLink's plan. For example, if comparing which project could be completed first, GulfLink is over two years behind SPOT based on the date of issuance of its ROD and its current project timeline.[99] 33 U.S.C. § 1504(i)(3)(C). With respect to the applicant's financial capacity, GulfLink is "marginally capitalized" and dependent on a private-equity firm for funding, a fact that bears on its ability to construct, as well as its solvency in the case of a catastrophic oil spill, other large legal liabilities, and at decommissioning.[100] 33 U.S.C. §§ 1503(c)(1), 1504(i)(3). Moreover, GulfLink has yet to obtain or confirm agreements with the Department of Energy or ExxonMobil to access any crude oil to export,[101] among other factors. Moreover, MARAD provided no analysis of either facilities' costs of construction or operations or any projections on the relative cost of oil to consumers. 33 U.S.C. § 1504(i)(3)(D). MARAD's failure to perform this required analysis in an effort to avoid the mandatory selection process effectively eviscerates these requirements in the DWPA

---

[99] JA0326.

[100] JA0058-59; *contra* JA0370-71 (MARAD finding while SPOT is also marginally capitalized, it is owned, and its key obligations guaranteed, by a publicly-traded, "leading North American provider of midstream energy services" that already exports 2.1 million bpd of U.S. oil).

[101] JA0073; JA0004-05 (clarifying that ExxonMobil has only made a "non-binding expression of support" to "continuing the discussion" with GulfLink and the Strategic Petroleum Reserve); *contra* JA0368 (MARAD finding that SPOT's parent company already "owns or has access to several crude oil pipelines from multiple sources" to supply project).

in this case. Two oil terminals could never be placed in closer proximity than GulfLink and SPOT.

## III.  MARAD's Application Area change was arbitrary and capricious and will result in undesirable consequences inconsistent with the DWPA's criteria for deepwater ports.

A hallmark of administrative decision making is that an agency must give adequate reasons for its decisions. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). It follows that agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. *See, e.g., Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005) (acknowledging that an agency can take fresh analysis of a problem and provide adequate rational justification for its conclusions). When an agency changes its existing position, the agency must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis deleted). In explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515. "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16. It follows that an "[u]nexplained inconsistency" in agency

42

policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Brand X,* 545 U.S. at 981. An arbitrary and capricious regulation of this sort is itself unlawful. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

Despite the limitations imposed by the Act and the public's predictable and understandable objections to any approval of two deepwater ports in the same Application Area, MARAD's explanation for its changes to the Application Area for GulfLink and SPOT is two sentences long:

> Based on a review of the Deepwater Port Act and its legislative history, MARAD has determined that for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading. While MARAD had initially included pipelines within the application areas of recent projects, MARAD has determined that the areas, consistent with Congressional intent, can and should be limited to the circular zones surrounding the unloading and loading points.[102]

MARAD claims, without further support, that its about-face on how to draw an Application Area is supported by its review [of] the DWPA and its legislative history and "consistent with Congressional intent."[103] But that is not so. It makes no sense that MARAD could sidestep any further explanation by simply changing the Application Area *post hoc* to cleave two ports so close together that their pipelines cross. MARAD's action was arbitrary and capricious for several reasons.

---

[102] JA0572.
[103] JA0572.

### A. MARAD's explanation lacks justification in the record.

First, there's nothing further in the record to explain the basis for MARAD's statement. As even MARAD references, its previous Application Area determinations for oil export terminals did include the pipeline area, so its failure to provide further explanation is telling.[104] Further, MARAD evaded the comments from Better Brazoria and the other members of the public asking questions about the Application Area throughout the administrative proceedings for GulfLink.[105] In a response-to-comments chart, MARAD stated circularly that "the applications in question do not share the same application area."[106] MARAD promised it would address the question further in GulfLink's ROD.[107] But that was an empty promise. The ROD neglects to discuss the Application Area or the controversy surrounding it.[108] In effect, MARAD provided no justification for ignoring the overlapping pipelines and allowing two competing deepwater projects to be licensed just miles apart to service VLCCs.

---

[104] *See, e.g., JA0422.*

[105] *See* JA0040,  (MARAD noting this was one "primary category" of comments received); *see, e.g.,* JA0885-87; JA0733-34; JA0653-54; JA0685-96 (public comments on the issue).

[106] JA1494; JA1498.

[107] *See* JA01498 ("Considerations of DWPA licensing factors will be covered in the ROD.").

[108] GulfLink ROD, Record Excerpts, Tab 1, JA0014-96.

44

### B.    The legislative history does not support MARAD's narrowly drawn Application Area for GulfLink.

MARAD makes a bare reference to "legislative history" in the GulfLink notice.[109] The Court does not need to review legislative history where the text speaks plainly. As the Supreme Court "has emphasized many times, what Congress (possibly) expected matters much less than what it (certainly) enacted." *Stanley*, 145 S.Ct. at 2067. The text of the DWPA and the legislative history show Congress's desire to cast a wide net around the project—encompassing the entire "deepwater port"—in setting its Application Area. 33 U.S.C. § 1504(d)(1); S. Rep. No. 93-1217, at 36. Its intent was to "establish a comprehensive Federal licensing system for deepwater port development; therefore, components of a deepwater port, such as a pipeline segment, or pumping station, which may lie within the territorial seas, are included in the licensing process." S. Rep. No. 93-1217, at 36.

Additionally, the DWPA's drafters conceived the application-area and national-interest test to be central components of the law, putting specific procedures in the Act to direct the agency how to manage competing applications for platforms just miles apart and so close to one another that their pipelines overlap. *See* S. Rep. No. 93-1217, at 44. One reason was for efficiency. The drafters wished "to avoid piecemeal consideration" of projects in the same area by considering them

---

[109] JA0572.

45

"simultaneously." *See* S. Rep. No. 93-1217, at 44. In keeping with that goal, the Act's implementing regulations specify that review of the competing port applications in the same Application Area would be done in a single environmental impact statement or environmental assessment, unlike the two separate, parallel review processes MARAD used here. *See* 33 C.F.R. § 148.710(b). As Senator James L. Buckley explained, a "broad geographical area" is necessary for this process to work: "Section 5(d) creates a procedure that directs the Secretary to define an Application Area to enable the Secretary, the adjacent coastal states, and the public to weigh in on the merits of competing proposals covering a broad geographical area, such as the New England coast or Texas coast." S. Rep. No. 93-1217, at 96.

Another policy reason is Congress believed that it matters who owns a deepwater port. Each individual deepwater port could capture a massive share of the crude-oil midstream market due to the economies of scale in VLCCs, if not exercise monopoly control and engage in "anti-competitive abuses." *See* S. Rep. No. 93-1217, at 13, 19–23. Finally, Congress foresaw the serious national security and environmental risks from these ports and required the agency to judge the competing projects on that basis. *See* 33 U.S.C. § 1504(i)(2), (3). Indeed, the drafters "recognize[d] that environmental dangers inevitably trail after oil, wherever and however it is transported." S. Rep. No. 93-1217 at 12. And they worried that concentrating vast quantities of oil to serve any of these deepwater "superports" in

one area pose some of the same environmental risks that Better Brazoria and its members have raised here:

> The break-up of a 500,000-ton tanker in heavy seas a few miles off Florida or Texas or Delaware would likely produce damages of catastrophic proportions. Thus, the nation, in moving toward superports, appears to be trading fewer spills for the increased danger of a catastrophic one.

*See id.*; *see also* AJ Jinkins Decl. ¶¶33–37; L. Jinkins Decl. ¶26; Oldham Decl. ¶¶22, 24, 27–28, 33–35, 54; Page Decl. ¶¶11-18; Robinson Decl. ¶¶12–14, 23, 31, 40–41, 45, 48, 52–54, 67, 74, 78–79. Thus, Congress carefully established the wider licensing process in the Act, *despite* being aware it might be unpopular with some oil industry actors who would see efficiencies in clustering project proposals "where secondary petroleum development already exists," recognizing that in some of these coastal areas, "patterns of industrial development may have already taxed a coastal State's environment to its limits." S. Rep. No. 93-1217 at 11 (describing the reasoning for giving states veto power through the Governor's review). As Senator Buckley further explained, this procedure will allow "a true evaluation and ranking of various proposals on the basis of their economy and environmental impact." S. Rep. No. 93-1217, at 96. This comment corresponds directly with the adoption of Section 1504(i), which requires the Secretary to consider any competing applications within any Application Area on the basis of which will "best" serve the nation. 33 U.S.C. § 1504(i). MARAD's action to limit GulfLink's Application Area to avoid

any neighboring, competing ports is the complete opposite of Congress's intent, and the agency's reliance on "legislative history" is arbitrary and capricious.

### C. Past practice does not support MARAD's change to exclude the offshore pipelines.

MARAD's explanation for shrinking the Application Area here runs directly counter to the agency's past practice immediately after the DWPA's enactment. *See Barr,* 114 F.4th at 446; *Loper Bright,* 603 U.S. at 386, 394. Consulting historical records for prior applications dating back to the 1970s right after the DWPA took effect shows that the radii selected for proposed ports were *four to seven times larger* than those selected for SPOT and GulfLink. *See* Section II-A-1, *supra,* at 29-32. Again, Senator Buckley's comments describe how an "application area for a port 12 miles offshore would be a circle 24 miles in diameter." S. Rep. No. 93-1217, at 96. However, even he expressed concern that this boundary was too small, and would not prevent segmented review of an application for "a port 25 miles down the coast, designed to serve the same market." *Id.* The siting and relative designated radii of LOOP and SEADOCK, as proposed, are instructive of the Congressional vision that one facility might be licensed off the coast of Louisiana and a second DWP licensed off the coast of Texas, as shown in Figure 5, *supra,* at 31.

MARAD's June 26, 2019 change in policy was not only a change from how the Agencies had historically designated a deepwater port Application Area, but also how they initially set the Application Areas just months earlier in March 2019, when

48

noticing SPOT's application.[110] SPOT's original Application Area included its offshore pipeline.[111] COLT's Notice of Application did the same.[112]

In a contemporaneous March 2019 preapplication phone call, MARAD warned the company's representatives that there could be an "issue around pipeline crossings," according to notes taken by a GulfLink consultant.[113] Later, in GulfLink's April 2019 letter of intent to file a deepwater port license application, company CEO Jeff Ballard acknowledged his proposed port's "offshore pipeline technically crosses through the designated 'application area' for the pipeline portion of the COLT project."[114,115] It also crossed SPOT's pipelines.[116]

The Agencies cannot ignore the obvious disparity they have created now in noticing deepwater port projects as compared to the past. Figure 6, below, maps the revised, noticed 3.3- and 3.5-nm radii around SPOT and GulfLink and contrasts it with the original radii employed in the 1970s.

---

[110] JA0422.

[111] JA0422.

[112] Deepwater Port License App.: Texas COLT, 84 Fed. Reg. at 7969.

[113] JA0006.

[114] JA0001.

[115] While Mr. Ballard went on to urge MARAD to narrow the application area in precisely the way MARAD ultimately did, he acknowledged "[o]ut of an abundance of caution" that MARAD might find that "33 U.S.C. § [1504(d)] is deemed to apply." JA0001. Notably, the company also did not offer a legal argument for how it could avoid that inconvenient statutory conflict. *id.*

[116] JA1439; JA1442.

*Figure 6: SPOT's Licensed Location with 3.3-nm Radius (Green)
and GulfLink Location with 3.5-nm Radius (Yellow)
Compared to Radii of 14- and 21-nm around SPOT*



Given that their respective platforms are 7 nm apart,[117] this prescribed distance of 3.3 nm and 3.5 nm would appear to be the greatest distance the Agencies could specify for SPOT and GulfLink to avoid an overlap in their designated Application Areas. Instead, MARAD effectively defined the Application Area so narrowly that there never will be a competing port.

This evidence directly counters MARAD's conclusory justifications and reveals its inconsistency with past practice and legislative history. MARAD's

---

[117] JA1415.

change allowed two competing deepwater port applications in the same Application Area to move forward—not as competitive alternative applications—but as separate applications altogether.

> **D.     MARAD's designation of GulfLink's Application Area failed to consider important aspects of permitting deepwater ports contemplated by Congress.**

MARAD's failure to properly draw the Application Area was not just legal error, but it has serious real-world consequences from avoiding complying with Congress's express conditions and purposes in the DWPA. The immediate post-enactment, larger Application Areas for LOOP and SEADOCK far better fit the purposes of the DWPA than GulfLink's, including better enabling the agency to (1) the authorize and regulate deepwater ports' location, (2) protect the marine and coastal environment, (3) protect the United States' and adjacent coastal states' interests in siting deepwater ports, (4) permit States and communities to regulate growth, determine land use and otherwise protect the environment, and (5) promote deepwater ports while minimizing tanker traffic and the risks associated with that traffic. *See* 33 U.S.C. § 1501(a).

First, a larger radius would avoid proliferation of these projects in a single area, given their immense impacts both onshore and offshore on the local community. 33 U.S.C. § 1501(a)(2), (4). Immense local opposition surrounded the SPOT, COLT, and GulfLink deepwater port applications all proposed off the coast

of Brazoria County, Texas in 2019. The heavily-impacted Village of Jones Creek passed two resolutions: Resolution No. 07-2019A asking all relevant governmental agencies to deny GulfLink's application[118] and Resolution No. 07-2019B to deny COLT's application.[119] The Village also wrote to Governor Abbott opposing GulfLink and enclosing the Resolutions.[120] Jones Creek residents also submitted two petitions with signatures opposing the onshore GulfLink tank farm.[121]

GulfLink's combination of damaging and poorly-sited onshore and offshore components was understandably met with opposition. Speaker of the Texas House, Dennis Bonnen, opposed GulfLink because the project included plans to build a tank farm in a residential community.[122] And state Representative Cody Thane Vasut also amplified these concerns, highlighting that the residents of the Village of Jones Creek would be exposed to flooding and other hazards.[123] Port Freeport submitted two letters (in 2021 and again in 2024) expressing its concerns with GulfLink, including ship traffic, safety, oil spills, and the potential for detrimental adverse economic consequences if the port needed to be closed.[124] Port Freeport referenced GulfLink's own admission that an oil spill would have dire consequences on port

---

[118] JA0097-98.
[119] JA0099-100.
[120] JA1171.
[121] JA0578-0599; JA0101-0122.
[122] JA0577.
[123] JA0710.
[124] JA0717-19; JA0711-16.

operations and could potentially jeopardize the Port's $270 million dollar/day operations.[125]

Second, a larger radius avoids navigational concerns. 33 U.S.C. §§ 1501(a)(5); 1503(c)(4)–(5), 1509. In the GulfLink Final EIS, the Agencies repeatedly emphasized safety concerns with existing shipping lanes and potential impacts on local ports, like Port Freeport.[126] While the safety zone for GulfLink is yet to be established,[127] MARAD made no effort to address safety issues and collision risks/oil spills before licensing two oil ports to operate closely adjacent. On the key issue of navigational safety, licensing only one of the projects would have reduced ship traffic and other hazards that would now be concentrated and compounded by both projects operating with loading terminals only miles apart. In siloing its reviews and approving both projects, MARAD and USCG never conducted a consolidated analysis of the cumulative safety risks. Indeed, the GulfLink ROD's discussion of safety makes no mention of SPOT, and the same omission is true in SPOT's ROD.[128] Likewise, the offshore safety-risk scenarios MARAD and USCG evaluated in GulfLink's Final EIS only focused on risks from

---

[125] JA0712.
[126] JA1377; JA1385; JA1407.
[127] GulfLink ROD, Record Excerpts, Tab 1, JA0066-68; JA1385.
[128] GulfLink ROD, Record Excerpts, Tab 1, JA0064-68; JA0377-83 (SPOT ROD).

GulfLink and its ship traffic alone, failing to address the presence of SPOT and its nearby traffic.[129]

Third, MARAD's legal failure voided what environmental protection Congress offered to Brazoria County residents—already dealing with petrochemical plants and other export terminals, flooding, and air quality in "severe" nonattainment of federal limits—from concentrating the tremendous risks of *two* VLCC superports near their homes. A. Jinkins Decl. ¶¶6–51; L. Jinkins Decl. ¶¶6-31; Oldham Decl. ¶¶16–54; Page Decl. ¶¶ 7–20; Robinson Decl. ¶¶9–79. Without action to enforce the law, more than 3 million bpd of crude oil combined could pass through these ports, equivalent to about 75 percent of all crude oil the United States now exports in total.[130]

For all of these reasons, this change runs counter to the DWPA, the enacting regulations, congressional intent, and past practice, and MARAD did not provide a reasonable explanation for ignoring these mandates and concerns in altering the definition of Application Area. Accordingly, the Court should find the decision arbitrary and capricious.

---

[129] JA1422-23; JA1426-27; JA1481.
[130] JA0484; JA1387; GulfLink ROD, Record Excerpts, Tab 1, JA0063.

## IV.　Remand with Vacatur is the Proper Remedy.

The Court must vacate MARAD's ROD for GulfLink because it was unlawful after already approving SPOT's license for the same area. Vacating an invalid agency action is the APA's "default" remedy. *Tex. Corn,* 141 F.4th at 710; *see* 5 U.S.C. §§ 551(13), 706(2). Departing from that rule, to remand without vacatur, is meant to occur "only in rare cases satisfying two conditions." *Tex. Corn,* 141 F.4th at 710 (citation modified). First, the Court assesses the "seriousness of the deficiencies" to determine whether the agency could justify its decision on remand despite the legal error. *Texas v. United States,* 50 F.4th 498, 529 (5th Cir. 2022). Second, the Court reviews the disruptiveness of the consequences of vacating the underlying decision. *Id.*

First, MARAD's asserted authority to license GulfLink, after licensing SPOT,[131] rests on an error in interpreting the licensing statute. MARAD cannot justify the decision on remand. *Texas,* 50 F.4th at 529 (concluding that there was "no possibility that [the agency] could obviate the[] conflicts on remand" because the challenged decision had "severe" deficiencies and "fundamental substantive defects" that "contradict[ed] significant portions of the [enabling statute]").

Second, no amount of asserted disruptiveness will save this decision if the DWPA prohibits two licenses from being issued in the same Application Area. A

---

[131] SPOT License, Record Excerpts, Tab 2.

55

second license cannot issue. 33 U.S.C. § 1504(d); 33 C.F.R. § 148.281(a). Further, the ROD itself is not a license.[132] It does not authorize GulfLink to own, construct, or operate a deepwater port.[133] GulfLink still must comply with state and Federal permitting, mitigation, and related requirements outlined in the ROD before MARAD could issue a license be issued necessary to start construction of the proposed deepwater port.[134] Based on information and belief, GulfLink has not yet received several other permits and approvals necessary to construct, including lacking a Clean Water Act Section 404 permit for dredging and filling wetlands and waterbodies to build both onshore and offshore components of the project.[135] Thus, vacating the ROD at this stage will not cause serious disruption and will preserve order under the DWPA.

## CONCLUSION

Better Brazoria simply asks the Court to hold the agency to its obligation to license only one deepwater port, crude export terminal in their area. For the foregoing reasons, Petitioners request this Court vacate the Record of Decision to license the Texas GulfLink deepwater port and remand the case to the Agencies for further proceedings.

---

[132] GulfLink ROD, Record Excerpts, Tab 1, JA0024.
[133] GulfLink ROD, Record Excerpts, Tab 1, JA0024; JA0096.
[134] GulfLink ROD, Record Excerpts, Tab 1, JA0024; JA0096; JA0073-88 (outlining conditions GulfLink must meet).
[135] GulfLink ROD, Record Excerpts, Tab 1, JA0075.

56

Respectfully submitted,

*s/ Amy Catherine Dinn*
Amy Catherine Dinn, TX 24026801
Caroline Crow, TX 24118360
Lone Star Legal Aid
1415 Fannin
Houston, Texas 77002
T: (713) 652-0077, ext. 8108
adinn@lonestarlegal.org
ccrow@lonestarlegal.org

Mike Brown, TX 24118170
Bridgett McCoy, LA 41091
900 Camp Street, Unit 303
New Orleans, LA 70130
T: (504) 910-1735
mlbrown@earthjustice.org
bmccoy@earthjustice.org

*Counsel for Petitioner
Citizens for Clean Air and Water in
Brazoria County d/b/a Better Brazoria*

## CERTIFICATE OF SERVICE

I certify that on October 6, 2025, we previously electronically filed the foregoing Opening Brief of Petitioners with the Clerk of Court using the CM/ECF system. This updated version to incorporate Joint Appendix cites and non-substantive revisions is being filed on March 23, 2026 and served contemporaneously using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users, including the counsel for the Respondents and Intervenor Respondent.

*s/ Amy Catherine Dinn*

Amy Catherine Dinn, TX24026801

## CERTIFICATE OF COMPLIANCE

1. This revised Opening Brief to incorporate Joint Appendix cites complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1, this document contains 11,899 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Microsoft® Word for Microsoft 365 MSO (Version 2602 Build 16.0.19725.20126) 64-bit in 14 point font and Times New Roman.

*s/ Amy Catherine Dinn*
Amy Catherine Dinn, TX24026801