No. 25-60202

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY,
*Petitioner*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, SECRE-
TARY, U.S. DEPARTMENT OF TRANSPORTATION, in his official capacity as
Secretary of the U.S. Department of Transportation; UNITED STATES
MARITIME ADMINISTRATION, an agency of the U.S. Department of Trans-
portation; ADMINISTRATOR, in his official capacity as Administrator of
the U.S. Maritime Administration; UNITED STATES COAST GUARD, an
agency of the U.S. Department of Homeland Security; KEVIN E. LUNDAY,
in his official capacity as Commandant of the U.S. Coast Guard,
*Respondents*.

On Petition for Review of an Order of the Maritime Administration

### RESPONDENTS' ANSWERING BRIEF

| | |
|---|---|
| Of Counsel: | ADAM R.F. GUSTAFSON<br>*Principal Deputy Assistant Attorney* |
| GREGORY ZERZAN | *General* |
| *General Counsel* | ROBERT N. STANDER |
| CHARLES E. ENLOE | *Deputy Assistant Attorney General* |
| *Assistant General Counsel* | |
| PAULA LEE | REBECCA JAFFE |
| *Senior Trial Attorney* | EZEKIEL A. PETERSON |
| U.S. Dep't of Transportation | *Attorneys*<br>Environment & Natural Resources Div. |
| ELIZABETH O'CONNOR | U.S. Department of Justice |
| *Chief Counsel* | 999 18th St, North Terrace, Suite 600 |
| AINSLEY Q. PARRISH | Denver, CO 80202 |
| MICHAEL C. PUCCI | (202) 598-6399 |
| *Trial Attorneys* | ezekiel.a.peterson@usdoj.gov |
| Maritime Administration | |

## CERTIFICATE OF INTERESTED PERSONS

Under Circuit Rule 28.2.1, Respondents are governmental parties that need not furnish a certificate of interested persons.

/s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

i

## STATEMENT REGARDING ORAL ARGUMENT

Respondents believe that oral argument would be both appropriate and helpful to the Court in ensuring full consideration of the issues in the parties' briefs.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................... ii

TABLE OF AUTHORITIES ................................................................. v

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION .................................................... 2

STATEMENT OF THE ISSUES ......................................................... 3

PERTINENT STATUTES AND REGULATIONS ................................. 3

STATEMENT OF THE CASE ............................................................. 3

    A.    The Deepwater Port Act ................................................. 3

    B.    Factual and procedural background ........................................ 5

        1.    The proposed SPOT deepwater port ............................. 5

        2.    The proposed Texas GulfLink deepwater port and MARAD's environmental review ................... 6

        3.    Petitioner's challenge to SPOT and this Court's decision in *Citizens I* ........................................ 9

        4.    MARAD's decision approving Texas GulfLink's application ................................................. 10

SUMMARY OF ARGUMENT ........................................................... 13

STANDARD OF REVIEW ............................................................... 16

ARGUMENT ................................................................................... 17

I. The Deepwater Port Act does not require MARAD to include pipelines in the application area...................................... 17

    A. The statutory text does not require MARAD to include pipelines in the application area.............................. 18

    B. The Act leaves MARAD significant discretion in defining each individual port's application area. .................. 22

    C. The legislative history supports MARAD's statutory interpretation..................................................... 25

    D. Petitioner's arguments ignore MARAD's statutory discretion and fabricate a statutory requirement........................................................................... 27

II. MARAD's explanation as to how it set the application area for Texas GulfLink was not arbitrary and capricious............................................................................. 32

    A. MARAD offered a reasoned explanation as to how it set Texas GulfLink's application area.............................. 32

    B. MARAD reasonably responded to Petitioner's comments and addressed the relevant statutory factors in its Record of Decision............................................. 35

III. If this Court finds any error in MARAD's explanation, it should remand to the agency without vacatur. ......................... 39

CONCLUSION .................................................................................. 40

CERTIFICATE OF COMPLIANCE.................................................... 42

CERTIFICATE OF DIGITAL SUBMISSION ...................................... 43

CERTIFICATE OF SERVICE............................................................. 44

ADDENDUM.................................................................................... 1a

iv

# TABLE OF AUTHORITIES

## Cases

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
   715 F.2d 897 (5th Cir. 1983) ........................................................ 10, 16

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) .............................................................. 20

*Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dep't of Transp.,*
   98 F.4th 178 (5th Cir. 2024) ........................................... 3, 9, 10, 32, 37

*F.C.C. v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ...................................................................... 33, 34

*Gulf Restoration Network v. U.S. Dep't of Transp.,*
   452 F.3d 362 (5th Cir. 2006) .............................................................. 16

*Harris v. United States,*
   19 F.3d 1090 (5th Cir. 1994) .............................................................. 16

*Lackey v. Stinnie,*
   604 U.S. 192 (2025) ........................................................................... 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   591 U.S. 657 (2020) ...................................................................... 18, 19

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024) ............................................................... 17, 23, 34

*Louisiana v. Verity,*
   853 F.2d 322 (5th Cir. 1988) .............................................................. 16

*Matter of GFS Industries, L.L.C.,*
   99 F.4th 223 (5th Cir. 2024) ......................................................... 20, 21

*Michigan v. EPA,*
   576 U.S. 743 (2015).................................................................23

*Mohamad v. Palestinian Auth.,*
   566 U.S. 449 (2012).................................................................25

*RadLAX Gateway Hotel, L.L.C. v. Amalgamated Bank,*
   566 U.S. 639 (2012).................................................................21

*Russello v. United States,*
   464 U.S. 16 (1983)...................................................................21

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021).....................................................40

*Texas Brine Co., L.L.C. v. Am. Arbitration Ass'n, Inc.,*
   955 F.3d 482 (5th Cir. 2020).....................................................30

*Texas v. United States,*
   50 F.4th 498 (5th Cir. 2022) .....................................................40

*Vernon Smith, etc. v. School Bd. of Concordia Parish,*
   88 F.4th 588 (5th Cir. 2023) .....................................................31

## Statutes

5 U.S.C. § 706(2)(A) ...................................................................16

33 U.S.C. § 1501 ........................................................................30

33 U.S.C. § 1501(a)(5)...........................................................25, 37

33 U.S.C. § 1501(a)(6)................................................................25

33 U.S.C. § 1502(9) .....................................................................4

33 U.S.C. § 1502(9)(A) .............................................................4, 22

33 U.S.C. § 1502(9)(B) ...........................................................19, 22

33 U.S.C. § 1503(a) ............................................................................4

33 U.S.C. § 1503(b) ............................................................................4

33 U.S.C. § 1503(c) ........................................................ 10, 13, 36, 37

33 U.S.C. § 1503(c)(1)–(9) ...............................................................29

33 U.S.C. § 1504 .................................................................................4

33 U.S.C. § 1504(d) ................................................................ 4, 24, 30

33 U.S.C. § 1504(d)(1)..................................................... 1, 4, 21, 22, 28

33 U.S.C. § 1504(d)(2)....................................1, 5, 6, 18, 19, 20, 22, 23, 30

33 U.S.C. § 1504(d)(3).................................................................... 4, 6

33 U.S.C. § 1504(i)(2) .........................................................................5

33 U.S.C. § 1504(i)(3) .........................................................................5

33 U.S.C. § 1516 .................................................................................2

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...................................................................20, 30

S. Rep. 93-1217 (1974)................................................................26, 27

## INTRODUCTION

Deepwater ports are essential for importing and exporting liquefied natural gas and crude oil. To promote the construction and operation of these facilities, Congress passed the Deepwater Port Act of 1974. When an applicant seeks a license to construct a deepwater port, it must submit an application to the Maritime Administration (MARAD), part of the U.S. Department of Transportation. Upon receiving an application to construct a deepwater port, MARAD then sets an "application area," which is "any reasonable geographical area" within which the port may be constructed and operated. 33 U.S.C. § 1504(d)(2). The application area "shall not exceed" a circular zone centered on the principal point of loading and unloading at the port, which is located offshore, with a radius extending to the nearest shoreline. *Id.* The statute contemplates that there will only be one deepwater port within each application area. *Id.* § 1504(d)(1).

Intervenor Texas GulfLink applied to construct a deepwater port off the coast of Texas to export crude oil. When MARAD received this application, it set the application area as a circular zone around the proposed port with a 3.5 nautical mile radius. Petitioner argues that, in doing so, MARAD violated the Deepwater Port Act because the agency was required to include the port's underwater pipelines within the port's application area.

That argument is wrong. The plain text of the statute has no such requirement; rather, the statute contemplates that the application area

can be set as "any reasonable geographical area" and prescribes a maximum, but no minimum, area. In arguing that the statute requires more, Petitioner attempts to add a requirement to the statute that does not exist. MARAD complied with the Deepwater Port Act when it set the application area for Texas GulfLink, and the agency offered a reasoned explanation for why it set such an application area. This Court should deny the petition for review.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review the petition under the Deepwater Port Act, which provides that any person "adversely affected or aggrieved by the Secretary [of Transportation]'s decision to issue . . . a license [to construct and operate a deepwater port] may, not later than 60 days after any such decision is made, seek judicial review of such decision in the United States Court of Appeals for the circuit within which the nearest adjacent coastal State is located." 33 U.S.C. § 1516. Petitioner timely filed their petition for review within 60 days of the record of decision. The nearest adjacent coastal State to the proposed deepwater port is Texas, so this Court has jurisdiction to review the petition. MAR.0007611.

## STATEMENT OF THE ISSUES

1.    Whether the Deepwater Port Act requires MARAD to include undersea pipelines in setting a port's "application area," where the statute defines "application area" as "any reasonable geographical area within which a deepwater port may be constructed and operated."

2.    Whether MARAD's decision to set the application area for the Texas GulfLink deepwater port as a circular zone extending 3.5 nautical miles from Texas GulfLink's platform was arbitrary and capricious.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    The Deepwater Port Act

Congress passed the Deepwater Port Act to promote oil and natural gas production and to promote the construction of deepwater ports as a safe means of transporting oil and natural gas. *Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dep't of Transp.* (*Citizens I*), 98 F.4th 178, 188 (5th Cir. 2024) (citing 33 U.S.C. § 1501). A deepwater port is "any fixed or floating manmade structure . . . located beyond State seaward boundaries and . . . used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas."

3

33 U.S.C. § 1502(9)(A). The Deepwater Port Act generally defines "deepwater port," to include "all components and equipment," such as "pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark." *Id.* § 1502(9). Under the statute, no one may own, construct, or operate a deepwater port without a license from the Secretary of Transportation. *Id.* § 1503(a), (b).

MARAD is responsible for reviewing new applications to construct deepwater ports and does so under detailed procedures set forth in the Act. *Id.* § 1504. Relevant here, MARAD must designate an "application area" when a party applies to construct a deepwater port. *Id.* § 1504(d). The application area must "encompass[] the deepwater port site" and must be drawn in a way that "eliminate[s], at the time [the] application was submitted, the need for any other deepwater port within that application area." *Id.* § 1504(d)(1). Because the statute contemplates that there will be one deepwater port within each application area, it directs any other applicants interested in constructing a port within a given application area to submit a completed application within 90 days of the initial application. *Id.* § 1504(d)(3).

Unlike the statute's specific definition of "deepwater port," the statute defines "application area" much more generally: the application area is "any reasonable geographic area within which a deepwater port may be constructed and operated" that "shall not exceed a circular zone, the

4

center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal [s]tate." *Id.* § 1504(d)(2). So the statute prescribes a maximum application-area size with the language "shall not exceed," but it does not prescribe any minimum application-area size. *Id.*

When MARAD determines that two proposed ports share the same application area, § 1504(*i*) of the Deepwater Port Act provides procedures governing which port to license. *Id.* § 1504(*i*)(2). The Act explains that, if two applications are submitted within the same application area, MARAD must determine if one of the proposed ports "clearly best serves the national interest," considering environmental, economic, and national-security factors. *Id.* § 1504(*i*)(2)–(3).

### B. Factual and procedural background

#### 1. The proposed SPOT deepwater port

In January 2019, MARAD received an application for the construction of a different deepwater port called SPOT off the coast of Freeport, Texas. MAR.0063186. The SPOT deepwater port would export crude oil. MAR.0063186.

MARAD published a notice of application for the SPOT deepwater port license in the Federal Register in March 2019. MAR.0077022. In its

notice of application, MARAD defined SPOT's application area as "a circle having a radius of no less than three-and-three tenths (3.3) nautical miles centered at SPOT's proposed platform, . . . and 0.25 nautical miles on either side of SPOT's proposed pipeline route between the terminal and the shore." MAR.0073541. Pursuant to the Deepwater Port Act, MARAD also instructed any other persons wishing to construct a deepwater port in the same application area to apply within 90 days. MAR.0073541; *see* 33 U.S.C. § 1504(d)(3).

### 2. The proposed Texas GulfLink deepwater port and MARAD's environmental review

In May 2019, shortly after MARAD issued the notice of application with respect to SPOT, Texas GulfLink submitted its formal application to construct a deepwater port about seven nautical miles from SPOT. MAR.0145783, MAR.0092032. Texas GulfLink's proposed underwater pipeline would cross SPOT's proposed pipeline in one location. MAR.0145783.

MARAD published a notice of application with respect to Texas GulfLink in June 2019. MAR.0092032. In that notice, MARAD explained that, under 33 U.S.C. § 1504(d)(2), the agency "has the discretion to establish a reasonable application area constituting the geographic area in which only one deepwater port may be constructed and operated." MAR.0092032. Exercising that discretion, MARAD described how it had

consulted with the U.S. Coast Guard in setting Texas GulfLink's application area and designated the port's application area as "a circle having a radius of no less than three and one-half (3.5) nautical miles centered at Texas GulfLink's proposed platform." MAR.0092032.

MARAD acknowledged that this approach was a departure from its previous practice of including pipelines in the application area, and it explained why it made this change. MAR.0092033. The agency explained that it had reviewed the Deepwater Port Act and its legislative history and determined that, "for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading," not on pipelines. MAR.0092033. MARAD stated that it had "initially included pipelines within the application areas of recent projects," but had determined that the areas, "consistent with Congressional intent, can and should be limited to the circular zones surrounding the unloading and loading points." MAR.0092033. Consistent with this change, MARAD stated that it would also be adjusting the application areas for SPOT and for Texas COLT, a third proposed deepwater port in the vicinity. MAR.0092033.

To comply with its obligations under the National Environmental Policy Act (NEPA), MARAD conducted several rounds of separate environmental reviews for the proposed SPOT and Texas GulfLink deepwater ports. MAR.0063195–203 (SPOT procedural history); MAR.0007612–20 (Texas GulfLink procedural history). This review process culminated in

the publication of Final Environmental Impact Statements (EISs) addressing the environmental effects of each deepwater port. MAR.0076994–7883; MAR.0144903–5904.

The EISs for each port not only addressed the direct environmental effects from each port, but also analyzed the cumulative effects of both ports together. MAR.0077736–97 (SPOT cumulative impacts); MAR.0145769–825 (Texas GulfLink cumulative effects). The EIS for Texas GulfLink acknowledged that both that port and SPOT would be constructed in the same general area (with some overlap of pipelines) and noted that "[c]onstruction of these projects could occur simultaneously." MAR.0145788. But the EIS concluded that "the extent of the impact from each project would be limited, and it is unlikely the portion of the pipelines that intersect would be constructed at the same time." MAR.0145788, 803, 808.

The public was given the opportunity to submit comments on the EISs for Texas GulfLink. In its comments, Petitioner raised concerns about how MARAD defined Texas GulfLink's application area. MAR.0124161, 124166–67, 0012080–81, 0012343–49. In response to Petitioner's comments, MARAD explained that the designation of the application area is outside the scope of an EIS, which is only designed to analyze the environmental effects of the proposed port under NEPA. MAR.0148385. MARAD noted that, in any event, "the applications in question do not share the same application area." MAR.0148385.

MARAD also pointed to the significant analysis in the EIS about the "overlap of cumulative impacts with SPOT, including with respect to water resources." MAR.0152783.

### 3. Petitioner's challenge to SPOT and this Court's decision in *Citizens I*

In November 2022, MARAD issued a Record of Decision approving SPOT's license application. MAR.0063178–271. Shortly afterward, several petitioners, including the Petitioner in this case, filed a petition for review in this Court challenging the Decision under NEPA and the Deepwater Port Act. *See Citizens I*, 98 F.4th at 185–86. Among other things, Petitioner argued that MARAD failed to adequately consider the cumulative effects of SPOT and Texas GulfLink on regional air quality and that MARAD violated the Deepwater Port Act by failing to determine whether SPOT would be consistent with the nation's energy-sufficiency goals. *Id.* at 194, 197.

This Court denied the petition on all grounds. *Id.* at 198. It held that MARAD's approach to analyzing the cumulative effects of SPOT and Texas GulfLink was reasonable and that the record showed that MARAD "at least took a 'hard look' at the project's effects on air quality." *Id.* at 194. The Court also noted that the SPOT EIS addressed the cumulative impacts of SPOT on the Rice's whale and on other protected gulf species. *Id.* at 193 n.7.

With respect to Petitioner's Deepwater Port Act claims, this Court noted that, "[s]o long as [MARAD's] decision was rational and based on consideration of the relevant factors, it should be upheld." *Id.* at 197. Specifically, in reviewing MARAD's conclusions under the statute, the Court "must give due deference to the agency's ability to rely on its own developed expertise." *Id.* (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)). Ultimately, the Court held that, "[e]ven if [MARAD's] conclusions were brief, they were based on consultations with the agency's experts and a detailed review of the record," so the agency's determination was not arbitrary or capricious. *Id.* at 198.

### 4.    MARAD's decision approving Texas GulfLink's application

MARAD Decision approving Texas GulfLink's license application in February 2025. MAR.0007595. In that Decision, the agency addressed the nine statutory criteria that it is required to consider under 33 U.S.C. § 1503(c) when making a decision on whether to approve a deepwater port license application. MAR.0007635–71. These criteria include, among other things, determining: that the applicant is financially responsible; that the deepwater port is in the national interest; that the deepwater port will not unreasonably interfere with navigation or use of the high seas; and that the deepwater port will be constructed and operated so as to prevent or minimize adverse impacts on the marine environment. 33 U.S.C. § 1503(c).

10

MARAD found that all the required criteria were met. Relevant here, the agency determined that the construction and operation of Texas GulfLink was in the national interest for several reasons. MAR.0007642–43. MARAD determined that Texas GulfLink "is expected to reduce the likelihood and consequences" of collisions because the offshore location of the Port is expected to move vessel traffic away from more congested areas such as near-shore ports. MAR.0007642. MARAD determined that the port would enable loading of large ships at the deepwater port without the need for an inefficient process known as "reverse lightering," in which smaller ships load at an onshore port and then transport oil to a larger ship waiting offshore. MAR.0007642. MARAD determined that the port would create jobs in Texas. MAR.0007643. And MARAD determined that the port would not impact domestic oil prices but would allow for the export of crude oil from excess production capability, which could benefit U.S. allies subject to oil-supply disruptions. MAR.0007642. For all these reasons, MARAD concluded that "[t]he construction and operation of the Port is in the national interest because the Project will benefit employment, economic growth, and U.S. energy infrastructure resilience and security." MAR.0007671.

Separately, the agency also determined that Texas GulfLink would not interfere with navigation or reasonable use of the high seas. MAR.0007643–47. MARAD pointed to the fact that it would establish a zone around the port in which no external installations or structures

11

would be permitted. MAR.0007645. That zone could be supplemented with the establishment of other routing measures to help ships in the area avoid the deepwater port. MAR.0007645. The Decision laid out proposed "no-anchoring areas" and "areas to be avoided" and explained how MARAD would further consult with Texas GulfLink and the U.S. Coast Guard before port operations commence to confirm that the safety measures adequately address concerns. MAR.0007646–47.

The Decision also addressed how the operation and construction of the deepwater port would use the best available technology to minimize the effects on the marine environment. MAR.0007648–67. The Decision laid out the control technologies that the port would use to minimize environmental effects and explained that the proposal to construct the port had been modified in response to ongoing consultation with regulatory agencies to make the port more environmentally protective. MAR.0007648. To ensure that the port minimized effects on the environment, the Decision laid out 43 conditions with which Texas GulfLink must comply, including that the port must minimize and down-shield lighting to reduce disturbance to migratory birds; must continue to conduct public outreach to impacted communities in the project vicinity; and must implement extra measures to eliminate the vast majority of volatile organic compounds emitted from port facilities. MAR.0007658, 59, 65–66.

Having determined that Texas GulfLink met all the statutory criteria in 33 U.S.C. § 1503(c), including having received approval from the Governor of Texas, MARAD approved Texas GulfLink's application. MAR.0007674–75. Petitioner filed this petition for review challenging MARAD's Decision under the Deepwater Port Act.[1]

## SUMMARY OF ARGUMENT

1.     MARAD complied with the Deepwater Port Act. The Act, on its face, does not require the agency to use a particular methodology to set the application area for a deepwater port license application, and the text of the Act certainly does not require the agency to include pipelines within the application area. The Deepwater Port Act defines an application area as any reasonable geographical area within which a deepwater port may be constructed and operated and sets a maximum, but no minimum, size for an application area. The plain text of the Act allows MARAD to set a reasonable application area that does not include a deepwater port's offshore pipelines.

This reading is further supported by the significant discretion that the Deepwater Port Act vests in MARAD when determining the application area. Congress not only defined the application area in terms of a

---

[1] Petitioner also listed the U.S. Coast Guard as a respondent in this action, but no Coast Guard action is at issue here.

13

"reasonable geographic area" but also stated that it could be "*any* reasonable geographic area," which suggests that MARAD has the widest possible discretion when setting the application area.

The legislative history of the Deepwater Port Act also supports MARAD's decision to exclude underwater pipelines from the port's application area. The legislative history makes clear that the application area was meant to apply to limited areas and that deepwater ports that were meant to serve the same market were nonetheless supposed to be evaluated separately.

Petitioner's arguments otherwise ask this Court to read a requirement into the statute that is simply not there. Petitioner claims that MARAD failed to evaluate whether Texas GulfLink was "needed," in light of another nearby port. But Congress set specific criteria that MARAD must consider in evaluating a deepwater port license application; nowhere in these criteria is a requirement that MARAD determine whether a proposed deepwater port would serve the national interest better than a nearby deepwater port where the two ports do not overlap in application area. And, in any event, MARAD determined that Texas GulfLink was in the national interest. MARAD complied with the statute in setting Texas GulfLink's application area.

2.    MARAD also reasonably explained why it set the application area for Texas GulfLink and that explanation was not arbitrary and ca-

14

pricious. MARAD explained that, while it had previously included underwater pipelines in a deepwater port's application area, it had reviewed the Deepwater Port Act and the Act's legislative history and had determined that the best reading of the statute permitted the agency to exercise its discretion and exclude pipelines from a port's application area. After *Loper Bright*, when an agency bases a decision on what it considers the best reading of the statute, the only reviewable question is whether that statutory interpretation is correct. There is no arbitrary-and-capricious review of an agency's discussion of legislative history, Congressional intent, or statutory text.

In arguing that MARAD's explanation was inadequate, Petitioner claims that the agency failed to evaluate several factors that the Deepwater Port Act requires the agency to look at when licensing a deepwater port. But Petitioner misses the point—those are factors that the agency must consider when deciding whether to approve the license application, not factors that MARAD must consider when designating the application area. And the record here is clear that MARAD took a thorough look at all the relevant statutory factors, including whether the port would be in the national interest, whether the port would impair navigation and use of the high seas, and whether the port would be operated in such a way as to minimize effects on the marine environment.

15

MARAD complied with the Deepwater Port Act and offered a reasoned explanation for its decision. This Court should deny the petition for review.

## STANDARD OF REVIEW

This Court reviews agency action under the Deepwater Port Act under the deferential standard of the APA. *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006). Under that standard, the Court may hold unlawful and set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). The Court reviews the agency's decision "not as a chemist, biologist, or statistician . . . but as a reviewing court exercising [a] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Id.* (quoting *Avoyelles Sportsmen's League*, 715 F.2d at 905) "[I]f the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious." *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (quoting *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988)). An agency's decision should be upheld "so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Verity*, 853 F.2d at 327.

In resolving questions of statutory interpretation, "[c]ourts must exercise their independent judgment in deciding whether an agency has

16

acted within its statutory authority." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 400.

## ARGUMENT

Petitioner brings only one claim: that MARAD violated the Deepwater Port Act when it excluded Texas GulfLink's pipelines from the port's application area. But that claim fails for two reasons. First, the plain text of the Deepwater Port Act does not require MARAD to include pipelines in a port's application area. In fact, the statute gives MARAD significant latitude in defining a port's application area. And second, MARAD reasonably explained how it set the application area for Texas GulfLink. That explanation was not arbitrary and capricious. This Court should deny the petition for review.

## I.　The Deepwater Port Act does not require MARAD to include pipelines in the application area.

The plain text of the Deepwater Port Act does not require MARAD to include underwater pipelines when determining an application area for a deepwater port. Petitioner's argument reads additional text into the statute while glossing past the significant discretion that the statute offers MARAD when setting an application area.

17

### A.    The statutory text does not require MARAD to include pipelines in the application area.

When interpreting a statute, the Court begins with the text. *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025).

Start with § 1504's definition of the "application area." The statute states: "As used in this section [(§ 1504)], 'application area' means any reasonable geographical area within which a deepwater port may be constructed and operated." 33 U.S.C. § 1504(d)(2). The statute also sets a maximum limit on the geographic scope of the application area, explaining that the area "shall not exceed a circular zone" centered at the "principal point of loading and unloading at the port" the radius of which is the distance to the shore. *Id.* So the statute creates two requirements that MARAD must follow when setting an application area: (1) the application area must be any reasonable geographic area within which a deepwater port may be constructed and (2) the application area cannot exceed a circular zone, centered on the place of loading of the port, with a radius extending to the nearest shoreline. *Id.*

The statutory text does not require that the application area include a port's pipelines. Nor does the statutory text require MARAD to set an application area that is large enough to include pipelines. "It is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts." *Little Sisters of the Poor Saints*

18

*Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (cleaned up).

To be sure, the definition *allows* an application area to include a port's pipelines, because it gives MARAD significant discretion in setting "any reasonable geographic area" as within the statute's requirements. *Id.* But nothing in the textual definition of application area *compels* MARAD to designate an application area that is large enough to encompass pipelines.

Petitioner's argument centers on the fact that the overall statutory definition of a deepwater port includes pipelines, so, they argue, the application area necessarily must as well. Pet.'s Br. 38–39. Section 1502 defines "deepwater port" to include "all components and equipment, including pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark." 33 U.S.C. § 1502(9)(B). Petitioner's argument brushes past three indicia that the statute's definition of deepwater port was not meant to be incorporated into the definition of application area.

*First*, Congress defined application area separately from its definition of deepwater port, and it did so specifically for the purposes of § 1504. 33 U.S.C. § 1504(d)(2). The general definition of deepwater port is found in § 1502 (a definitions section) and applies generally to the Deepwater Port Act as a whole. But the more specific definition of the application

19

area is found in a particular provision of the deepwater port act and applies only to that section. *Id.* § 1504(d)(2). If Congress intended the application area to encompass the entirety of the "deepwater port," including undersea pipelines, then it could have easily relied on the prior definition of deepwater port rather than introducing a new defined term: "application area." *See Cargill v. Garland*, 57 F.4th 447, 461 (5th Cir. 2023) (en banc) ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)). Interpreting "application area" and "deepwater port" as coterminous would render the definition of application area superfluous.

The fact that Congress expressly provided that its definition of "application area" applies specifically to the section governing MARAD's procedures for considering applications to operate deepwater ports is further evidence that the application area is a separate and more specific concept than the statute's more general definition of deepwater port. *Cf. Matter of GFS Industries, L.L.C.*, 99 F.4th 223, 229 (5th Cir. 2024) (explaining that, to the extent there is tension between two sections of a statute, "the more specific provision should govern over the more general" (internal quotations omitted)). Here, the Court should read the specific definition of application area to refer to a different concept than the more general definition of deepwater port (found in the Act's definition section) so as

20

to negate any tension between the sections of the statute. *See id.;* *RadLAX Gateway Hotel, L.L.C. v. Amalgamated Bank,* 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.") (internal quotation omitted).

*Second*, Congress did not just use the term "deepwater port" when defining the application area. It used a different term: "deepwater port site." 33 U.S.C. § 1504(d)(1) ("[T]he Secretary shall publish a description in the Federal Register of an application area encompassing *the deepwater port site* proposed by such application . . . ." (emphasis added)). The use of the term "deepwater port site" rather than "deepwater port" suggests that Congress contemplated something different than the entirety of a port's outlying structures and pipelines when defining the application area. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). When the language stating that an application area must encompass a "deepwater port site" is coupled with the language from the same section defining application area by means of a maximum, rather than a minimum area, the best reading of the statutory language is that Congress meant to allow MARAD to set the application area as an area including less than all of the deepwater port's structures, as defined in § 1502.

21

*Third*, the language that Congress used to define the application area differs substantively from the language used to define a deepwater port. The definition of deepwater port is presented in structural terms. The text refers to "any fixed or floating manmade structure," "any group of such structures," including "all components and equipment." 33 U.S.C. § 1502(9)(A)–(B). In contrast, the definition of application area is defined in terms of spatial and geographic terms. The application area "encompass[es] the deepwater port site," it can be "any reasonable geographical area," and it is contemplated as a "circular zone" with a maximum radius centered around the "principal point of loading and unloading." *Id.* § 1504(d)(1)–(2). This difference in language confirms that the definition of application area is meant to accomplish a different purpose than the definition of deepwater port.

Fundamentally, the text of § 1504(d) allows MARAD to set an application area that does not include a port's offshore pipelines. In arguing otherwise, Petitioner attempts to incorporate a separate statutory definition that is not relevant to the definition of an application area.

### B.   The Act leaves MARAD significant discretion in defining each individual port's application area.

Not only does the definition of application area facially allow MARAD to set an area that does not include pipelines, the text of the statute also shows that Congress intended to give MARAD significant discretion when setting an application area. The Deepwater Port Act

22

states that an application area is "*any reasonable geographic area* within which a deepwater port may be constructed and operated." 33 U.S.C. § 1504(d)(2) (emphasis added). The fact that Congress not only defined the application area in terms of a "reasonable geographic area" but also stated that it was "*any* reasonable geographic area" suggests that Congress intended to provide MARAD with wide discretion when setting the application area.

To be sure, Courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and do not simply defer to an agency's interpretation of the statute. *Loper Bright*, 603 U.S. at 412. But *Loper Bright* itself recognized that "[a] statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. In illustrating this example, the Court pointed to examples of statutes that empower agencies to "regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Id.* at 395 (cleaned up) (citing *Michigan v. EPA*, 576 U.S. 743, 752 (2015)).

The Deepwater Port Act provides precisely such an example of discretion vested in an agency when the Act defines the scope of the application area. The Act does not define the application area as coterminous with the proposed deepwater port; it specifically grants MARAD significant discretion to define "any reasonable geographic area." 33 U.S.C.

23

§ 1504(d)(2). In defining Texas GulfLink's application area to be a circular area extending from the port's point of loading, MARAD exercised its discretion under the statute to set "any reasonable" application area. *See* MAR. 0092032–33. Simply put, the statute vests MARAD with the discretion to exclude pipelines from a proposed deepwater port's application area.

This interpretation of the statute makes sense. Under the Deepwater Port Act, only one port may generally be constructed in each application area. 33 U.S.C. § 1504(d). If MARAD were required by the statute to include each proposed port's offshore pipelines within the application area, it would have the effect of precluding the construction of any ports with overlapping pipelines. That would be both strange as a practical matter and would run counter to the purpose of the Deepwater Port Act. As a practical matter, underwater pipeline crossings are inconsequential. The area off the coast of Texas and Louisiana is home to a complex web of underwater pipelines and cables that cross each other in numerous places. *See National Pipeline Mapping System, Public Viewer*, https://pvnpms.phmsa.dot.gov/PublicViewer/ (map of federal waters in the Gulf showing numerous pipelines off the coast of Texas and Louisiana).

As for the purpose of the Deepwater Port Act, the statute was specifically written to "promote the construction and operation of deepwater

24

ports" and to "promote oil or natural gas production on the outer Continental Shelf by affording an economic and safe means of transportation" of oil and natural gas. 33 U.S.C. § 1501(a)(5)–(6). Reading the application area requirement to bar the construction of any deepwater ports with pipelines that overlap at all, even where these crossings would cause no environmental issues, runs counter to the statutory purpose of the Act.

At bottom, the Deepwater Port Act gives MARAD significant discretion in setting the application area for each proposed deepwater port and the text of the Act does not require MARAD to include underwater pipelines within that application area. MARAD complied with the Deepwater Port Act when it exercised that discretion here.

## C.  The legislative history supports MARAD's statutory interpretation.

Contrary to Petitioner's arguments, Pet.'s Br. 57–60, the Deepwater Port Act's legislative history supports MARAD's interpretation that an application area may exclude pipelines. This Court need not review the legislative history in determining whether the Deepwater Port Act allows MARAD to exclude offshore pipelines from the application area because the text of the statute is clear that the agency has discretion to do so. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous

language.") (cleaned up). Nonetheless, the Deepwater Port Act's legislative history supports MARAD's interpretation of the statute here. *See* MAR.0092033.

Two pieces of legislative history are particularly instructive. First, the Senate report's explanation of the application-area requirement suggests that Congress did not intend that an application area would necessarily include all the structures associated with a deepwater port. S. Rep. No. 93-1217 at 44. The report explained that "[i]n order to avoid piecemeal consideration of various proposed deepwater ports for *particular limited areas*, [the application-area process] requires the Secretary to consider simultaneously all applications for proposed deepwater ports in any particular application area." *Id.* (emphasis added). The term "particular limited areas" suggests that application areas could be quite limited in their geographic scope. Petitioner quotes this report, but omits the Senate's language that the application-area requirement applied to "particular limited areas." *See* Pet.'s Br. 58.

Second, Senator James Buckley's statement attached to the Senate report explained: "As conceived originally, an 'application area' would enable the Secretary, the adjacent coastal states, and the public to weigh the merits of competing proposals covering a broad geographic area, such as the New England coast or the Texas coast." S. Rep. No. 93-1217 at 96. But the Senator continued: "Subsequently, however, the Subcommittee

26

reduced the size of any application area to [the current statutory definition]. As a result, *an application for a port 25 miles down the coast, designed to serve the same market, would have to be evaluated separately.*" *Id.* (emphasis added). Senator Buckley's statement made clear that Congress wrote the Deepwater Port Act in such a way that two nearby deepwater ports could have separate application areas, even if those ports were designed to serve the same market.

Petitioner quotes only the first section of Senator Buckley's statement to support its argument that the application area must encompass a "broad geographical area." Pet.'s Br. 58. But, as explained above, the language that Petitioner quotes refers to a prior version of the bill "[a]s conceived originally." S. Rep. No. 93-1217 at 96. The fact that Congress originally contemplated that the application area would be broad but then changed the area to its current statutory definition further supports that MARAD has the discretion to set a smaller application area that excludes offshore pipelines.

### D.    Petitioner's arguments ignore MARAD's statutory discretion and fabricate a statutory requirement.

Petitioner devotes a significant portion of its brief to arguing that MARAD failed to determine that only one port was needed in Texas GulfLink's application area and that MARAD could not issue a license for Texas GulfLink because it had already issued a license for SPOT.

27

Pet.'s Br. 33–54 (ECF header pp. 46–54).[2] These arguments are wrong. Petitioner is both grafting a requirement to make a "need" determination onto the Deepwater Port Act that is not in the statute and is ignoring MARAD's discretion to set separate application areas for Texas GulfLink and SPOT.

Petitioner is correct that the Deepwater Port Act contemplates that MARAD will define the application area in a way so as to "eliminate . . . the need for any other deepwater port within that application area," and thus that there will generally be one port within each application area. 33 U.S.C. § 1504(d)(1). Section 1504(d)(1) thus instructs MARAD to draw the application area sufficiently small such that only one port is necessary in each area. In its notice of application for Texas GulfLink, MARAD made that determination. MAR.0092033. Petitioner does not argue that MARAD violated § 1504(d)(1)'s requirement to draw an application area that obviates the need for any other ports in the same area. Instead, Petitioner goes one step further: it argues that the Deepwater Port Act also requires MARAD to include analysis about whether Texas GulfLink was "needed" in light of a nearby port, SPOT. Pet.'s Br. 34–35 (ECF header pp. 46–47).

---

[2] There are two pages listed as page number 33 in Petitioner's brief. For the sake of clarity, for overlapping page numbers we cite both the page number and the ECF header pagination.

28

That requirement is simply not in the statute. After MARAD set nonoverlapping application areas for Texas GulfLink and SPOT (a decision that was reasonable, as discussed in Part II), there was no further statutory requirement to assess whether both ports were "needed" in the same broad geographic region. Rather, the Deepwater Port Act sets forth nine explicit conditions for issuance of a license to construct a deepwater port, including a showing of financial responsibility, a determination that the construction of the deepwater port will be in the national interest and consistent with national security, and a showing that the port will be operated using the best available technology so as to minimize adverse impacts on the marine environment. 33 U.S.C. § 1503(c)(1)–(9). Petitioner does not dispute that MARAD complied with its obligation to make these required findings under the licensing conditions in § 1503(c). Nowhere in these conditions is a requirement that MARAD determine whether a proposed deepwater port would serve the national interest better than a nearby deepwater port. *Cf.* Pet.'s Br. 50 (arguing that MARAD failed to determine which deepwater port best served the national interest).

Petitioner harps on the Act's procedure in § 1504(*i*) describing how MARAD should evaluate competing deepwater port applications for the same application area, Pet.'s Br. 51, but that provision does not apply here where the two ports do not share an application area. Petitioner argues that Congress "did not give MARAD discretion to make an Application Area so tiny as to preclude this comparative competition," Pet.'s Br.

29

51. But the statute *did* give MARAD discretion to designate a reasonably sized application area. As described above, the Deepwater Port Act vests MARAD with discretion in setting the application area, stating that the application area is "*any reasonable geographic area* within which a deepwater port may be constructed and operated." 33 U.S.C. § 1504(d)(2) (emphasis added). That is not an absurd result—the Deepwater Port Act is intended to promote the construction of ports and set the application area in terms of a maximum, not minimum, area. *See id.* §§ 1501, 1504(d); *see also Texas Brine Co., L.L.C. v. Am. Arbitration Ass'n, Inc.*, 955 F.3d 482, 486 (5th Cir. 2020) ("The absurdity bar is high, as it should be. The result must be preposterous, one that 'no reasonable person could intend.'") (quoting Scalia & Garner 237). It is certainly plausible—and more importantly, it is plain from the text of the statute—that Congress permitted MARAD to designate an application area of any size for any given deepwater port so long as that area was reasonable. MARAD did so here and thus was not required to evaluate the Texas GulfLink and SPOT applications as competing applications under § 1504(*i*).

In arguing that MARAD was required to determine whether Texas GulfLink was "needed," Petitioner largely points to statements that MARAD made in its final and draft EISs for the port. Pet.'s Br. 36–49 (ECF header pp. 48–49). But that confuses the issue. The EISs are designed to ensure MARAD's compliance with NEPA by analyzing the environmental effects of the deepwater port. They are not meant to address

the licensing conditions in the Deepwater Port Act, which is done in the ROD, where MARAD determined that Texas GulfLink was in the national interest. MAR.0007635–71. The statements in the EIS analyzed the environmental effects of Texas GulfLink (including cumulative effects) under NEPA and considered reasonable alternatives for the port under that statute, not the Deepwater Port Act. *See* MAR.0144933 (EIS prepared in accordance with NEPA).

Petitioner's brief is clear that it is raising only one claim: that MARAD improperly set the application area in violation of the Deepwater Port Act. *See, e.g.*, Pet.'s Br. 13, 17, 29. To the extent that Petitioner alludes to supposed deficiencies in the EIS or deficiencies in MARAD's analysis of Texas GulfLink's cumulative effects—i.e., claims alleging violations of NEPA—those claims are not presented here. Plaintiffs have therefore forfeited any arguments about the sufficiency of the EIS. *See Vernon Smith, etc. v. School Bd. of Concordia Parish*, 88 F.4th 588, 594 (5th Cir. 2023) ("A party forfeits an argument by failing to adequately brief the argument in its opening brief on appeal." (cleaned up)). And, as explained above, there is no requirement in the Deepwater Port Act that MARAD determine whether Texas GulfLink is "needed" alongside other nearby ports.

Petitioner's other argument is that MARAD was not permitted to approve Texas GulfLink's license application because it had already approved SPOT's license application in a nearby area. Pet.'s Br. 50–54.

31

Even assuming that the Deepwater Port Act prohibits MARAD from approving license applications for two ports within the same application area, that prohibition is not implicated here because Texas GulfLink and SPOT do not share one application area.

## II. MARAD's explanation as to how it set the application area for Texas GulfLink was not arbitrary and capricious.

Petitioner also argues that MARAD's explanation as to how it set the application area for Texas GulfLink was arbitrary and capricious, but that argument is not supported by the record. "So long as an agency's decision was rational and based on consideration of the relevant factors, it should be upheld." *Citizens I*, 98 F.4th at 197. Here, MARAD provided a reasonable explanation for how it defined Texas GulfLink's application area and why it excluded pipelines from Texas GulfLink's application area. At minimum, the agency's explanation was not arbitrary and capricious.

### A. MARAD offered a reasoned explanation as to how it set Texas GulfLink's application area.

Here, MARAD more than complied with its obligation to explain how it set Texas GulfLink's application area. The agency explained that it had consulted with the U.S. Coast Guard in developing the application area and designated the application area as a circle around the proposed Texas GulfLink platform with a radius of at least 3.5 nautical miles. MAR.0092032. In setting this application area, MARAD acknowledged

that it had previously included a port's offshore pipelines in the application area but explained why it was changing its methodology now. MAR.0092033.

When an agency changes its position, it need not show that the reasons for the new policy are better than the reasons from the old one; "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). To be sure, an agency must sometimes provide a more detailed explanation, such as when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* But generally, when changing policies an agency need not provide a more detailed justification than what would suffice for a new policy created on a blank slate. *Id.*

Here, MARAD explained that it had reviewed the Deepwater Port Act and its legislative history and had determined "that for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading." MAR.0092033. Thus, the agency found that "consistent with Congressional intent, [application areas] can and should be limited to the circular zones surrounding the unloading and loading points." MAR.0092033.

33

Insofar as Petitioner is arguing that MARAD's determination that application areas need not include underwater pipelines is arbitrary and capricious, including the agency's discussion of legislative history, that argument is misplaced. Questions of statutory interpretation are not subject to arbitrary-and-capricious review; rather, the correct interpretation of the statute is simply a question of statutory interpretation for the Court. *Loper Bright*, 603 U.S. at 398. As explained in Part I, the text of the Deepwater Port Act allows MARAD to exclude underwater pipelines from a port's application area. Because that is the correct interpretation of the statute, Petitioner's arbitrary-and-capricious claim fails. In any event, MARAD's determination more than satisfied the agency's obligation to justify its position. MARAD explained that it believed that the new application area was "permissible under the statute, that there are good reasons for it, and that [MARAD] *believes* it to be better." *Fox Television Stations*, 556 U.S. at 515 (emphasis in original).

In arguing otherwise, Petitioner gestures to possible "serious reliance interests" that MARAD should have taken into account in explaining its policy change. Pet.'s Br. 54–55 (quoting *Fox Television Stations*, 556 U.S. at 515). But, after *Loper Bright*, reliance interests can't override the best interpretation of the statute's text, which, as explained above, is that MARAD can set an application area to exclude pipelines. And in any event, Petitioner points to no such reliance interests, nor does it explain how MARAD's previous decision to include offshore pipelines in a port's

34

application area could have engendered serious reliance interests. The application area serves a narrow purpose under the statute; it does not define the scope of MARAD's environmental review or otherwise cabin the agency's authority to address environmental issues that could affect Petitioner. There were no serious reliance interests that MARAD had to address when changing its policy.

## B.    MARAD reasonably responded to Petitioner's comments and addressed the relevant statutory factors in its Record of Decision.

MARAD reasonably responded to Petitioner's comments on the EIS and addressed the relevant statutory factors in making its decision. *Cf.* Pet.'s Br. 56, 63–66. Petitioner's comments on the EIS raised concerns that GulfLink's proposed pipelines crossed SPOT's and thus that the project's application area should be considered to overlap SPOT's. MAR.0152779. But as MARAD noted in its response to these comments, the comments were not substantive feedback on the EIS, which analyzed the port's environmental effects under NEPA. MAR.0152779. MARAD noted that the application area issue was outside the scope of the EIS and referred back to the fact that, under the best reading of the statutory language, the projects did not share the same application area. MAR.0152779. To address Petitioner's substantive concerns, MARAD explained that the EIS "provides information regarding the overlap of cumulative effects with SPOT," including the overlapping pipelines.

35

MAR.0152783. Petitioner cannot now argue that the decision to set the application area was deficient by pointing to comments that it submitted concerning a completely separate part of the agency's decisionmaking process (one that they do not challenge here).[3]

To go along with its argument that MARAD failed to respond to comments, Petitioner also claims that MARAD failed to address factors Congress laid out in the Deepwater Port Act. Pet.'s Br. 63–66. But these are factors that MARAD must consider when making its ultimate decision on issuing a deepwater port license, not when it takes the preliminary step of designating an application area of the deepwater port itself. 33 U.S.C. § 1503(c). And, in any event, MARAD's Decision discussed all the relevant statutory factors at length.

Section 1503(c) lays out nine statutory criteria that MARAD must address when deciding whether to approve a license application to construct a deepwater port. MARAD's Decision devotes extensive discussion to each of these criteria, including explaining why the port was in the national interest, MAR.0007642–43, why the port would not interfere with navigation or reasonable use of the high seas, MAR.0007643–47,

---

[3] Petitioner also states that MARAD promised to discuss the application-area issue in its Decision and failed to do so. Pet.'s Br. 56. But that's wrong—the agency agreed to discuss the Deepwater Port Act's *licensing factors* in its ROD. MAR.0152783; *see* 33 U.S.C. § 1503(c) (the licensing factors, distinct from the application area). As explained below, MARAD did so.

and how the port would be operated and constructed with the best available technology so as to minimize any effect on the marine environment, MAR.0007648–67. Petitioner cannot credibly argue that any discussion of the relevant statutory criteria was missing from MARAD's decision. At the very minimum, the agency's decision was "rational and based on consideration of the relevant factors," even if it was less encyclopedic than Petitioner would have preferred. *Citizens I*, 98 F.4th at 197–98 ("Even if these conclusions were brief, they were based on consultations with the agency's experts and a detailed review of the record. Given that fact, we cannot say that the agency's determination here was an arbitrary or capricious one.").

Petitioner claims that MARAD failed to consider an important statutory factor because it failed to recognize that setting a larger application area would avoid the "proliferation" of deepwater ports. Pet.'s Br. 63. This argument is doubly wrong. First, the "proliferation" of deepwater ports is not a factor that MARAD was required to consider under the Deepwater Port Act. *See* 33 U.S.C. § 1503(c). And second, Congress was not concerned about the "proliferation" of deepwater ports when it passed the Deepwater Port Act. Just the opposite. Congress explicitly stated that the purpose of the Deepwater Port Act was "to promote the construction and operation of deepwater ports." *Id.* § 1501(a)(5). In arguing that Congress passed the Deepwater Port Act out of a concern for there being too many deepwater ports, Petitioner flips the statute on its head.

37

Second, Petitioner argues that MARAD failed to address navigational concerns that flowed from setting the application area that it did. Pet.'s Br. 65–66. This argument is belied by the Decision itself, which devotes extensive discussion to navigational concerns as one of the nine statutory criteria it considers and reaches a conclusion that the port would not interfere with navigation or reasonable use of the high seas. MAR.0007642–47, 71–72. MARAD noted that the offshore location of the Port is expected to move vessel traffic away from more congested navigation areas, such as near-shore ports, and will thus reduce the likelihood and consequences of collisions. MAR.0007642. And MARAD discussed, as Petitioner acknowledges, that the Coast Guard would establish a safety zone around the port along with "no anchoring areas" and "areas to be avoided." MAR.0007645–47. Petitioner thinks that MARAD should have reached a different conclusion about navigational hazards, but simply second-guessing the agency's reasoned conclusion is not sufficient to show that the agency failed to consider a statutory factor.

Finally, Petitioner raises concerns that MARAD violated the Deepwater Port Act by disregarding environmental concerns. Pet.'s Br. 66. This argument tosses aside the detailed discussion in the Decision about how the port would be constructed and operated so as to minimize environmental effects (not to mention the lengthy EIS, which Petitioner does not challenge here.). MAR.0007648–67. Simply put, MARAD addressed

38

environmental concerns at every step of the review process for the proposed Texas GulfLink port. Petitioner's suggestion that MARAD somehow voided statutory environmental protections has no force when the Decision is clear that the agency devoted significant consideration to such concerns. *See* MAR.0007648–67.

\*    \*    \*

Fundamentally, MARAD made a reasoned and permissible decision under the Deepwater Port Act when it defined Texas GulfLink's application area as a circular zone with a radius of 3.5 nautical miles from the port's point of loading and when it excluded pipelines from the application area. Petitioner would have preferred that MARAD made a different decision, but it has not shown that MARAD's decision was impermissible. The record shows that MARAD complied with the statute and made a rational decision based on consideration of the relevant factors in the Deepwater Port Act. This Court should deny the petition for review.

## III. If this Court finds any error in MARAD's explanation, it should remand to the agency without vacatur.

The Court should deny the petition. But if it does find any error in MARAD's explanation as to how it set the application area, it should remand to MARAD without vacating the underlying ROD.

"Two factors determine whether vacatur is warranted: (1) the seriousness of the deficiencies of the action, that is, how likely the agency

39

will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (cleaned up). "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).

To the extent this Court finds any error in MARAD's explanation as to how it set Texas GulfLink's application area, it should remand to the agency without vacating the underlying decision. There is "at least a serious possibility" that MARAD would be able to substantiate its decision with further analysis if it were given the opportunity to do so. *Id.*

## CONCLUSION

For these reasons, the Court should deny the petition for review.

Respectfully submitted,

Of Counsel: /s/ *Ezekiel A. Peterson*
ADAM R.F. GUSTAFSON
GREGORY ZERZAN *Principal Deputy Assistant Attorney*
*General Counsel* *General*
CHARLES E. ENLOE ROBERT N. STANDER
*Assistant General Counsel* *Deputy Assistant Attorney General*
PAULA LEE
*Senior Trial Attorney* REBECCA JAFFE
U.S. Dep't of Transportation EZEKIEL A. PETERSON
*Attorneys*
ELIZABETH O'CONNOR Environment & Natural Resources Div.
*Chief Counsel* U.S. Department of Justice
AINSLEY Q. PARRISH 999 18th St, North Terrace, Suite 600
MICHAEL C. PUCCI Denver, CO 80202
*Trial Attorneys* (202) 598-6399
Maritime Administration ezekiel.a.peterson@usdoj.gov

February 23, 2025
90-13-1-17913

41

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 9,083 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1.    all required privacy redactions have been made per 5th Cir. R. 25.2.13;

2.    the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and

3.    the document has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Antivirus, and according to the program is free of viruses.

/s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

## CERTIFICATE OF SERVICE

I certify that on February 23, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, which will notify all counsel of record.

/s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

# ADDENDUM

33 U.S.C. § 1501 ................................................................2a

33 U.S.C. § 1502 ................................................................3a

33 U.S.C. § 1503 ................................................................4a

33 U.S.C. § 1504 ................................................................6a

## 33 U.S.C. § 1501

*Congressional declaration of policy*

### (a)  Purposes

The purposes of this chapter are—

**(1)** to authorize and regulate the location, ownership, construction, and operation of deepwater ports in waters beyond the territorial limits of the United States;

**(2)** to provide for the protection of the marine and coastal environment to prevent or minimize any adverse impact which might occur as a consequence of the development of deepwater ports;

**(3)** to protect the interests of the United States and those of adjacent coastal States in the location, construction, and operation of deepwater ports;

**(4)** to protect the rights and responsibilities of States and communities to regulate growth, determine land use, and otherwise protect the environment in accordance with law;

**(5)** to promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States and transporting oil or natural gas from the outer Continental Shelf while minimizing tanker traffic and the risks associated with that traffic; and

**(6)** to promote oil or natural gas production on the outer Continental Shelf by affording an economic and safe means of transportation of outer Continental Shelf oil or natural gas to the United States mainland.

\* \* \*

2a

## 33 U.S.C. § 1502

*Definitions*

In this chapter:

* * *

**(9)  Deepwater port**

The term "deepwater port"—

**(A)** means any fixed or floating manmade structure other than a vessel, or any group of such structures, that are located beyond State seaward boundaries and that are used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas for transportation to or from any State, except as otherwise provided in section 1522 of this title, and for other uses not inconsistent with the purposes of this chapter, including transportation of oil or natural gas from the United States outer continental shelf;

**(B)** includes all components and equipment, including pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark;

* * *

3a

## 33 U.S.C. § 1503

*License for ownership, construction, and operation of deepwater port*

* * *

**(c)    conditions for issuance**

The Secretary may issue a license in accordance with the provisions of this chapter if—

**(1)** the Secretary determines that the applicant is financially responsible and will meet the requirements of section 2716 of this title;

**(2)** the Secretary determines that the applicant can and will comply with applicable laws, regulations, and license conditions;

**(3)** the Secretary determines that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality;

**(4)** the Secretary determines that the deepwater port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, as defined by treaty, convention, or customary international law;

**(5)** the Secretary determines, in accordance with the environmental review criteria established pursuant to section 1505 of this title, that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment;

**(6)** the Secretary has not been informed, within 45 days of the last public hearing on a proposed license for a designated application area, by the Administrator of the Environmental Protection Agency that the deepwater port will not conform with all applicable provisions of the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, or the Marine Protection, Research and Sanctuaries Act, as amended;

**(7)** the Secretary has consulted with the Secretary of the Army, the Secretary of State, and the Secretary of Defense, to determine their views on the adequacy of the application, and its effect on programs within their respective jurisdictions;

**(8)** the Governor of each adjacent coastal State approves, or is presumed to approve, the issuance of the license pursuant to section 1508(b)(1) of this title, if applicable; and

**(9)** the adjacent coastal State to which the deepwater port is to be directly connected by pipeline has developed, or is making, at the time the application is submitted, reasonable progress, as determined in accordance with section 1508(c) of this title, toward developing, an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972.

\* \* \*

## 33 U.S.C. § 1504

*Procedure*

\* \* \*

**(d)  Application area; publication in Federal Register; "application area" defined; submission of other applications; notice of intent and submission of completed applications; denial of pending application prior to consideration of other untimely applications**

**(1)** At the time notice of an application is published pursuant to subsection (c) of this section, the Secretary shall publish a description in the Federal Register of an application area encompassing the deepwater port site proposed by such application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port within that application area.

**(2)** As used in this section, "application area" means any reasonable geographical area within which a deepwater port may be constructed and operated. Such application area shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State.

**(3)** The Secretary shall accompany such publication with a call for submission of any other applications for licenses for the ownership, construction, and operation of a deepwater port within the designated application area. Persons intending to file applications for such license shall submit a notice of intent to file an application with the Secretary not later than 60 days after the publication of notice pursuant to subsection (c) of this section and shall submit the completed application no later than 90 days after publication of such notice. The Secretary shall publish notice of any such application received in

accordance with subsection (c) of this section. No application for a license for the ownership, construction, and operation of a deepwater port within the designated application area for which a notice of intent to file was received after such 60-day period, or which is received after such 90-day period has elapsed, shall be considered until the application pending with respect to such application area have been denied pursuant to this chapter.

* * *