**No. 25-60202**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S DEPARTMENT OF TRANSPORTATION; UNITED STATES MARITIME ADMINISTRATION, AN AGENCY OF THE U.S DEPARTMENT OF TRANSPORTATION; ADMINISTRATOR, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S MARITIME ADMINISTRATION; UNITED STATES COAST GUARD, AN AGENCY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN E. LUNDAY, IN HIS OFFICIAL CAPACITY AS COMMANDANT OF THE U.S. COAST GUARD,

*Respondents,*

TEXAS GULFLINK, LLC,
*Intervenor*

---

On Petition for Review from Maritime Administration

---

### BRIEF OF INTERVENOR TEXAS GULFLINK, LLC

---

**KEAN MILLER LLP**
TOD J. EVERAGE (#32445)
AMANDA HOWARD LOWE (#32507)
JEFFREY GELPI (#37130)
MATTHEW GAAR (#41253)
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Tel: 504.585.3050
tod.everage@keanmiller.com
amanda.lowe@keanmiller.com
jeff.gelpi@keanmiller.com
matthew.gaar@keanmiller.com

**Attorneys for Texas GulfLink, LLC**

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the Judges of this Court may evaluate possible disqualification or recusal.

1. **Petitioner:**
   a. Citizens for Clean Air & Water in Brazoria County d/b/a Better Brazoria
   b. Lone Start Legal Aid – Counsel for Petitioner

2. **Respondents:**
   a. U.S. Department of Transportation

   b. U.S. Secretary of Transportation, Sean Duffy

   c. U.S. Maritime Administration ("MARAD")

   d. MARAD Administrator

   e. U.S. Coast Guard

   f. Commandant of the U.S. Coast Guard, Kevin E. Lunday

   g. U.S. Department of Justice – Counsel for Respondents

3. **Intervenor:**
   a. Texas GulfLink, LLC, Intervenor
   b. Kean Miller LLP – Counsel for Intervenor
   c. Texas GulfLink Holdings, LLC – Interested Party in Intervenor
   d. Sentinel Midstream LLC – Interested Party in Intervenor
   e. Cresta Energy Fund I Carry, LP – Interested Party in Intervenor
   f. Cresta Energy Fund I, LP – Interested Party in Intervenor

*/s/ Tod J. Everage*
Attorney of Record for Texas GulfLink, LLC

ii

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to U.S. Fifth Circuit Local Rule 28.2.3, counsel for Intervenor respectfully requests oral argument in this matter, as it pertains to an issue of first impression in the Fifth Circuit and related to a federal law that is not often litigated—the Deepwater Port Act of 1974, 33 U.S.C. § 1501, *et seq*. While the issues are discrete, the implications of this case are considerable given the tremendous investment in Texas GulfLink and its endorsement by the United States government supporting U.S. energy policy and national interest. The Administrative Record was generated over 7 years of the application process and Intervenor believes that oral argument will assist the Court in understanding the context of that process and the challenged decisions made by the U.S. Maritime Administration, to which undersigned counsel was involved.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ...................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS .................................................................................... iv

TABLE OF AUTHORITIES ............................................................................. vi

INTRODUCTION ...............................................................................................1

STATEMENT OF THE ISSUES.........................................................................2

STATEMENT OF THE CASE.............................................................................2

    A.    Deepwater Port Act of 1974................................................................3

    B.    Deepwater Port Applications Spiked After Crude Export Ban Lifted. ................................................................................................4

    C.    Deepwater Port Act Application Process .............................................6

    E.    Texas GulfLink's Application Area......................................................9

    F.    Other Deepwater Port Application Areas ..........................................12

SUMMARY OF THE ARGUMENTS ...............................................................13

STANDARD OF REVIEW ...............................................................................15

ARGUMENT .....................................................................................................17

I.    Applicable Law.......................................................................................17

    A.    Statutory Interpretation .....................................................................17

    B.    MARAD was Delegated Discretionary Authority to Designate a Reasonable Application Area.............................................................19

    C.    Petitioner's Examples of Past Application Areas Do Not Support Its Own Position ...............................................................................22

    D.    Overlapping Pipelines Are Common Offshore. ................................25

    E.    The DWPA Does not Require MARAD to Perform a "Need" Based Analysis Prior to Designing the Application Area..................27

F.   The DWPA Envisions a Competitive Analysis for Multiple Proposed Projects Within the Same Application Area. ........................28

G.   Petitioner Should Have Challenged This Issue In SPOT's Judicial Review. ..............................................................................29

H.   Petitioner Unfairly Characterizes the Legislative Intent of the DWPA ..................................................................................................31

I.    Remand Over Vacatur ...............................................................32

CONCLUSION...................................................................................................33

CERTIFICATE OF SERVICE .........................................................................34

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .................................35

v

## TABLE OF AUTHORITIES

### Cases

*Asadi v. G.E. Energy (USA), LLC*, 720 F.3d 620, 622 (5th Cir. 2013) ……17, 18, 19

*BedRoc Ltd. v. U.S.*, 541 U.S. 176, 183 (2004) …………………………………17

*Boureslan v. Aramco*, 857 F.2d 1014, 1018 (5th Cir. 1988) ……………………….19

*Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dept. of Transp.*, 98 F.4th 178, 188 (5th Cir. 2024) …………………….3

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 129 S.Ct. 2343 (2009) …………………………………………………….......17

*Gulf Restoration Network v. DOT*, 452 F.3d 362, 368 (5th Cir. 2006)……………..17

*Kornman & Assocs., Inc. v. U.S.*, 527 F.3d 443, 451 (5th Cir. 2008) ……………...19

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) …………………15, 16

*Matter of DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019) ………………………………17

*Matter of GFS Industries, LLC*, 99 F.4th 223, 229 (5th Cir. 2024) ………………...25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) ……………………………………………..17

*Schaeffler v. U.S.*, 889 F.3d 238, 242 (5th Cir. 2018) ………………………………...19

*Texas v. EPA*, 137 F.4th 353, 365 (5th Cir. 2025) (*Texas I*) ………………16, 17, 18

*Texas v. EPA,* 156 F.4th 523, 536 (5th Cir. 2025) (*Texas II*) ………………………17

*Vitol, Inc. v. U.S.*, 30 F.4th 248, 253-54 (5th Cir. 2022) ……………………………...18

*U.S. v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) …………………………18, 19, 31

### Statutes

33 U.S.C. § 1501 ………………………………………………………… iii, 3

33 U.S.C. § 1501(a)(5) ……………………………………………………… 3

33 U.S.C. § 1502(9)(A) ……………………………………………………... 3

33 U.S.C. § 1502(9)(B)…………………………………………………….....21

33 U.S.C. § 1504(c)(1)(B) …………………………………………………... 7

33 U.S.C. § 1504(d) …………………………………………….2, 7, 19, 23, 30

33 U.S.C. § 1504(d)(1)…………………………………………………….9, 20

33 U.S.C. § 1504(d)(2)…………………………………………...9, 20, 21

33 U.S.C. § 1504(d)(3)……………………………………………...10, 30

33 U.S.C. § 1504(h)(3)…………………………………………………….22

33 U.S.C. § 1504(i)………………………………………………...28, 29, 30

33 U.S.C. § 1504(i)(2)……………………………………………………...9

33 U.S.C. § 1504(i)(3)…………………………………………………28

33 U.S.C. § 1508(a)(2) ……………………………………………………..7

33 U.S.C. § 1516………………………………………………………..15

33 U.S.C. § 1520……………………………………………………..26

42 U.S.C. § 6212a(a)…………………………………………………..4

## Regulations

33 C.F.R. § 148.3 …………………………………………………………..3

33 C.F.R. § 148.281(a)…………………………………………………10

49 C.F.R. § 1.93(h)…………………………………………………….3

## Other Authorities

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113,
129 Stat. 2987……………………………………….……………………..4

U.S. Fifth Circuit Local Rule 28.2.3……………………………………………iii

*Federal Register*, Vo. 60, No. 26, Wednesday, February 8, 1995
(FR 95-3039)…………………………………………………………………2

*Federal Register*, Vol. 62, No. 48, Wednesday, March 12, 1997 (62 FR 11382)….3

vii

*Federal Register*, Vol. 84, No. 43, Tuesday, March 5, 2019 (84 FR 7968)………10

*Federal Register*, Vol. 84, No. 123, Wednesday, June 26, 2019 (84 FR 30301)…24

*Federal Register*, Vol. 85, No. 214, Wednesday, November 4, 2020
(85 F.R. 70233)……………………………………………………………24

S. Rep. No. 93-1217……………………………………………………...28, 32

## <u>INTRODUCTION</u>

This case involves a petition for judicial review ("Petition") of the Record of Decision ("ROD") issued by the U.S. Maritime Administration ("MARAD") regarding the Deepwater Port Act of 1974 ("DWPA") license application filed by Texas GulfLink, LLC ("Texas GulfLink" or "Intervenor"). After a lengthy environmental review process under the National Environmental Policy Act ("NEPA"), MARAD issued its ROD approving Texas GulfLink on February 14, 2025. Petitioner herein participated in the public comment phases of the DWPA application process, along with other environmental groups, encouraging MARAD to deny Texas GulfLink's ROD and eventual license. Petitioner does not raise any objections to the NEPA process or conclusions reached by MARAD within the ROD. While this suit is brought by an environmental group, this is not an environmental suit. Rather, Petitioner challenges the issuance of the ROD on the basis of an authorized and discretionary decision made by MARAD concerning Texas GulfLink's "application area," announced within a public notice dated June 26, 2019. Texas GulfLink respectfully submits that MARAD's decision was compliant with the DWPA, and Petitioner's request for judicial review should be denied.

1

## STATEMENT OF THE ISSUES

1. Does MARAD have the discretionary authority to designate the "application area" for a deepwater port project less than the maximum size allowed under 33 U.S.C. § 1504(d)?

2. Whether MARAD's decision to set the application area for Texas GulfLink as a circular zone extending 3.5 nautical miles from its platform was arbitrary and capricious.

## STATEMENT OF THE CASE

Texas GulfLink is a proposed crude oil export terminal that will be constructed 26.6 miles off the coast of Freeport, Texas in the Gulf of America. The terminal will export domestically produced crude oil around the globe using Very Large Crude Carriers ("VLCC") which will be able to fully load in the deeper waters at Texas GulfLink's offshore terminal. No such terminal exists in the Western Gulf of America, and Texas GulfLink seeks to be the first. This infrastructure project will serve to further U.S. energy policy while also dramatically cutting down on the environmental impacts caused by current export methods. The U.S. Government has known about the benefits of deepwater ports for decades, though due to several commercial and regulatory barriers, very few have ever been constructed.[1]

---

[1] U.S. Dept. of Transportation, Notice of Proposed Rulemaking, Limit of Liability for Deepwater Ports, *Federal Register*, Vol. 60, No. 26, Wednesday, February 8, 1995 (FR 95-3039) ("Section 1004(d) of OPA 90 directs the Secretary to conduct a study of the relative operational and environmental risks posed by the marine transportation of oil to deepwater ports versus other ports.

2

### A.    DEEPWATER PORT ACT OF 1974

The DWPA was enacted in 1974 to promote oil and natural gas production and "to promote the construction and operation of deepwater ports as a safe and effective means of . . . transporting oil or natural gas . . .". 33 U.S.C. § 1501(a)(5); *see also Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dept. of Transp.*, 98 F.4th 178, 188 (5th Cir. 2024). The DWPA authorizes and regulates the location, ownership, construction, and operation of deepwater ports offshore. *See* 33 U.S.C. § 1501. Under the DWPA and its implementing regulations, MARAD is delegated the authority to manage the application process jointly with the U.S. Coast Guard. *See* 33 C.F.R. § 148.3.[2] No person may engage in the ownership, construction, or operation of a deepwater port without a license from MARAD. Projects licensed under the DWPA are not engaged in exploration or production, but are intended to serve as oil or gas import or export terminals. *See* 33 U.S.C. § 1502(9)(A). Since the enactment of the DWPA only thirty-one (31) applications

---

. . . The study concluded that crude oil deliveries via deepwater ports represent a lower risk to the environment than the other three delivery modes. This is principally because the delivery tankers remain far offshore, well away from most environmentally sensitive waters, and because the seafloor pipeline is relatively protected from the kinds of damage that cause large oil spills. Furthermore, the total quantity of oil in the deepwater port's pipeline system is less than the total amount that could be spilled from a single typical tank ship.").

[2] All references to the "Secretary" within the DWPA are to the Secretary of Transportation, who formally delegated the authority to manage the DWPA application process to MARAD and U.S. Coast Guard. "Organizations and Delegation of Powers and Duties: Delegation to the Commandant, United States Coast Guard and Administrator, Maritime Administration," *Federal Register*, Vo. 62, No. 48, Wednesday, March 12, 1997, pp. 11382-11383 (62 FR 11382); *see also* 49 C.F.R. § 1.93(h).

have been filed and of those only nine (9) have ever received a license; the last being

Texas GulfLink in January 2026.

### B. DEEPWATER PORT APPLICATIONS SPIKED AFTER CRUDE EXPORT BAN LIFTED.

In 2015, fueled by the excess crude oil production created by the shale boom, the prohibition on the export of domestic crude oil was lifted.[3] Shortly thereafter, the exports began. The most efficient method for shipping crude oil across oceans is with the largest crude carrier ships available—VLCC's. The problem with exporting crude via VLCC was the same as it was importing it. VLCC's require 70 feet or more of draft when fully loaded and there are no inshore ports in the United States that are dredged to such depths. When the VLCC's would arrive with a load of crude for import to the U.S., they would have to remain offshore in deep enough water and be unloaded by smaller tankers that could navigate into the ports. This unloading process is called "lightering," a process which continues today.

For exporting U.S. crude oil via VLCC's, the process is reversed. An empty VLCC can enter the port to partially load to a point, but then must move offshore to a sufficient depth of water to be loaded fully using smaller ships by "reverse lightering." The issue with lightering and reverse lightering is that they require these smaller tankers (which themselves are quite large) to make multiple trips between

---

[3] *See* Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, 129 Stat. 2987 (amending 42 U.S.C. § 6212a(a)).

the loading docks in port and the VLCC waiting offshore, increasing loading time and vessel traffic, which heightens safety risks and increases the GHG emissions from so many vessel trips. It is far more efficient to move the entire loading process offshore, directly to the VLCC. Louisiana Offshore Oil Port ("LOOP") is the only crude oil deepwater port in operation in the U.S. and is located off the coast of Louisiana. As of yet, no similar port currently exists to serve crude oil producers in Texas.

In July 2018, Texas Gulf Terminals, Inc. filed a DWPA application for a crude oil export terminal proposed for 12.7 nautical miles ("nm") off the coast of North Padre Island in Kleberg County, Texas.[4] Then in 2019, four more groups filed DWPA applications to try to secure sections of the market to export crude from Texas. On January 31, 2019, an Enterprise Products subsidiary filed an application for Sea Port Oil Terminal ("SPOT") planned 27.2-30.8 nm off the coast of Freeport, Texas.[5] On March 5, 2019, a joint venture between Oiltanking North America, LLC, Kinder Morgan Liquids Terminals, LLC, and Enbridge (U.S.), Inc. filed an application for Texas Crude Oil Loading Terminal ("COLT"), planned for 27.8 nm off the coast of Freeport, Texas.[6] On May 30, 2019, Texas GulfLink's application

---

[4] Texas Gulf Terminals, Inc. withdrew its application on February 28, 2020.

[5] SPOT received its DWPA conditional license on April, 8, 2024, but, based on its own recent public statements, has not satisfied the conditions necessary to begin construction, or commercialized its project.

[6] COLT withdrew its application on December 10, 2019. Enbridge then temporarily joined Enterprise on SPOT, but has since terminated its involvement.

was filed, also seeking to construct a terminal 26.6 nm off the coast of Freeport, Texas.[7] That same day, Phillips 66 filed an application for Bluewater Texas Terminals ("Bluewater") which was planned further south for 15 nm off the coast of San Patricio County, Texas.[8] A year later in September 2020, Energy Transfer sought a DWPA license to operate a terminal 99 miles south of Cameron Parish, Louisiana called Blue Marlin Offshore Port ("BMOP").[9]

The DWPA application process takes a tremendous amount of capital investment and time to plan, especially in the context of increasingly dynamic federal policymaking. Throughout this lengthy process, there is no guarantee that market forces or geopolitical assumptions will remain unchanged, putting the entire project at risk. Not surprisingly, of the thirty-one (31) DWPA applications ever filed with MARAD, only four (4) have ever been built. These factors are relevant to MARAD's considerations during the application processing.

## C. DEEPWATER PORT ACT APPLICATION PROCESS

The DPWA application process is expensive in both time and cost. While the DWPA contemplates that an application will be reviewed in 356 days, recent applications have taken anywhere from three (3) to six (6) years to receive a ROD,

---

[7] Texas GulfLink's conditional license was signed on January 29, 2026.
[8] Bluewater remains pending, but has not received its ROD.
[9] BMOP also remains pending, but has not received its ROD.

with the vast majority of that time being spent under NEPA review, involving many state and federal agencies and the public.

The first step after an applicant submits its DWPA application is for MARAD to review it for completeness. *See* 33 U.S.C. § 1504(c)(1)(B). Next, MARAD publishes a Notice of Application in the Federal Register ("Notice") advising the public that an application has been filed, that the application is sufficiently complete to begin review, and that the NEPA process will commence with the preparation of an Environmental Impact Statement ("EIS"). The Notice includes a short summary of the application as well as two other important pieces of information.

First, MARAD designates the adjacent coastal state in accordance with 33 U.S.C. § 1508(a)(2). Second, under Section 1504(d), MARAD is required to describe an "application area" for the deepwater port. After the publication of the Notice, MARAD and the U.S. Coast Guard work together with other governmental agencies, third party contractors, and the applicant to prepare an EIS as required by NEPA. Several versions of the EIS are published with the public having an opportunity to review and comment each time. Ultimately, the completion of the NEPA process and the review of the additional DWPA factors culminates in the preparation of the ROD, which advises the applicant if it can proceed to the licensing stage or not. The ROD includes a discussion on the NEPA review results and an

7

analysis of the nine (9) separate requirements under the DWPA.[10] A ROD announcing an approval contains conditions that must be satisfied at various intervals before the applicant can obtain a license and construct the deepwater port.

### D.  TEXAS GULFLINK'S DWPA APPLICATION PROCESS

Texas GulfLink's application generally followed this same process. To be sure, the review of Texas GulfLink's application was thorough, extensive, and lengthy. A process that was originally designed to take 356 calendar days ultimately took 2,087 days from application filing to ROD (5 years, 8 months, 2 weeks, 1 day). During that time frame, Texas GulfLink's application materials received over 80,000 public comments, predominantly made up of form petition signatures solicited by Petitioner and other environmental organizations. Needless to say, all aspects of Texas GulfLink's application and project were scrutinized and found to be compliant with the DWPA and the requirements of NEPA.[11] The Final EIS and ROD evidence an extensive and thoroughly considered record. Ultimately, MARAD concluded that "the construction and operation of [Texas GulfLink] is in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency, environmental quality, and energy security."[12]

_____

[10] *See, e.g.,* Texas GulfLink ROD (MARAD_AR_0007565-7675).

[11] *See id.* at p. 70 ("Moreover, the environmental impact analysis requirements of NEPA have been satisfied.") ("MARAD_AR_0007672"); *see also id.* at p. 73 ("MARAD also finds that the Texas GulfLink, LLC application to construct and operate a deepwater port 26.6 nautical miles offshore of Brazoria County, TX, meets the requirements of the DWPA.") (MARAD_AR_0007675).

[12] ROD at p. 73. (MARAD_AR_0007675).

8

### E.    TEXAS GULFLINK'S APPLICATION AREA

Relevant to this case is the definition and designation of the deepwater port "application area." Section 1504(d)(1) provides that the Notice published by MARAD in the Federal Register, must include a description of "an application area encompassing the deepwater port site proposed by such application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port within the application area." 33 U.S.C. § 1504(d)(1). Thus, at some point during the drafting of the Notice, MARAD must decide how large the application area should be. Section 1504(d)(2) guides MARAD in that effort.

"As used in this section, 'application area' means **any reasonable geographical area within which a deepwater port may be constructed and operated**." 33 U.S.C. § 1504(d)(2) (emphasis added). That Section further limits the application area to a size that "shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State." *Id.*

The purpose of designating an application area is to collect all potential projects within that defined geographic area and process them all at once, selecting the one that "clearly best serves the national interest." *See* 33 U.S.C. § 1504(i)(2);

9

33 C.F.R. § 148.281(a). To achieve that, the Notice advises all other interested parties who are planning a deepwater port within the designated application area that they have 90 days to file their own DWPA application or their projects will not be considered. *See* 33 U.S.C. § 1504(d)(3).

SPOT's Notice was published on March 4, 2019 and informed the public of SPOT's irregular application area that was originally a circular zone around SPOT's platform whose radius is 3.3 nm and a buffer of 0.25 nm on either side of the offshore pipeline.[13] COLT's Notice was published the next day on March 5, 2019 and contained the same language as SPOT's but expanded the radius of the circular zone to 3.5 nm.[14] These circular zones were much smaller than MARAD had historically designed them and this was the first time MARAD had designated the offshore supply pipelines specifically within the application areas. Even though SPOT and COLT were in proximity to one other, their application areas did not overlap.

Seeing this, Texas GulfLink—which had been under development already— knew that its proposed offshore terminal would fall outside of SPOT and COLT's application areas, but its proposed offshore pipeline would cross both SPOT and COLT's offshore pipelines and thus, their application areas. In the pre-filing

---

[13] SPOT Notice of Application (MARAD_AR_73539-73543).
[14] U.S. Dept. of Transportation, Notice of Application for Texas COLT, LLC, *Federal Register*, Vol. 84, No. 43, Tuesday, March 5, 2019 (84 FR 7968).

10

meetings and discussions with MARAD, the pipeline crossing issue was raised.[15] Pipeline crossings are routine and commonplace in the Gulf of America and because they are buried and monitored, they pose little to no relevant operational risk to the deepwater port itself. Out of an abundance of caution, Texas GulfLink filed its DWPA application on May 30, 2019, within the 90 days of SPOT's notice.

Relative to the application area, the Federal Register Notice for Texas GulfLink was published on June 25, 2019 and stated:

> In accordance with 33 U.S.C. 1504(d) MARAD is required to designate an application area for a deepwater port application intended to transport oil. Under section 1504(d)(2), MARAD has the discretion to establish a reasonable application area constituting the geographic area in which only one deepwater port may be constructed and operated. MARAD has consulted with USCG in developing Texas GulfLink's application area and designates an application area encompassing the deepwater port that is a circle having a radius of no less than three and one-half (3.50) nautical miles centered at Texas GulfLink's proposed platform . . . [16]

The Notice also included the following explanation of MARAD's decision to design the application area as well as its decisions to revise SPOT and COLT's irregularly shaped application areas, by removing the 0.25 nm buffer zones around the pipeline from the application areas.

> Based on a review of the Deepwater Port Act and its legislative history, MARAD has determined that for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading. While

---

[15] *See* MARAD_AR_0003090.

[16] Texas GulfLink Notice of Application (MARAD_AR_0092032).

MARAD had initially included pipelines within the application areas of recent projects, MARAD has determined that the areas, consistent with Congressional intent can and should be limited to the circular zones surrounding the unloading and loading points. MARAD will notify the applicants for [SPOT] and [COLT] projects that the applications areas for those projects will be adjusted accordingly."[17]

MARAD then designed Texas GulfLink's application area consistent with the amended application areas for SPOT and COLT. That decision resulted in SPOT, COLT, and Texas GulfLink having close, but not overlapping circular zones ranging from 3.3-3.5 nm in radius. Petitioner never objected to the size or design of SPOT's application area or the decision by MARAD to adjust it when it challenged SPOT's ROD in this Court. *See Citizens, infra*.

## F.    OTHER DEEPWATER PORT APPLICATION AREAS

Petitioner argues that Texas GulfLink's application area was unprecedented, but that is not true. If anything it was SPOT and COLT's original, irregularly shaped application areas that deviated from precedent; Texas GulfLink's appears to be consistent with MARAD's actions for SPOT and COLT's amended application areas.

---

[17] *Id.* (MARAD_AR_0092033).

| Deepwater Port | Application Area Size | Location |
|---|---|---|
| LOOP | Circular Zone – 14 mile radius | 18 miles offshore |
| SEADOCK | Circular Zone – 21 mile radius | 26 miles offshore |
| TGTI | Circular Zone – 12.7 mile radius | 12.7 miles offshore |
| SPOT | Circular Zone – 3.3 mile radius and 0.25 miles on either side of offshore pipeline; amended to remove pipeline from application area | 27.2-30.8 miles offshore |
| COLT | Circular Zone – 3.5 mile radius and 0.25 miles on either side of offshore pipeline; amended to remove pipeline from application area | 27.8 miles offshore |
| Texas GulfLink | Circular Zone – 3.5 mile radius | 26.6 miles offshore |
| Bluewater | Circular Zone – 3.46 mile radius | 15 miles offshore |
| Blue Marlin | Circular Zone – 3.30 mile radius | 99 miles offshore |

This history shows that only once has MARAD designated an application area where the circular zone's radius matched the distance between the platform and coast. In all other cases, applying the same provision under the DWPA, MARAD drew something less than the maximum allowed application areas.

## SUMMARY OF THE ARGUMENTS

The issue presented in this case is straightforward. What does the DWPA require from MARAD in terms of describing an application area for a deepwater port? Contrary to Petitioner's arguments, the statute clearly and unambiguously gives MARAD discretionary authority to describe and designate a deepwater port's application area within certain minimal restrictions. The "application area" must be a "reasonable geographic area" and it must not larger than having a radius that exceeds the distance between the platform and the high-water mark of the adjacent

13

coastal State. Texas GulfLink's proposed pipeline crosses over SPOT's proposed pipeline, however, the circular zones comprising the application areas of SPOT and Texas GulfLink do not overlap. Petitioner believes they should overlap, and but for MARAD's arbitrary and capricious decision they would overlap, so that those projects would have to compete for only one license. But, that argument should have been raised by Petitioner in SPOT's judicial review lawsuit because the drawing of an application area is done to flush out any future unfiled DWPA applications. Arguing that Texas GulfLink's application area should be bigger so that it would encompass a prior filed DWPA application would lead to absurd consequences and would be wholly inconsistent with the reading of the DWPA itself. Further, arguing that all application areas must include "at least" all of the offshore pipelines interprets the DWPA's definition of "application area" as having a minimum requirement when it clearly says the opposite. Regardless, MARAD's designation of Texas GulfLink's application area was not arbitrary and capricious.

Petitioner's brief discusses how the comparative analysis between Texas GulfLink and SPOT should have looked, but MARAD correctly concluded that analysis was not necessary. Because MARAD's decision to draw Texas GulfLink's application area as it did was reasonable and lawful, the Court need not concern itself with what the comparative analysis between SPOT and Texas GulfLink would have

14

looked like if they occupied the same application area. For these reasons, the Petition for Review should be denied.

## STANDARD OF REVIEW

Petitioner seeks to vacate Texas GulfLink's ROD pursuant to the DWPA, 33 U.S.C. § 1516. That Section allows "any person who suffered a legal wrong, or who was adversely affected or aggrieved by the Secretary's decision to issue, transfer, modify, renew, suspend, or revoke a license may, not later than 60 days after any such decision is made, seek judicial review of such decision in the United States Circuit Court of Appeals for the circuit within which the nearest adjacent coastal State is located." Petitioner has timely brought this judicial review. However, Petitioner's complaint does not concern the findings in the ROD. Rather, it concerns one decision made by MARAD in 2019 concerning its designation of Texas GulfLink's "application area," asserting its noncompliance with the plain language in the DWPA. Separately, Petitioner goes on to complain about MARAD's failure to perform an unnecessary competitive analysis of SPOT and Texas GulfLink together in the process of issuing Texas GulfLink's ROD, failing to mention that it never complained of these issues in its legal challenge to SPOT's ROD.

The first question presented involves one of statutory interpretation. Questions of statutory interpretation are not subject to the "arbitrary and capricious" standard on review; rather, since *Loper Bright*, the correct interpretation of the

15

statute is simply a question of statutory interpretation for the Court. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). In resolving questions of statutory interpretation, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.* at 412; *Texas v. EPA*, 137 F.4th 353, 365 (5th Cir. 2025) (*Texas I*). To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 400. Courts now apply *de novo* review to determine the meaning of statutory provisions, using all traditional tools of statutory construction. *Id.*

Second, if "the best reading of the statute is that it delegates discretionary authority to the agency," courts must "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Texas I*, 137 F.4th at 365 (citing *Loper Bright*, 603 U.S. at 395). When agencies operate within these delegated spheres, their actions are reviewed under the traditional arbitrary and capricious standard. An "agency's exercise of discretion is reviewed for whether it is 'arbitrary, capricious,' or 'an abuse of discretion,'" and such action is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

16

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Texas v. EPA,* 156 F.4th 523, 536 (5th Cir. 2025) (*Texas II*); *see also Gulf Restoration Network v. DOT*, 452 F.3d 362, 368 (5th Cir. 2006). "An arbitrary or capricious action is one that relies on improper factors, fails to consider key information, offers a decision that the record does not support, or lacks plausibility." *Citizens*, 98 F.4th at 190. This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

**ARGUMENT**

## I.   APPLICABLE LAW

### A.   STATUTORY INTERPRETATION

This case centers around statutory interpretation of the DWPA. When faced with an issue of statutory construction, the reviewing court's analysis "begins with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Texas I*, 137 F.4th at 365 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 129 S.Ct. 2343 (2009)). "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd. v. U.S.*, 541 U.S. 176, 183 (2004); *see also Matter of DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."). If the plain meaning of the statute is apparent from a simple

17

reading of the text itself, then the statute is unambiguous, and must be enforced as written. *Asadi v. G.E. Energy (USA), LLC*, 720 F.3d 620, 622 (5th Cir. 2013).

However, this presumption in favor of a plain language interpretation of statutory provisions is not meant to be a hard and fast rule; it does not apply where "(1) the statute provides another definition, or (2) when the ordinary meaning is incompatible with the statutory context." *Vitol, Inc. v. U.S.*, 30 F.4th 248, 253-54 (5th Cir. 2022). Depending on the provision at issue, "context" can mean "both the immediate clause and the broader context of the statute as a whole." *U.S. v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (quoting *Asadi*, 720 F.3d at 622). Statutory provisions were never meant to be read and interpreted in isolation. *Texas I*, 137 F.4th at 366 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The practice of examining individual statutory provisions, without considering the larger framework within which they are designed to operate, can result in a failure to capture the total breadth of legislative intent. Thus, where the plain meaning of a particular provision (when read in context) conflicts with the overall statutory scheme, it must be discarded in favor of a more harmonious interpretation. *See Vitol*, 30 F.4th at 253-55. If possible, courts interpret provisions of a statute in a manner that renders them compatible, not contradictory. *See Asadi,* 720 F.3d at 622. In sum, "[t]he plainness or ambiguity of statutory language is

18

determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.*

If a provision remains ambiguous even after (1) considering the plain language of the statute (2) in the context of the overall statutory scheme, and (3) after applying the interpretive canons of statutory construction, then and only then will the Court be permitted to look beyond the text of the statute itself to consider legislative history. *See Schaeffler v. U.S.*, 889 F.3d 238, 242 (5th Cir. 2018) ("Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history."); *Kornman & Assocs., Inc. v. U.S.*, 527 F.3d 443, 451 (5th Cir. 2008). In the U.S. Fifth Circuit, the use of legislative history as a tool of statutory interpretation is "generally discouraged." *Moore*, 71 F.4th at 395 (5th Cir. 2023) ("In very rare cases, we may look to legislative history."). "Legislative history is relegated to a secondary source behind the language of the statute in determining congressional intent; even in its secondary role legislative history must be used cautiously." *Id.* at 392, n.2 (*quoting Boureslan v. Aramco*, 857 F.2d 1014, 1018 (5th Cir. 1988)).

## B.     MARAD WAS DELEGATED DISCRETIONARY AUTHORITY TO DESIGNATE A REASONABLE APPLICATION AREA.

The provision in question is 33 U.S.C. § 1504(d) and the definition of the term "application area." That section orders MARAD to "publish a description in the

19

Federal Register of an <u>application area</u> encompassing the deepwater port site proposed by such application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port within that application area." 33 U.S.C. § 1504(d)(1) (emphasis added). The following section goes on to provide a spatial definition of "application area" as meaning "any reasonable geographical area within which a deepwater port may be constructed and operated." 33 U.S.C. § 1504(d)(2).

That section further qualifies the application area designation: "Such application area shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State." 33 U.S.C. § 1504(d)(2). "Application area" as a term has no plain meaning outside of the DWPA. For that reason, the DWPA provides a definition, and one that gives MARAD the discretionary authority to designate the size of that "application area" within the provided guideposts.

MARAD has handled many DWPA applications and for those projects has designed relatively consistent circular zones for their application areas. Motivated by a general opposition to deepwater ports, Petitioner attempts to characterize the DWPA as saying something it plainly does not say.

20

Ignoring all other words within the statutory definition of "application area," Petitioner focuses on the definition of "deepwater port" to support its argument. Particularly, Petitioner asserts that because "deepwater port" is defined to include the undefined term "pipelines", that the application area for Texas GulfLink had to include the entire offshore pipeline between Texas GulfLink's platform and the Texas coast. Petitioner argues that "this circle with a defined radius must <u>at least</u> include all components of the deepwater port defined in 33 U.S.C. 1502(9)(B)."[18] Petitioner claims that "MARAD announced that it was unprecedently narrowing the application area for [Texas] GulfLink to at least 3.5 nm and <u>omitting</u> its pipelines from consideration."[19]

In other words, Petitioner's argument is that the circular zone comprising the application area must "at least" be all the way to the coastline, because the offshore pipeline is at least that long. But to do so would give no meaning to the words "shall not exceed." Petitioner's reading converts a statutory ceiling into a mandatory floor. Section 1504(d)(2) establishes only a maximum radius and then delegates to MARAD the authority to designate any reasonable geographic area within that outer boundary. Had Congress intended to mandate a minimum radius extending to shore, it could have said so. It did not. Instead, it very clearly chose to create a <u>maximum</u>

---

[18] Pet. Brief at p. 28 (emphasis added).
[19] Pet. Brief at p. 3 (emphasis added).

21

size and then leave MARAD the discretion to contract the circle to any reasonable geographic area within which the deepwater port could be constructed and operated. Thus, MARAD's designation of Texas GulfLink's application area was lawful.

## C.    PETITIONER'S EXAMPLES OF PAST APPLICATION AREAS DO NOT SUPPORT ITS OWN POSITION

Petitioner obliquely argues that the application area must include the offshore supply pipeline associated with the deepwater port because the term "deepwater port" is defined to include "pipelines."[20] But Petitioner stops there. Petitioner does not discuss the subsea pipelines connecting the platform and the Single Point Mooring buoys ("SPM") which, are certainly contained within all descriptions of the application area for all projects.[21] Nor does Petitioner ever specifically say how much of the offshore supply pipeline must fall within the application area. In sections of Petitioner's brief it argues that the entire length of the offshore pipeline must be included and in other sections it appears to endorse other deepwater port application areas that do not contain the entire pipeline.

The inconsistency in Petitioner's arguments is highlighted in its references to other deepwater port application area designations and other sections of the DWPA.

---

[20] Petitioner also cites to Section 1504(h)(3) in support of its argument that "Congress' use of "deepwater port" in the DWPA consistently includes the pipelines." However, Section 1504(h)(3) not only mentions the deepwater port and the pipeline separately but mentions "the pipeline segment of *the port*" not "the deepwater port." Clearly, Congress would not have had to address the rental payments of the offshore pipeline separately from the "deepwater port" if the entirety of that pipeline was so clearly contained within the "deepwater port" definition for the purposes of Section 1504.

[21] Texas GulfLink's platform will be connected to its SPM's with a 1.6 nm subsea pipeline.

First, Petitioner cites supportively to the original application areas designated for SPOT and COLT, which not only included a circular zone of 3.3 nm and 3.5 nm respectively, but also 0.25 nm on either side of the proposed pipeline route between the terminal and the shore.[22] While Petitioner characterizes Texas GulfLink's application area as unprecedented, it says nothing of the irregular and unprecedented application areas initially designed for SPOT and COLT. Indeed, those application areas were a strong deviation from all prior designations which were only circular zones.

Petitioner also attacks Texas GulfLink's application area by citing favorably to the first two DWPA applications ever filed: LOOP and SEADOCK. Petitioner suggests that the larger circular zones for LOOP and SEADOCK "confirms, if there were any doubt, the plain text's requirement to encircle the offshore pipelines."[23] Petitioner argues that the application areas for LOOP and SEADOCK are examples of "application areas compliant with 33 U.S.C. § 1504(d)" because "both include the entire deepwater port site with a circular radius, including their offshore pipelines reaching towards shore."[24]

---

[22] As previously stated, MARAD later revised its application area designations for SPOT and COLT to remove the 0.25 nm on either side of the offshore pipeline. Petitioners never raised this argument in its Petition for Judicial Review against SPOT.

[23] Pet. Brief at 29.

[24] Pet. Brief at 30.

In each of those cases, MARAD did not treat the term "deepwater port" as requiring that the entire offshore pipeline be included within the application area. For LOOP, its application area "encompassing the deepwater port site is that area contained within a circle having 14 nautical mile radius" around the terminal.[25] The catch is that LOOP is located 18 nm offshore, leaving 4 nm of pipeline outside of its application area.[26] For SEADOCK, MARAD designated a 21 nm radius around the terminal even though SEADOCK was proposed to be located approximately 26 miles offshore.[27] Thus, LOOP and SEADOCK's application areas do not provide the support for Petitioner's argument that it claims. Rather, what LOOP and SEADOCK show is that MARAD read the DWPA as only providing a maximum size of the circular zone, and that MARAD had discretion to establish a smaller zone so long as it is reasonable.

In discussing MARAD's precedent with application areas, Petitioner fails to acknowledge the other proposed crude oil export terminals filed around SPOT, COLT, and Texas GulfLink whose application areas that were drawn similar to Texas GulfLink's. The Bluewater deepwater port was assigned a 3.46 nm radius circular zone around its SPM as its application area in its Notice published on June

---

[25] Pet. Brief at 29 (citing 41 Fed. Reg. 3768 (Jan. 26, 1976)).
[26] https://www.loopllc.com/resources/port-information
[27] Pet. Brief at 30 (citing 41 Fed. Reg. 3768 (Jan. 26, 1976)).

26, 2019.[28] BMOP was assigned a 3.30 nm radius circular zone around its platform as its application area in its Public Notice published on November 4, 2020.[29] Note that under Petitioner's interpretation, BMOP should have an application area that is a circular zone with a minimum radius of 99 miles! Taking Petitioner's illogical reading of the DWPA to an absurd conclusion, if a DWPA was proposed for 300 miles offshore, its application area would be a circular zone with a diameter of 600 miles and geographical area of 282,743 square miles, which is approximately one-third of the entire Gulf of America and length of the Gulf coast.

What is evident is that MARAD reviews each DWPA application independently and performs a reasoned evaluation under the DWPA to determine the designated application area. And that evaluation is guided by the statute itself. Section 1504(d)(2) clearly requires that the application area must be a "reasonable geographical area within which a deepwater port may be constructed and operated" and that it cannot be larger than a circular zone starting at the terminal and extending all the way to the high-water mark of the nearest adjacent coastal state. If MARAD followed those requirements then the application area is statutorily compliant and legally sound. MARAD did all of these things correctly here.

### D.    OVERLAPPING PIPELINES ARE COMMON OFFSHORE.

---

[28] Notice of Application, Deepwater Port License Application: Bluewater Texas Terminals, LLC, *Federal Register*, Vol. 84, No. 123, Wednesday, June 26, 2019, pp. 30301-30303 (84 F.R. 30301).
[29] Notice of Application, Deepwater Port License Application: Blue Marlin, LLC, *Federal Register*, Vol. 85, No. 214, Wednesday, November 4, 2020, pp. 70233-70235 (85 F.R. 70233).

Offshore siting of oil and gas infrastructure has always prioritized the platform, mainly because that is where the well is located. While crossing offshore pipelines should be minimized, it is not necessary to try to avoid all crossings, as doing so would deter or even prevent the development of deepwater ports in contravention of the stated intent behind the DWPA. A 2012 diagram from NOAA shows just how intertwined the offshore pipeline systems already were at that time.



Crossed pipelines offshore are extremely common, and also highly regulated by the Department of Interior. Section 1520 of the DWPA requires MARAD to work with the Department of Interior to establish and enforce standards and regulations that may be necessary to ensure the safe construction and operation of pipelines on the OCS. 33 U.S.C. § 1520. Thus, the DWPA contains a separate mechanism for ensuring the safety of pipelines, supporting their omission from the definition of "deepwater port" for the unrelated purpose of determining the "application area".

26

E.    **THE DWPA DOES NOT REQUIRE MARAD TO PERFORM A "NEED" BASED ANALYSIS PRIOR TO DESIGNING THE APPLICATION AREA.**

Petitioner argues that Section 1504(d)(1) requires MARAD to perform a "need" based analysis when determining the size and shape of the application area, but that is not the case. The statute states that within an application area the need for any other deepwater port would be eliminated; it does not say that MARAD must perform an analysis about whether more than one deepwater port is needed in its application area designation. Indeed, Petitioner has claimed that the application area must <u>at least</u> include the entirety of the offshore pipeline, which brings the application to its maximum allowable distance. What other analysis could MARAD do once it has the circular zone drawn to such a size?

What makes more sense is a reading wholly different form Petitioner's interpretation. The DWPA states that there will be only one deepwater port licensed within an application area and it instructs MARAD to tell the public what that application area is. That is so that they may efficiently process all options at the same time and select the best project to license. This is also consistent with legislative intent. According to the Joint Senate Report addressing the original DWPA: "Section 5(d) of the Act requires the Secretary to establish a geographic application area encompassing the site of a deepwater port as proposed in an application and to publish a description of the area, giving time for competing applications to be

27

filed."[30] To read the DWPA as requiring MARAD to first perform a "need" based analysis that will dictate the size of the application area is reading far too much into the plain language of the statute.

### F. THE DWPA ENVISIONS A COMPETITIVE ANALYSIS FOR MULTIPLE PROPOSED PROJECTS WITHIN THE SAME APPLICATION AREA.

The DWPA further provides both a priority hierarchy and a four-factor analysis for comparing multiple DWPA projects in the same application area. 33 U.S.C. § 1504(i). First, the DWPA license should go to the proposed project that "clearly best serves the national interest." To determine which port may best serve the national interest, MARAD shall consider: (1) the environmental impacts of the proposed project; (2) implications of national security; (3) anticipated completion dates; and (4) differences in construction and operational costs. 33 U.S.C. § 1504(i)(3). If after reviewing the competing DWPA applications no one project stands out, then 1504(i)(2) provides a hierarchy for approval: (1) first, to a project proposed by the adjacent coastal state or any governmental agency or political subdivision thereof; (2) second, to the project that is not proposed by an oil producer, refiner, or marketer, or any of their affiliates; and (3) to anyone else.

Petitioner argues that Texas GulfLink's ROD should be vacated because MARAD failed to perform the competitive analysis under Section 1504(i). Because Texas GulfLink and SPOT rightfully did not share an application area, Petitioner's

---

[30] S. Rep. No. 93-1217 at p. 2.

arguments regarding 1504(i) are moot. Alternatively, as described fully by Respondents, MARAD's evaluation of Texas GulfLink and SPOT together was thorough and approved by this Court in Petitioner's legal action challenging SPOT's ROD.

Moreover, the record reflects that Texas GulfLink is a worthy recipient of a positive ROD under the DWPA as well as its DWPA license. In addition to the thorough examination of Texas GulfLink's environmental impacts, its financial condition was thoroughly analyzed to MARAD's satisfaction.[31] Moreover, as was recently publicly announced, Texas GulfLink expects to receive an approximately $2 billion investment through an investment vehicle controlled by the U.S. Department of Commerce.[32] Texas GulfLink has also received its DWPA license and several other permits.

G.     **PETITIONER SHOULD HAVE CHALLENGED THIS ISSUE IN SPOT'S JUDICIAL REVIEW.**

Moreover, even if a competitive analysis should have been done, then that effort should have taken place in association with SPOT's application. Petitioner failed to address this issue in SPOT's case and at this point has waived any further complaints about alleged defects in SPOT's DWPA application processing.

---

[31] *See* Texas GulfLink ROD at p. 69 ("The Applicant has provided the necessary documentation, guarantees, and assurances to confirm it has or has access to the required financial capital to construct, operate, and decommission the Port." (MARAD_AR_0007671).

[32] *See* U.S. Department of Commerce Fact Sheet: U.S.-Japan Trade Deal: https://www.commerce.gov/news/fact-sheets/2026/02/fact-sheet-us-japan-trade-deal

Section 1504(d)(3) tasks MARAD with publishing a "call for submission of any other applications" within the application area, implying that MARAD is seeking all unfiled applications. That's what MARAD did in connection with SPOT, triggering Texas GulfLink's application. While their pipelines overlapped initially when SPOT's pipeline was included in its application area, MARAD revisited that decision and amended SPOT's application to remove the majority of the offshore pipeline from it. The consequence of that decision was that no comparative analysis was necessary under section 1504(i). Petitioner claims that MARAD's decision not to do that analysis was incorrect, but again, that complaint should have been lodged in SPOT's judicial review. Presumably, Petitioner believes SPOT's application area also should have been much larger, which would have encompassed Texas GulfLink if drawn according to its interpretation of section 1504(d), and then triggered the section 1504(i) analysis.

But because they failed to raise any of these issue in SPOT's judicial review, Petitioner attempts to improperly address it here. But, attacking MARAD's design of Texas GulfLink's application area because it doesn't encompass SPOT is backwards. The DWPA does not envision drawing an application area that could encompass another pending project that MARAD is already evaluating, it only requires that the application area encompass the *applicant's* deepwater port site.

30

When Texas GulfLink's deepwater port site did not appear within SPOT's application area, MARAD was free to process SPOT's application independently. Then, when no further projects were submitted after MARAD's "call for submission" related to Texas GulfLink's project, then it was free to process Texas GulfLink's application independently as well. MARAD's designated application area for Texas GulfLink was legal and reasonable.

### H.   PETITIONER UNFAIRLY CHARACTERIZES THE LEGISLATIVE INTENT OF THE DWPA

First, in the Fifth Circuit, the use of legislative history as a tool of statutory interpretation is "generally discouraged." *Moore*, 71 F.4th at 395 (5th Cir. 2023). Second, the primary source of legislative history raised by Petitioner is the 1974 Joint Senate Report on the DWPA. However, Petitioner quotes from the comments of one Senator who authored an addendum to the Joint Report to specifically raise his "exception[s] to some provisions of this bill" and argues those comments represent the Congressional intent for the DWPA. Senator Buckley's disagreements with the final language of the statute does not represent Congressional intention behind the bill. But, Senator Buckley's factual recitation of how the statutory application area was ultimately decided is not simply his opinion, but a discussion of actual legislative action. Specifically, Senator Buckley wrote that the originally conceived design for the "application area" allowed MARAD to review competing projects within a "broad geographical area, such as the New England coast or the

31

Texas coast."[33] However, in Subcommittee, the definition of "application area" was changed to reduce its size and a maximum size was inserted. The fact that Congress did not want to allow the application area to be designed too expansively and capped its size, while instructing MARAD to be reasonable, indicates that Congress delegated to MARAD the discretionary authority to manage the size of the circular zone. Thus, even the legislative history supports MARAD's reading of the statute.

## I.    REMAND OVER VACATUR

The Petition for Judicial Review should be denied. Not only were MARAD's actions lawful and compliant with the DWPA, but Petitioner's arguments lack merit. However, in the event this Honorable Court finds error in MARAD's designation of Texas GulfLink's application area, the ROD should be remanded to MARAD rather than vacated.

The disruptive consequence of vacatur is a severe one given the complained of action. Petitioner does not challenge the ROD for any violations of NEPA or other major deficiencies. They simply argue that a decision back in 2019 on how large to draw the circular zone around the platform was not adequately explained and was also unlawful. To unwind almost 7 years of application review over such a complaint would be a gross injustice. If the Court concludes that MARAD inadequately explained its reasoning for the application area size, then remanding the ROD back

---

[33] S. Rep. No. 93-1217 at p. 96.

to MARAD to supply that reasoning is the appropriate action. However, Texas GulfLink submits that MARAD's actions where not arbitrary or capricious and the Petition should be denied.

## CONCLUSION

MARAD's designation of Texas GulfLink's application area was legally sound and in compliance with the DWPA. The plain reading of the statute clearly authorizes MARAD to designate applications areas of a reasonable size. Because it did so for Texas GulfLink, the Petition for Judicial Review should be denied.

Respectfully submitted:

/s/ *Tod J. Everage*
**KEAN MILLER LLP**
TOD J. EVERAGE (#32445)
AMANDA HOWARD LOWE (#32507)
JEFFREY GELPI (#37130)
MATTHEW GAAR (#41253)
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Tel: 504.585.3050
tod.everage@keanmiller.com
amanda.lowe@keanmiller.com
jeff.gelpi@keanmiller.com
matthew.gaar@keanmiller.com

**Attorneys for Texas GulfLink, LLC**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this the 2nd day of March, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to those who are non-CM/ECF participants.

*/s/ Tod J. Everage*
TOD J. EVERAGE

34

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 8,568 words, excluding the parts of this brief exempted by FED. R. APP. P. 32(f).

2.      The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman, 14 point.

3.      The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in FED. R. APP. P. 32(a)(7), may result in the Court's striking the Brief and imposing sanctions against the person signing the Brief.

        This 2nd day of March, 2026.

                                */s/ Tod J. Everage*
                                TOD J. EVERAGE

                                **Attorney for Texas GulfLink, LLC**

35