Case No. 25-60202

# In the United States Court of Appeals For the Fifth Circuit

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S DEPARTMENT OF TRANSPORTATION; UNITED STATES MARITIME ADMINISTRATION, AN AGENCY OF THE U.S DEPARTMENT OF TRANSPORTATION; ADMINISTRATOR, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S MARITIME ADMINISTRATION; UNITED STATES COAST GUARD, AN AGENCY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN E. LUNDAY, IN HIS OFFICIAL CAPACITY AS COMMANDANT OF THE U.S. COAST GUARD,

*Respondents,*

TEXAS GULFLINK, LLC,

*Intervenor*

On Petition for Review from Maritime Administration

## INTERVENOR'S PETITION FOR REHEARING *EN BANC*

W. Scott Hastings
Texas Bar No. 24002241
scott.hastings@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Ste. 2800
Dallas, Texas 75201
Tel.: (214) 740-8000
Fax: (214) 740-8800

Tod J. Everage (#32445)
tod.everage@keanmiller.com
Amanda Howard Lowe (#32507)
amanda.lowe@keanmiller.com
Jeffrey Gelpi (#37130)
jeff.gelpi@keanmiller.com)
**KEAN MILLER LLP**
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Tel: 504.585.3050
**Attorneys for Texas GulfLink, LLC**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

1. **Petitioner:**
   a. Citizens for Clean Air & Water in Brazoria County d/b/a Better Brazoria ("Brazoria")
   b. Lone Start Legal Aid – Counsel for Petitioner
2. **Respondents:**
   a. U.S. Department of Transportation
   b. U.S. Secretary of Transportation, Sean Duffy
   c. U.S. Maritime Administration ("MARAD")
   d. MARAD Administrator
   e. U.S. Coast Guard
   f. Commandant of the U.S. Coast Guard, Kevin E. Lunday
   g. U.S. Department of Justice – Counsel for Respondents
3. **Intervenor:**
   a. Texas GulfLink, LLC ("TGL")
   b. Kean Miller LLP – Counsel for Intervenor
   c. Troutman Pepper Locke LLP – Counsel for Intervenor
   d. Texas GulfLink Holdings, LLC – Interested Party in Intervenor
   e. Sentinel Midstream LLC – Interested Party in Intervenor
   f. Cresta Energy Fund I Carry, LP – Interested Party in Intervenor
   g. Cresta Energy Fund I, LP – Interested Party in Intervenor
   h. Texas GulfLink Operating Company, LLC – Interested Party

*/s/ W. Scott Hastings*
*Counsel for Intervenor*

## RULE 40 STATEMENT REGARDING *EN BANC* REVIEW

This Petition presents an issue of exceptional importance in this Circuit regarding the Deepwater Port Act ("DWPA"), which "promote[s] the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States." 33 U.S.C. §1501(a)(5). Most deepwater ports are (and will be) located off the coast of Louisiana and Texas. *See* Op. at 5-6.

When the MARAD, an agency of the U.S. Dept. of Transportation ("DOT"), approved Texas GulfLink, LLC ("TGL") to construct a deepwater port, it described TGL's project as "a critical step toward cementing America's position as a global energy superpower."[1] Nevertheless, the Panel vacated that approval, finding it was based on a defective notice published six years earlier that adopted an "application area" in conflict with the DWPA. Op. at 20. The Panel's interpretation affects all persons seeking to construct deepwater ports in the future, including those with pending applications.

Further review is warranted because MARAD's application area for TGL does not conflict with the DWPA. At a minimum, a Panel decision overriding an Executive licensing determination after a six-year review by multiple agencies is an extraordinary judicial act warranting the utmost scrutiny.

---

[1] https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-unleashes-american-energy-awards-texas-0.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS ........ ii

RULE 40 STATEMENT REGARDING *EN BANC* REVIEW ........ iii

TABLE OF CONTENTS ........ iv

TABLE OF AUTHORITIES ........ v

STATEMENT OF THE ISSUE ........ 1

STATEMENT OF THE CASE ........ 1

A. The Development and Licensing of Deepwater Ports in the Gulf ........ 1

B. TGL's Application. ........ 4

C. Procedural History. ........ 5

SUMMARY OF THE ARGUMENT ........ 6

ARGUMENT ........ 7

A. The DWPA Must Be Read as a Whole and in Context. ........ 7

B. The Term Deepwater Port Site When Used for an Application Area Does Not Include Remote Components Such as Pipelines. ........ 10

C. The Panel Opinion Improperly Strips MARAD and Coordinating Agencies of the Authority to Regulate Deepwater Ports to Ensure Pipeline Safety. ........ 15

CONCLUSION ........ 17

CERTIFICATE OF SERVICE ........ 19

CERTIFICATE OF COMPLIANCE ........ 20

PANEL OPINION (Attached)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens for Clean Air & Clean Water in Brazoria County (“Brazoria”) v. U.S. Dept. of Transp.*, 98 F.4th 178 (5th Cir. 2024) ....................1, 6

*Dep’t of Agric. Rural Dev. Rural Hou. Serv. v. Kirtz*, 601 U.S. 52 (2024)....................8

*Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007)....................9

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)....................9

*Fischer v. United States*, 603 U.S. 480 (2024)....................7

*Get Oil Out! Inc. v. Exxon Corp.*, 586 F.2d 726 (9th Cir. 1978) ....................3, 10

*Gundy v. United States*, 588 U.S. 128 (2019)....................7, 8

*J. Ray McDermott & Co., Inc. v. Fidelity & Cas. Co. of New York*, 466 F.Supp. 353 (E.D. La. 1979)....................11

*National Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)....................8

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)....................8

*Utility Air Regulatory Group (“UARG”) v. EPA*, 573 U.S. 302 (2014)....................8, 9, 10

*White v. Black*, 190 F.3d 366 (5th Cir. 1999) ....................12

**Statutes and Rules**

33 U.S.C. §1501(a)(5) ........ iii

33 U.S.C. §1502(9) ........ 8, 10

33 U.S.C. §1503 ........ 3, 10

33 U.S.C. §1504 ........ 3

33 U.S.C. §1504(c)(2) ........ 4, 12

33 U.S.C. §1504(d) ........ *passim*

33 U.S.C. §1504(i) ........ 4

33 U.S.C. §1509(d) ........ 13, 14

33 U.S.C. §1520(a) ........ 3, 15

43 U.S.C. §1334(e) ........ 3

49 U.S.C. §60101, *et seq.* ........ 15

33 C.F.R. §148.3 ........ 4

33 C.F.R. §148.400(b) ........ 13

33 C.F.R. §150.940 ........ 13, 14

49 C.F.R. §§190-199 ........ 15

Fed. R. Civ. P. 28.2.1 ........ ii

Fed. R. Civ. P. 40 ........ iii

**Other Authorities**

41 Fed. Reg. 3768 (Jan. 16, 1976) (LOOP) ........ 5

41 Fed. Reg. 3769 (Jan. 16, 1976) (SEADOCK) ........ 5

84 Fed. Reg. 30298-01, 30299 (June 26, 2019) (TGL) ........ 5

84 Fed. Reg. 30301-01 (June 26, 2019) (Bluewater) ........ 5

85 Fed. Reg. 70233-01 (Nov. 4, 2020) (Blue Marlin) .............................................5

H. Rep. 93-668 (Nov. 28, 1973) .........................................................................10

H.R. Conf. Rep. 93-1605 (Dec. 16, 1974) .............................................................12

S. Rep. 93-1217 (1974) ..........................................................................10, 12

1974 U.S.C.C.A.N. 7529 (Oct. 1, 1974) ..............................................................10

https://www.maritime.dot.gov/ports/deepwater-ports-and-licensing/deepwater-ports-map .......................................................................2

https://www.ncei.noaa.gov//maps/gulf-data-atlas/atlas.htm.....................................3

https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-unleashes-american-energy-awards-texas-0. ................ iii

# STATEMENT OF THE ISSUE

Section §1504(d)(1) & (2) provide:

> (1) … the Secretary shall publish a description in the Federal Register of an application area encompassing the deepwater port site proposed by such application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port within that application area.
>
> (2) … "application area" means any reasonable geographical area within which a deepwater port may be constructed and operated. Such application area shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State.

Is the Secretary required to include the entire length of an underground pipeline connecting a port to the coast when defining the application area for a deepwater oil port under 33 U.S.C. §1504(d)?

# STATEMENT OF THE CASE

## A. THE DEVELOPMENT AND LICENSING OF DEEPWATER PORTS IN THE GULF.

"[I]t may come as no surprise that the Gulf leads the nation in producing and exporting oil to domestic markets worldwide." *Citizens for Clean Air & Clean Water in Brazoria County ("Brazoria") v. U.S. Dept. of Transp.*, 98 F.4th 178, 185 (5th Cir. 2024). Builders of offshore platforms today face challenges that were not considered decades ago, such as how "to efficiently export[] the roughly 3.9 million barrels of crude oil that move from the region daily." *Id.*

MARAD published the following map which illustrates the extent that deepwater port applications are clustered in the Gulf:




*See* https://www.maritime.dot.gov/ports/deepwater-ports-and-licensing/deepwater-ports-map (last visited Sept. 3, 2026). The waters off Texas and Louisiana are a maze of pipelines from crude oil production activity:




*See* https://www.ncei.noaa.gov//maps/gulf-data-atlas/atlas.htm. Congress delegated authority to "[t]he Secretary [of Transportation], in consultation with the Secretary of [the] Interior [to] establish and enforce such standards and regulations as may be necessary to assure the safe construction and operation of oil or natural gas pipelines on the Outer Continental Shelf." 33 U.S.C. §1520(a); *see also* 43 U.S.C. §1334(e).

Congress also imposed licensing requirements for those seeking to construct and operate deepwater ports. 33 U.S.C. §§1503 & 1504. "The licensing procedure contemplated by [DWPA] is difficult and time consuming." *Get Oil Out! Inc. v. Exxon Corp.*, 586 F.2d 726, 729 (9th Cir. 1978). "It requires cooperation not only among various departments and agencies within the federal government, but also of the state or states concerned." *Id.* MARAD leads the licensing evaluation process in coordination and consultation with the Department of Homeland Security, Coast Guard, Environmental Protection Agency, U.S. Army Corps of Engineers, Bureau

of Ocean Energy Management, Pipeline Hazardous Materials and Safety Administration, and various agencies in the adjacent coastal state. 33 C.F.R. §148.3.

### B. TGL'S APPLICATION.

TGL applied for a deepwater port license in 2019 after MARAD published notices in March 2019 that two other applicants (Sea Port Oil Terminal ("SPOT") and Texas Crude Offshore Loading Terminal ("Texas COLT")) applied for licenses. Op. at 5-6. TGL disclosed "the proposed location and capacity of the deepwater port, including all components thereof," as well as "the type and design of all components of the deepwater port," as required under 33 U.S.C. §1504(c)(2)(D) & (E). TGL's proposed pipeline would be buried beneath the seafloor but would cross the pipelines proposed by SPOT and Texas COLT. Op. at 6; JA208-209. Under the DWPA, if there is a conflict in the "application areas" for applicants, only one license may issue and only "to the port that 'clearly best serves the national interest.'" Op. at 2 (quoting 33 U.S.C. §1504(i)).

MARAD published notice of TGL's application, defining an "application area" under 33 U.S.C. §1504(d) that excluded all but 3.5 nm of TGL's proposed outgoing pipeline, which was contrary to how MARAD identified the application areas for SPOT and Texas COLT. Op. at 6-7. MARAD explained:

> MARAD has the discretion to establish a reasonable application area constituting the geographic area in which only one deepwater port may be constructed and operated. MARAD has consulted with USCG in developing Texas GulfLink's application area and designates an

> application area encompassing the deepwater port that is a circle having a radius of no less than three and one-half (3.50) nautical miles centered at Texas GulfLink's proposed platform[.]

84 Fed. Reg. 30298-01, 30299 (June 26, 2019). MARAD acknowledged the difference in how it handled its two prior notices, explaining:

> Based on a review [of] the Deepwater Port Act and its legislative history, MARAD has determined that for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading. While MARAD had initially included pipelines within the application areas of recent projects, MARAD has determined that the areas, consistent with Congressional intent, can and should be limited to the circular zones surrounding the unloading and loading points. MARAD will notify [SPOT and Texas COLT] that the application areas for those projects will be adjusted accordingly.

*Id.* MARAD consistently used this interpretation of the DWPA for prior and subsequent applications. *See, e.g.,* 41 Fed. Reg. 3768 (Jan. 16, 1976) (LOOP); 41 Fed. Reg. 3769 (Jan. 16, 1976) (SEADOCK); 84 Fed. Reg. 30301-01 (June 26, 2019) (Bluewater); 85 Fed. Reg. 70233-01 (Nov. 4, 2020) (Blue Marlin).

Texas COLT withdrew its application. Op. at 7. MARAD thereafter approved both SPOT's and TGL's deepwater port applications.

### C. PROCEDURAL HISTORY.

Brazoria challenged both RODs. Because SPOT's ROD was issued first, Brazoria's challenge to that ROD reached this Court first. Brazoria did not contest MARAD's retroactive modification of SPOT's application area to exclude its pipeline even though SPOT's environmental impact statement repeatedly discussed

the overlap with TGL. JA520-522; JA517 (map). Brazoria also did not argue that TGL's pipeline crossed into SPOT's original application area. This Court upheld MARAD's issuance of a SPOT's ROD. *Brazoria,* 98 F.4th at 198.

Brazoria filed its petition challenging TGL's ROD in 2025. Brazoria used the approval of SPOT's license against TGL to argue that TGL's application area, if properly drawn, would be in conflict with SPOT's application area; thus, TGL's license would not comply with 33 U.S.C. §1504(d). The Panel granted Brazoria's petition and vacated TGL's ROD. Op. at 2, 21.

## SUMMARY OF THE ARGUMENT

The Panel erred by failing to read the DWPA as a whole, in light of the purposes to be served. The Panel Opinion impairs the Executive's ability to promote creation of deepwater ports and to regulate the construction of offshore pipelines. Instead of honoring that discretion, the Panel Opinion imposes an artificial limitation on pipelines connecting deepwater ports to shore, holding that they cannot cross, even though there is nothing in the DWPA's text, purpose, or legislative history to suggest Congress was concerned about the possibility of crossing pipelines. What is more, the Panel Opinion ignores ample evidence within the plain language of the statute and the legislative history that Congress intended to vest DOT with discretion to determine "reasonable" application areas, and therefore strips from DOT the authority granted by Congress. The Panel's interpretation now undermines nearly

every application area ever designated by MARAD because none of them include the full length of the offshore pipeline.

Textually, the Panel ignored that (a) MARAD has discretion to establish a "reasonable geographical area within which a deepwater port may be constructed and operated," and (b) the application area must "encompass[] the deepwater port *site* proposed by such application." 33 U.S.C. §1504(d) (emphasis added). The words "reasonable" and "site" must be given meaning. *Fischer v. United States*, 603 U.S. 480, 486 (2024). Here, it is a congressional indication that MARAD may focus on the principal deepwater port structures when defining the application area—just as it did with TGL's application—and that MARAD may exclude more remote components such as the full length of the buried pipeline extending to the shore. The Panel's interpretation of the application area as necessarily encompassing the entire pipelines, by contrast, renders the words "reasonable" and "site" meaningless.

Given the "critical" importance of deepwater ports in general, and TGL's project specifically, "toward cementing America's position as a global energy superpower," this Court should grant *en banc* review and reverse the Panel Opinion.

## ARGUMENT

### A. THE DWPA MUST BE READ AS A WHOLE AND IN CONTEXT.

Words in a statute should not be construed "in a vacuum." *Gundy v. United States*, 588 U.S. 128, 141 (2019). "It is a fundamental canon of statutory

construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* (quoting *National Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007)). "[R]easonable statutory interpretation must account for both 'the specific context in which ... language is used' and 'the broader context of the statute as a whole.'" *Utility Air Regulatory Group ("UARG") v. EPA*, 573 U.S. 302, 321 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

To reach its conclusion, the Panel relies heavily on the definition of "deepwater port" in Section 1502(9).[2] Op. at 12-20. The Panel recognized, however, that courts may deviate from a statutory definition if strictly applying it "would be incompatible with Congress's regulatory scheme or would destroy one of the statute's major purposes." Op. at 18 (quoting *Dep't of Agric. Rural Dev. Rural Hou. Serv. v. Kirtz*, 601 U.S. 52, 60 (2024)).

---

[2] Section 1502(9) defines "deepwater port" as:

> (A) mean[ing] any fixed or floating manmade structure other than a vessel, or any group of such structures, that are located beyond State seaward boundaries and that are used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas for transportation to or from any State, except as otherwise provided in section 1522 of this title, and for other uses not inconsistent with the purposes of this chapter, including transportation of oil or natural gas from the United States outer continental shelf; [and]
>
> (B) includes all components and equipment, including pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark[.]

33 U.S.C. §1502(9).

Justice Scalia's opinion for the Court in *UARG* provides an analogous illustration where deviation from an all-encompassing statutory definition is warranted. The Court recognized that the Clean Air Act's defined term "air pollutant" required a narrower interpretation in some circumstances: "It is plain as day that the Act does not envision an elaborate, burdensome permitting process for major emitters of steam, oxygen, or other harmless airborne substances." *See* 573 U.S. at 317. The Court cited examples of "where EPA has inferred from statutory context that a generic reference to air pollutants does not encompass every substance falling within the Act-wide definition." *Id.* The Court recognized that these more limited interpretations were "consistent with the statutory scheme." *Id.* at 319.

The Court explained in language particularly relevant to the DWPA:

> To be sure, Congress's profligate use of "air pollutant" where what is meant is obviously narrower than the Act-wide definition is not conducive to clarity. One ordinarily assumes "'that identical words used in different parts of the same act are intended to have the same meaning.'" *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). In this respect (as in countless others), the Act is far from a *chef d'oeuvre* of legislative draftsmanship. But we, and EPA, must do our best, bearing in mind the "'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). As we reiterated the same day we decided *Massachusetts*, the presumption of consistent usage "'readily yields'" to context, and a statutory term—even one defined in the statute—"may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." *Duke*, 549 U.S. at 574.

*UARG*, 573 U.S. at 319-20 (cleaned up).

### B. THE TERM DEEPWATER PORT SITE WHEN USED FOR AN APPLICATION AREA DOES NOT INCLUDE REMOTE COMPONENTS SUCH AS PIPELINES.

DWPA's definition of a deepwater port is written broadly to include all components of the port, including pipelines. 33 U.S.C. §1502(9). In many parts of the statute, this broad definition makes complete sense, such as in the delegation of authority to license and regulate deepwater ports. *See, e.g.,* 33 U.S.C. §1503.[3] When Congress delegated that authority, it intended to create a single point of contact for coordinating the licensing and regulatory processes. *See* S. Rep. 93-1217 at 7529-30 (1974) (discussing coordination).[4] However, in other contexts, the term deepwater port may be more narrowly construed where, as here, context clearly requires. *UARG*, 573 U.S. at 319-20; *Get Oil Out! Inc.*, 586 F.2d at 729 (Kennedy, J. for the Court) (refusing to construe the DWPA broadly to include offshore drilling platforms and facilities).

---

[3] *See* S. Rep. 93-1217, 1974 U.S.C.C.A.N. 7529, 7562 (Oct. 1, 1974) (explaining: "[t]he [DWPA] establishes a comprehensive Federal licensing system for deepwater port development" as part of the reason "deepwater port" was defined to include components); H. Rep. 93-668 at 4 (Nov. 28, 1973) ("Connecting pipelines within the territorial waters are specifically included in the definition to make it clear that they come under the licensing provisions of this bill and do not need a license from other Federal agencies such as the Corps of Engineers.").

[4] The Senate explained: "the Committees decided in favor of consolidating deepwater port licensing authority in one Federal agency. This lead agency would then coordinate its activities with those of other Federal agencies having jurisdiction and expertise related to deepwater ports." S. Rep. 93-1217 at 7536. "[T]he U.S. Coast Guard would have the predominant role in regulating the construction and operation of deepwater ports regardless of which Federal agency issued the license." *Id.* "[N]avigational safety and marine environmental protection [are] major features of the deepwater port development process." *Id.*

A broad definition of deepwater port does not make sense when applied to what must be included in an application area designated under Section 1504(d)(1). Through Section 1504(d)(1), Congress directs the Secretary to designate "an application area encompassing the deepwater port ***site*** proposed by such application" and, critically, that "would eliminate … the need for any other deepwater port within that application area." 33 U.S.C. §1504(d)(1) (emphasis added). "The ordinary and common meaning of the term … 'site' implies a precise or fixed position of a building or structure." *J. Ray McDermott & Co., Inc. v. Fidelity & Cas. Co. of New York*, 466 F.Supp. 353, 363 (E.D. La. 1979). The Panel's rote interpretation of application area wholly fails to consider the Secretary's role in determining that one deepwater port "eliminates the need for any other deepwater port within that application area." 33 U.S.C. §1504(d)(1). The Panel's Opinion, for example, would deprive the Secretary of the discretion to determine that a greater density of deepwater ports is needed off the Texas coast, the primary locus of U.S. crude oil exports.

When the Senate discussed site locations, it focused on above-ground structures, with no mention of pipelines beneath the seafloor:

> Site location is also an important aspect of the deepwater port development process. Site location of the facility should include an assessment of environmental impact, alternative uses of the area and physical suitability of the location. … The Coast Guard has had ample prior experience in siting offshore structures similar to those contemplated for use in deepwater ports.

S. Rep. 93-1217 at 7536-37. By referencing the "facility" and "structures," Congress understood the "site" of a deepwater port as focused on its primary platforms and structures.

When the Senate proposed adding the language that became Section 1504(d), it did not even mention underground pipelines or remote port components:

> An application area is any reasonable geographical area within which a deepwater port is proposed to be constructed and operated. It may not exceed a circular zone the center of which is the proposed port and the radius of which is the distance from such proposed port to the high water mark of the nearest adjacent coastal State.

S. Rep. 93-1217 at 7570 (1974). The final language that became Section 1504(d)(2) was added by the Conference Committee. H.R. Conf. Rep. 93-1605 at 7630. The language was modified to focus on the center of the primary port facilities: "the center of which is the principal point of loading and unloading at the port." 33 U.S.C. §1504(d)(2). This proposed language suggests Congress intended references to port in Section 1504(d) to refer to the primary operating location of the port, and not every remote component that may have been included within the deepwater port definition for other statutory purposes.

If Congress intended for the application area to include remote pipelines and components, it knew how to do so. *See, e.g.,* 33 U.S.C. §1504(c)(2)(D) & (E). The Panel Opinion errs by treating Congress's use of the word "site" in Section 1504(d)(1) as surplusage. *See White v. Black*, 190 F.3d 366, 368 (5th Cir. 1999).

Consistent with that ordinary meaning, the regulations consistently addressed "site evaluations" for purposes of Section 1504(d) as focusing on structures above the seafloor: "potential deepwater port locations, including … (1) [p]reliminary studies to determine the feasibility of a site; [and] (2) [d]etailed studies of the topography and geologic structure of the ocean bottom to determine its ability to support offshore structure and other equipment[.]" 33 C.F.R. §148.400(b).

Similarly, a broad reading of deepwater port is contrary to how DOT has construed 33 U.S.C. §1509(d) when defining "safety zones" around deepwater ports. Section 1509(d)(1) requires DOT to:

> designate a zone of appropriate size ***around and including any deepwater port*** for the purpose of navigational safety. In such zone, no installations, structures, or uses will be permitted that are incompatible with the operation of the deepwater port. The Secretary shall by regulation define permitted activities within such zone.

33 U.S.C. §1509(d)(1) (emphasis added). MARAD has exercised its authority on many occasions over many decades to define a safety zone around an actual or proposed physical structure, and not all of the pipelines associated with a port.[5] *See* 33 C.F.R. §150.940. On occasion, DOT, included a "pipeline end manifold," but

[5] *See, e.g.,* 33 C.F.R. §150.940(a)(1) (2005) (LOOP safety zone defined by "an arc … centered at the port's pumping platform complex"); 33 C.F.R. §150.940(c)(1) (2010) (Northeast Gateway Deepwater Port safety zone defined by "circular zones, each with a 500–meter radius and centered on each of the deepwater port's two submerged turret loading (STL) buoys"); 33 C.F.R. §150.940(d)(1) (2010) (Neptune Deepwater Port ("Neptune") safety zone defined by "circular zones, each with a 500–meter radius and centered on each of Neptune's two submerged turret loading (STL) buoys … encompass[ing], … the primary components of Neptune"); *see also* JA208-209 (TGL's proposed safety zone).

not the entire pipeline buried below ground because its focus there was on navigational safety. *See, e.g.,* 33 C.F.R. §150.940(c)(1). The language of Section 1509(d)(1)—"around and including any deepwater port"—is materially the same as the language of Section 1504(d)(1)—"encompassing the deepwater port site." *Compare* 33 U.S.C. §1509(d)(1) *with* 33 U.S.C. §1504(d)(1). It should be construed the same. Its focus is not on where pipelines should be located, but instead where the Executive finds that deepwater ports will serve the national interest and navigational safety. JA63-64. That Congress deliberately chose to modify the term deepwater port with the word "site" in Section 1504(d)(1) reinforces this point.

Read as a whole, the history, purpose, and text of Section 1504(d) is plainly at odds with the Panel Opinion's rigid application of Section 1502(9)'s deepwater port definition when construing Section 1504(d)'s application area. There is no indication that Congress intended the use of the phrase "deepwater port site" in Section 1504(d)(1) to require all remote, underground components of a deepwater port, including the full length of the outgoing offshore pipeline, to be included within an application area. Conversely, there is ample evidence that Congress intended "deepwater port" to be read more narrowly throughout Section 1504(d), including the words "reasonable" and "site", and, crucially, the statutory framework that vests the Secretary with the discretion to define the application area based on need.

### C. THE PANEL OPINION IMPROPERLY STRIPS MARAD AND COORDINATING AGENCIES OF THE AUTHORITY TO REGULATE DEEPWATER PORTS TO ENSURE PIPELINE SAFETY.

Reading "deepwater port site" broadly in Section 1504(d) also improperly strips MARAD of its discretion to define the application area where there may only be one deepwater port. *See* 33 U.S.C. §1504(d)(1). Section 1504(d)(2) explains that an "application area" is "any reasonable geographical area within which a deepwater port may be constructed and operated." *See* 33 U.S.C. §1504(d)(2). Then, Section 1520 delegates to MARAD authority to "establish and enforce such standards and regulations as may be necessary to assure the safe construction and operation of oil or natural gas pipelines on the Outer Continental Shelf." *See* 33 U.S.C. §1520(a). If MARAD's discretion to define "any reasonable geographical area" is constrained such that it must include the entire pipeline, MARAD's ability to determine how to best "assure the safe construction and operation of oil or natural gas pipelines on the Outer Continental Shelf" has also been artificially limited.

Pipelines are heavily regulated. *See* 49 U.S.C. §60101, *et seq.*; 49 C.F.R. §§190-199. TGL's proposed underground pipeline was a straightforward route to onshore facilities:

**Figure 2. Terminal Project Location**




MARAD could reasonably conclude that TGL's more direct route from port to shore was the most prudent route, even if it crossed another port's pipeline. After all, pipelines of all types and sizes in the Gulf repeatedly and historically cross. Op. at 18-19. But the artificial restraints compelled by the Panel Opinion encourage longer and less direct pipeline routes for offshore export terminals, as they try to avoid crossing another port's pipeline. MARAD, and not the Court, is entrusted with

responsibility to oversee and license the most appropriate and reasonable way to authorize deepwater ports.

## CONCLUSION

TGL requests rehearing *en banc*.

Dated: September 25, 2026.

Respectfully submitted,

*<u>/s/ W. Scott Hastings</u>*
W. Scott Hastings
Texas Bar No. 24002241
scott.hastings@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Ste. 2800
Dallas, Texas 75201
Tel.: (214) 740-8000
Fax: (214) 740-8800

**KEAN MILLER LLP**
TOD J. EVERAGE (#32445)
AMANDA HOWARD LOWE (#32507)
JEFFREY GELPI (#37130)
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Tel: 504.585.3050
tod.everage@keanmiller.com
amanda.lowe@keanmiller.com
jeff.gelpi@keanmiller.com

ATTORNEYS FOR TEXAS GULFLINK, LLC

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this the 25th day of September, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to those who are non-CM/ECF participants.

*/s/ W. Scott Hastings*
Counsel for Texas GulfLink, LLC

**CERTIFICATE OF COMPLIANCE**

1. This Petition complies with the type-volume limitation of FED. R. APP. P. 40(d)(3)(A) because the Petition contains 3,878 words, excluding the parts of this Petition exempted by FED. R. APP. P. 32(f).

2. The Petition complies with the typeface requirements of FED. R.APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this Petition has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman, 14 point.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in FED. R. APP. P. 32(a)(7), may result in the Court's striking the Petition and imposing sanctions against the person signing the Petition.

This 25th day of September, 2026.

*/s/ W. Scott Hastings*
Counsel for Texas GulfLink, LLC

# EXHIBIT A

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 12, 2026

Lyle W. Cayce
Clerk

---

No. 25-60202

---

Citizens for Clean Air & Clean Water in Brazoria County,

*Petitioner*,

*versus*

United States Department of Transportation; Sean Duffy, *Secretary, U.S. Department of Transportation, in his official capacity as Secretary of the U.S. Department of Transportation*; United States Maritime Administration, *an agency of the U.S. Department of Transportation*; Administrator, *in his official capacity as Administrator of* the U.S. Maritime Administration; United States Coast Guard, *an agency of the U.S. Department of Homeland Security*; Kevin E. Lunday, *in his official capacity as Commandant of the U.S. Coast Guard*,

*Respondents*.

---

Petition for Review of an Order of the Maritime Administration
Agency No. MARAD-2019-0093

---

Before Clement, Southwick, and Engelhardt, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

The Deepwater Port Act of 1974 ("DWPA") comprehensively regulates the construction and operation of deepwater ports. To construct a

deepwater port, a person must first apply for a license from the Secretary of Transportation. 33 U.S.C. § 1503(a). When the Secretary receives an application, he must publish a notice describing "an application area encompassing the deepwater port site proposed by such application." *Id.* § 1504(d)(1). The DWPA requires that there be only one deepwater port per application area, so if the Secretary receives more than one application for the same application area, he must issue a license to the port that "clearly best serves the national interest." *Id.* § 1504(i).

In 2025, the Secretary approved Intervenor Texas GulfLink, LLC's application to construct a deepwater port, even though its proposed pipeline would intersect with another deepwater port's pipeline. Petitioner Citizens for Clean Air & Clean Water in Brazoria County ("Better Brazoria") challenges that decision. It argues, in relevant part, that the DWPA requires the Secretary to include a deepwater port's proposed pipeline in its application area, and if Texas GulfLink's application area had been properly designated, it would include two deepwater ports.

Thus, we must decide whether the DWPA requires the Secretary to include a deepwater port's proposed pipeline in its application area. We hold that it does: The DWPA requires the Secretary to designate "an application area encompassing the deepwater port site," *id.* § 1504(d)(1), and it expressly defines "deepwater port" to "include[] all components and equipment, including pipelines . . . to the extent they are located seaward of the high water mark," *id.* § 1502(9)(B). Texas GulfLink's application area, properly drawn, would intersect with another deepwater port's pipeline, violating the DWPA's requirement that there be only one deepwater port per application area. Accordingly, we grant the petition for review, vacate the record of decision ("ROD") approving Texas GulfLink's application, and remand for further proceedings.

Case: 25-60202 Document: 128-1 Page: 3 Date Filed: 08/12/2026



# I

## A

In 1973, to retaliate against the United States for supporting Israel in the 1973 Arab–Israeli War, Arab members of the Organization of Petroleum Exporting Countries ("OPEC") embargoed the export of oil to the United States. *Oil Embargo, 1973–1974*, U.S. Dep't of State, Off. of the Historian, https://history.state.gov/milestones/1969-1976/oil-embargo [https://perma.cc/X8GM-4NQ4] (last visited June 29, 2026). This embargo ignited economic and energy crises that triggered several congressional responses, including the passage of the DWPA. *See* S. Rep. No. 93-1217, at 6 (1974) (citing the "Arab oil embargo" as an impetus for enacting the legislation, given the "high priority to reduce American reliance on foreign petroleum supplies and attain domestic energy self-sufficiency"), *as reprinted in* 1974 U.S.C.C.A.N. 7529, 7534.

Congress enacted the DWPA, in part, "to authorize and regulate the location, ownership, construction, and operation of deepwater ports in waters beyond the territorial limits of the United States." 33 U.S.C. § 1501(a)(1). Moreover, Congress sought "to promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States and transporting oil or natural gas from the outer Continental Shelf while minimizing tanker traffic and the risks associated with that traffic." *Id.* § 1501(a)(5).

Deepwater ports are not used for the exploration or production of oil or natural gas; instead, they serve only as import or export terminals. The DWPA defines a "deepwater port" as a "fixed or floating manmade structure . . . or any group of such structures" that is "located beyond State seaward boundaries" and is "used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas for

transportation to or from any State." *Id.* § 1502(9)(A). The statute's definition of "deepwater port" expressly "includes all components and equipment, including pipelines, pumping stations, service platforms, buoys, mooring lines, and similar facilities to the extent they are located seaward of the high water mark." *Id.* § 1502(9)(B).

Under the DWPA, no person may own, construct, or operate a deepwater port without a license issued by the Secretary of Transportation, *id.* § 1503(a), who has delegated the authority to process DWPA applications and issue licenses to the U.S. Maritime Administration ("MARAD") and the U.S. Coast Guard, 33 C.F.R. § 148.3(a)–(b); 49 C.F.R. § 1.93(h). After receiving an application to construct a deepwater port and confirming that the application is complete, the Secretary must "publish in the Federal Register a notice of the application" and "a summary of the plans." 33 U.S.C. § 1504(c)(1)(B)(ii)(I). That notice must include "a description . . . of an application area encompassing the deepwater port site proposed by such application and within which construction of the proposed deepwater port would eliminate, at the time such application was submitted, the need for any other deepwater port within that application area." *Id.* § 1504(d)(1). The DWPA defines "application area" as "any reasonable geographical area within which a deepwater port may be constructed and operated." *Id.* § 1504(d)(2). "Such application area shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State." *Id.*

Because there may only be one deepwater port per application area, the DWPA requires the Secretary to "call for submission of any other applications for licenses for the ownership, construction, and operation of a deepwater port within the designated application area." *Id.* § 1504(d)(3). If more than one application is submitted for an application area, the Secretary

must issue a license to the deepwater port that "clearly best serves the national interest," as determined by a list of four factors. *Id.* § 1504(i)(2)–(3). If no proposal "clearly best serves the national interest," the statute provides an "order of priorities" for issuing a license. *Id.* § 1504(i)(2).

B

In addition to passing the DWPA, Congress responded to OPEC's oil embargo by enacting the Energy Policy and Conservation Act of 1975, which effectively banned the export of domestic crude oil from the United States. Pub. L. No. 94-163 § 103, 89 Stat. 871, 877–78 (repealed 2015). This export ban was in place for forty years until Congress—motivated by the surplus of domestic crude oil produced by the shale oil boom—lifted the ban in 2015. *See* Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 101(a), 129 Stat. 2242, 2987 (2015).

The lifting of the export ban heightened interest in the efficient export of domestic oil. The most efficient way to export oil is by using the largest available crude carrier ships, which are often Very Large Crude Carriers ("VLCCs"). These ships are so large and carry so much oil (up to two million barrels) that they must be loaded in deep water. There are two ways to load these ships. The first is by a process called "reverse lightering," in which the VLCC remains offshore in deep water and smaller tankers take trips back and forth from an onshore port to deliver oil to the VLCC. The other method is to pipe oil to an offshore deepwater port from which the VLCC can load directly. Because reverse lightering increases loading time, vessel traffic, and expenses, oil companies prefer to load VLCCs from a deepwater port.

Currently, there is only one crude oil deepwater port in the United States: the Louisiana Offshore Oil Port ("LOOP"). But in 2019, MARAD

received three applications to build deepwater ports off the coast of Freeport, Texas.

MARAD published notices of two applications in March 2019: one to construct the Sea Port Oil Terminal ("SPOT"), and the other to construct the Texas Crude Offshore Loading Terminal ("Texas COLT"). MARAD's notice described SPOT's application area as "a circle having a radius of no less than three-and-three-tenths (3.30) nautical miles centered at SPOT's proposed platform . . . and 0.25 nautical miles on either side of SPOT's proposed pipeline route between the terminal and the shore." Deepwater Port License Application: SPOT Terminal Services LLC (SPOT), 84 Fed. Reg. 7413, 7414 (Mar. 4, 2019). Texas COLT's application area was almost identical, only its radius was "no less than three and one-half (3.50) nautical miles." Deepwater Port License Application: Texas COLT LLC (Texas COLT), 84 Fed. Reg. 7968, 7969 (Mar. 5, 2019). Pursuant to 33 U.S.C. § 1504(d)(3), both notices called for "[a]ny person interested in applying for the ownership, construction, and operation of a deepwater port within this designated application area" to file a notice of intent to apply within sixty days and a completed application within ninety days. 84 Fed. Reg. at 7414, 7969.

Within the sixty-day deadline, Texas GulfLink notified MARAD that it intended to apply to construct a deepwater port. Texas GulfLink sent its letter of intent "[o]ut of an abundance of caution" because it knew that its proposed pipeline would cross both SPOT's and Texas COLT's pipelines and, consequently, their application areas. On May 30, 2019, Texas GulfLink filed its application with MARAD.

When MARAD published its notice of Texas GulfLink's application, it described its application area differently than it had described SPOT's and Texas COLT's. The notice designated an application area "that is a circle

having a radius of no less than three and one-half (3.50) nautical miles centered at Texas GulfLink's proposed platform." Deepwater Port License Application: Texas GulfLink LLC (Texas GulfLink), 84 Fed. Reg. 30298, 30299 (June 26, 2019). Unlike SPOT's and Texas COLT's application areas, Texas GulfLink's did not include "0.25 nautical miles on either side of [the] proposed pipeline route between the terminal and the shore." *See* 84 Fed. Reg. at 7414, 7969. MARAD's notice acknowledged that the agency "had initially included pipelines within the application areas of recent projects," but after reviewing the DWPA's text and legislative history, it "determined that for the purpose of establishing application areas, Congress focused on the circular area surrounding a deepwater port's principal point of loading and unloading." 84 Fed. Reg. at 30299. Thus, in MARAD's view, it was "consistent with Congressional intent" to exclude Texas GulfLink's proposed pipeline from its application area. *Id.* The notice further indicated that MARAD would retroactively adjust the application areas for SPOT and Texas COLT accordingly. *Id.*

After receiving the three applications, MARAD conducted several rounds of environmental review for the proposed deepwater ports, as required by the DWPA and the National Environmental Policy Act ("NEPA"). *See* 33 U.S.C. § 1504(f)(2) (designating MARAD the lead agency for all DWPA applications for purposes of NEPA). Texas COLT ultimately withdrew its application, leaving only SPOT's and Texas GulfLink's applications for MARAD to review.

MARAD approved SPOT's application in November 2022. Better Brazoria filed a petition for review of that licensing decision, arguing that the environmental impact statement for that project violated both NEPA's and the DWPA's requirements. We denied the petition for review, holding that MARAD violated neither statute in approving SPOT's application.

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 198 (5th Cir. 2024).

Then, on February 14, 2025, MARAD approved Texas GulfLink's application. Better Brazoria timely filed the instant petition for review of that decision under the DWPA's citizen-suit provision, 33 U.S.C. § 1516.

Better Brazoria argues that the ROD approving Texas GulfLink's application must be vacated for two reasons. First, the group contends that MARAD violated the DWPA by excluding Texas GulfLink's proposed pipeline from its application area. Because a properly drawn application area would intersect with SPOT's pipeline, Better Brazoria argues that MARAD violated the DWPA by approving two deepwater ports within the same application area. Second, Better Brazoria asserts that MARAD's decision to designate Texas GulfLink's application area differently than it had designated SPOT's and Texas COLT's was arbitrary and capricious because the agency did not offer a sufficiently reasoned explanation for its change of course. We need only address the first issue to resolve this appeal.

## II

Before reaching the merits of Better Brazoria's challenge, even though no party challenges Better Brazoria's Article III standing, we must satisfy our continuing obligation to assure ourselves of our jurisdiction. *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 468 (5th Cir. 2020) (en banc). Better Brazoria has associational standing on behalf of its members if "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). To

demonstrate that at least one of its members has standing, Better Brazoria must show "(1) an injury in fact; (2) that is traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable decision." *Id.* at 586 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

We recently held that challengers to another proposed deepwater port in the Gulf of America failed to satisfy this standard. In *Center for Biological Diversity v. United States Department of Transportation*, 180 F.4th 796, 800–01 (5th Cir. 2026), three environmental organizations challenged MARAD's approval of Delfin LNG's application to construct a deepwater port off the coast of Texas and Louisiana. But none of these groups identified a single member "who fishes near the port, boats beside it, works around it, or otherwise uses Project-affected waters or nearby areas in a way the Project would impair." *Id.* at 801. The groups' members asserted general "health, recreational, business, professional and scientific interests" that would be threatened by the construction of the deepwater port, but they did not show that they planned to make use of specific areas that would be affected by the project. *Id.* at 803–06. For instance, one declarant "refer[red] vaguely to his 'community' and 'area' without relating either to the Project's location or scope." *Id.* at 804. Because none of the organizations showed that their members would suffer "a concrete, particularized injury fairly traceable to the challenged license," they lacked standing to challenge the license, and we denied their petition for review. *Id.* at 806.

But we have also held that another group of petitioners—including Better Brazoria—*did* have standing to challenge a proposed deepwater port. In *Citizens for Clean Air*, the petitioners relied in part on a declaration from Pamela Harris, who owned a home one mile from SPOT's proposed pipeline. 98 F.4th at 188. Harris voiced concern that the pipeline would "carry increased risks of oil spills, unwanted noise, habitat destruction, and

property devaluation." *Id.* She also said that the pipeline's construction and operation "would create an aesthetic and physical nuisance, negatively affecting her enjoyment of her property" and "her recreational activities" on the nearby beach. *Id.* We held that Harris's declaration showed that an individual member would have standing because "she 'plan[ned] to make use of the specific sites' where the environmental effects from SPOT would allegedly be felt" and therefore "identified cognizable interests threatened by the project." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

Here, Better Brazoria's members have identified cognizable interests very similar to those we found sufficient to establish standing in *Citizens for Clean Air*. One member, AJ Jinkins, owns a home about a mile and a half from Texas GulfLink's proposed tank farm and close to its proposed pipeline. In his sworn declaration, Jinkins expresses concern that the tank farm would increase the risk of flooding, particularly in the event of a hurricane, and that the flooding would pollute his well water. He says that he values "the peace and quiet of living in the country," but the light and noise pollution from the tank farm would make his community feel more "industrial" and might lower his property value. Jinkins further worries that construction of the tank farm and the traffic of the large trucks would deteriorate roads, make it difficult to get around, and be "unsightly and unpleasant." In sum, Jinkins has shown that he "plans to make use of the specific sites" where the effects of Texas GulfLink's deepwater port and its tank farm would be felt, so he "has identified cognizable interests threatened by the project." *Id.* (cleaned up).

Moreover, Jinkins has shown that his imminent injury is traceable to MARAD's challenged conduct and that this injury is likely to be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560–61. MARAD approved Texas GulfLink's application to construct a deepwater port based on an

application area that was allegedly designated in violation of the DWPA. The agency's approval of Texas GulfLink's application "will lead to the construction of a project causing the injuries" Jinkins asserts. *Citizens for Clean Air*, 98 F.4th at 188. And a decision in Better Brazoria's favor would vacate the ROD approving Texas GulfLink's application, preventing the construction of the project under the current application. Thus, Better Brazoria has demonstrated that at least one of its members would have Article III standing to bring this challenge.

Better Brazoria has also satisfied the other two elements of associational standing. Better Brazoria is an environmental organization, and it is seeking to protect environmental interests, including those raised by Jinkins. Further, neither of Better Brazoria's claims nor the relief it requests requires the participation of any of its members. Thus, Better Brazoria has associational standing to bring this action, so we proceed to the merits of its challenge.

## III

"To the extent necessary to decision and when presented," the Administrative Procedures Act authorizes us to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. We are to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

Better Brazoria's petition for review presents an issue of statutory interpretation that we review de novo, without deference to the agency's interpretation of the DWPA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA

requires."). We must "apply[] all relevant interpretive tools" to determine what reading of the statute "is best." *Id.* at 400.

IV

The central dispute before us is whether the DWPA requires MARAD to include a proposed deepwater port's pipelines in its application area.

Better Brazoria argues that it does: Section 1504(d)(1) requires the Secretary to publish a description of "an application area *encompassing* the deepwater port site," and § 1502(9)(B) defines "deepwater port" to "include[] all components and equipment, *including pipelines*." 33 U.S.C. §§ 1502(9)(B), 1504(d)(1) (emphases added). Taking these provisions together, Better Brazoria contends, the DWPA requires MARAD to designate an application area that encompasses the entire deepwater port site, including the deepwater port's pipelines.

In contrast, the Government and Texas GulfLink argue that the DWPA gives MARAD complete discretion to designate an application area within a statutory maximum, so the agency may choose to exclude a deepwater port's pipelines from its application area. They point to § 1504(d)(2), which defines "application area" as "any reasonable geographical area within which a deepwater port may be constructed and operated." *Id.* § 1504(d)(2). This provision sets a limit on the maximum size of an application area—it "shall not exceed a circular zone, the center of which is the principal point of loading and unloading at the port, and the radius of which is the distance from such point to the high water mark of the nearest adjacent coastal State"—but it sets no minimum. *Id.* Thus, according to the Government and Texas GulfLink, MARAD has unfettered discretion to designate any reasonable application area within this maximum zone.

A

To resolve this dispute, we start with the plain language of the DWPA. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). Section 1504(d)(1) states that "the Secretary shall publish a description in the Federal Register of an application area encompassing the deepwater port site." 33 U.S.C. § 1504(d)(1). This provision imposes a mandatory requirement on the Secretary, who *shall* publish a description that *encompasses* the deepwater port site. The ordinary meaning of "encompass" is to encircle, surround, envelop, or enclose. *See Encompass*, OXFORD ENGLISH DICTIONARY (Mar. 2026), https://doi.org/10.1093/OED/2042550495 ("To encircle as a ring or girdle; to surround, bound on all sides."); *Encompass*, MERRIAM-WEBSTER (2026), https://www.merriam-webster.com/dictionary/encompass [https://perma.cc/5MXH-K2UV] (defining "encompass" as to "envelop," "form a circle about," or "enclose"). Thus, under § 1504(d)(1), an application area must surround the "deepwater port site."

"Deepwater port" is a technical term that lacks an ordinary meaning, but the DWPA provides a statutory definition for the term. "When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019)). We may "deviate from a statutory definition only when applying the definition would be incompatible with Congress's regulatory scheme or would destroy one of the statute's major purposes." *Id.* at 60 (cleaned up).

The DWPA's definition of "deepwater port" expressly "includes all components and equipment, including pipelines . . . to the extent they are located seaward of the high water mark." 33 U.S.C. § 1502(9)(B). Construing § 1504(d)(1) in light of this definition, the DWPA requires the Secretary to designate an application area that surrounds the entire deepwater port site, which includes the port's pipelines "to the extent they are located seaward of the high water mark." *Id.*

Reading § 1504(d)(2) with an eye to § 1502(9)'s definition of "deepwater port" bolsters this conclusion. Section 1504(d)(2) defines "application area" as "any reasonable geographical area within which a deepwater port may be constructed and operated." *Id.* § 1504(d)(2). Interpreting this provision with § 1502(9)'s definition in mind, the statute requires an application area to include the area within which the deepwater port—including its pipelines—may be constructed and operated.

The Government offers three textual arguments to counter this interpretation, but none is persuasive.

*First*, the Government argues that the DWPA's definition of "application area" is more specific than its definition of "deepwater port" because the former definition appears in the section governing procedures for issuing licenses, whereas the latter definition appears in a definitions section that applies to the DWPA as a whole. The Government invokes the general/specific canon to argue that the specific definition of "application area" in § 1504(d)(2) should govern over the more general definition of "deepwater port."

The Government misconstrues the general/specific canon. That canon instructs that when "a general permission or prohibition is contradicted by a specific prohibition or permission," courts should "eliminate the contradiction" by construing the specific provision as an

exception to the general one. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). But the mere fact that a provision appears in a definitions section does not necessarily mean that it is more "general" than a provision appearing elsewhere in the statute. Here, § 1502(9) provides a specific definition of "deepwater port," and § 1504(d) defines "application area" by referencing the defined term "deepwater port."

The Government contends that this reading interprets "deepwater port" and "application area" as having coterminous definitions, thus rendering § 1504(d)(2)'s definition of "application area" superfluous. In reality, the Government's interpretation would introduce superfluity; reading § 1504(d)(2) to grant MARAD complete discretion to designate an application area within the maximum zone would render § 1504(d)(1)'s requirement that an application area "encompass[] the deepwater port site" a nullity. 33 U.S.C. § 1504(d)(1). This reading "would violate the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932).

The best reading of § 1504(d) harmonizes that provision's subparts. Section 1504(d)(1) sets a minimum size of an application area: it must at least "encompass[] the deepwater port site." 33 U.S.C. § 1504(d)(1). The next paragraph sets the maximum size of an application area, and it gives the Secretary discretion to designate "any reasonable geographical area" within that zone as long as the application area encompasses the deepwater port site. *Id.* § 1504(d)(2). Under this reading, MARAD still has significant discretion to designate application areas under § 1504(d)(2), but that discretion is cabined by the important statutory limitation imposed by § 1504(d)(1). Because this interpretation renders these two paragraphs compatible rather than contradictory, it is the best reading of the statute. *See Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation

require that we construe [a statute's provisions] in harmony, not set them at cross-purposes.").

*Second*, the Government asserts that the phrase "deepwater port site" as used in § 1504(d)(1) must have a distinct meaning from the term "deepwater port" as defined in § 1502(9). By using the phrase "deepwater port site" instead of "deepwater port," the Government urges, Congress must have intended to refer to something different than the entirety of a deepwater port's outlying structures and pipelines.

This argument runs afoul of the consistent-usage canon. Under that canon, "there is a presumption that a given term is used to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). "And likewise, where the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012).

Here, there is no *material* difference between the phrases "deepwater port" and "deepwater port site." Instead, the most natural reading is that "deepwater port site" refers to the location where a deepwater port—as defined by § 1502(9)—is to be constructed. *See Site*, Oxford English Dictionary (June 2026), https://doi.org/10.1093/OED/8976396144 ("An area of land occupied by a building, town, etc., or which is set apart for some purpose."); *Site*, Merriam-Webster (2026), https://www.merriam-webster.com/dictionary/site [https://perma.cc/PH9R-D85J] (defining "site" as "the spatial location of an actual or planned structure or set of structures (such as a building, town, or monuments)" or "a space of ground occupied or to be occupied by a building"). There is no textual indication that "deepwater port" should take

on an entirely new meaning from the definition provided in § 1502(9) merely because the phrase is followed by the word "site." *See* SCALIA & GARNER, *supra*, at 228 ("It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive.").

*Third*, the Government insists that "application area" and "deepwater port" must have different meanings because "deepwater port" is defined using "structural" terms (e.g., "any fixed or floating manmade structure" or "group of such structures"), whereas "application area" is defined in "spatial and geographic" terms (e.g., "any reasonable geographical area"). *See* 33 U.S.C. §§ 1502(9)(A), 1504(d)(2). But this argument presupposes the Government's first argument that reading § 1504(d) in light of § 1502(9) would render the definitions of "application area" and "deepwater port" coterminous. On the contrary, as discussed above, the most natural reading of the statute is that § 1504(d)'s definition of "application area"—"any reasonable geographical area within which a deepwater port may be constructed and operated"—incorporates § 1502(9)'s definition of "deepwater port" by using that defined phrase. *Id.* § 1504(d)(2). Thus, the application area must encompass the deepwater port site, including the port's pipelines, and be at least large enough for the construction and operation of a deepwater port, including its pipelines. Despite the Government's insistence, this construction introduces neither contradiction nor superfluity to the statute.

In short, reading § 1504(d) as requiring an application area to include a deepwater port's proposed pipelines is the best reading of the statute because it faithfully applies § 1502(9)'s definition of "deepwater port" and harmonizes the first two subparts of § 1504(d). As the best reading, this interpretation is the only permissible reading of the statute. *Loper Bright*, 603

U.S. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

B

Because the DWPA expressly defines a "deepwater port" as "including pipelines," 33 U.S.C. § 1502(9)(B), we may deviate from that definition only if applying it "would be incompatible with Congress's regulatory scheme or would destroy one of the statute's major purposes." *Kirtz*, 601 U.S. at 60 (cleaned up).

According to the Government and Texas GulfLink, reading the DWPA to require that application areas include deepwater ports' proposed pipelines would, in fact, destroy a major purpose of the statute. They note that underwater pipeline crossings are so common and inconsequential that the "area off the coast of Texas and Louisiana is home to a complex web of underwater pipelines and cables that cross each other in numerous places." Reading the DWPA to bar the construction of deepwater ports with pipelines that cross any other pipelines would run counter to the DWPA's express purpose "to promote the construction and operation of deepwater ports," they argue. 33 U.S.C. § 1501(a)(5).

In response, Better Brazoria points to another purpose of the DWPA: to "regulate the location, ownership, construction, and operation of deepwater ports." *Id.* § 1501(a)(1). Better Brazoria contends that interpreting the DWPA to give MARAD virtually unfettered discretion to designate "vanishingly small" application areas would undermine this purpose and allow the agency to avoid ever having to decide between two competing projects.

Interpreting the DWPA as requiring application areas to include pipelines would not destroy a major purpose of the statute. The Government and Texas GulfLink are correct that pipelines abound in the Gulf, and many

of these pipelines intersect.[1] But the DWPA does not prohibit pipeline crossings generally. It only requires that there be one deepwater port—including that port's pipelines—per application area. The vast majority of pipelines in the Gulf run to and from platforms used for the processing and distribution of oil or natural gas produced in the Gulf. *See* Deborah Cranswick, *Brief Overview of Gulf of Mexico OCS Oil and Gas Pipelines: Installation, Potential Impacts, and Mitigation Measures*, U.S. DEP'T OF THE INTERIOR MINS. MGMT. SERV., at 5 (Aug. 2001), https://www.boem.gov/newsroom/2001-067 [https://perma.cc/4QS3-T5AW]. The DWPA does not prohibit a deepwater port's proposed pipelines from crossing any of these pipelines, as they are not "components" or "equipment" of a deepwater port. *See* 33 U.S.C. § 1502(9)(B).

The DWPA is only implicated when a deepwater port's proposed pipelines would cross the pipelines of another deepwater port. As Texas GulfLink acknowledges, there is currently only one deepwater port in the Gulf—LOOP, located off the coast of Louisiana—which, like Texas GulfLink's proposed port, has a single underwater pipeline running from the structure to the shore. Given the sparsity of deepwater-port pipelines in the Gulf, it would not undermine the DWPA's purpose of promoting the construction of deepwater ports to require these ports' pipelines not to cross.

To be sure, requiring MARAD to include pipelines in deepwater ports' application areas limits the agency's discretion to designate application areas and makes it more likely that application areas might intersect. But that is a limit imposed by Congress, not this court. By imposing

---

[1] *See Oil and Gas Infrastructure 2024*, NAT'L CTRS. FOR ENV'T INFO., https://www.ncei.noaa.gov/maps/gulf-data-atlas/atlas.htm?plate=Offshore%%2020Structures [https://perma.cc/VLU6-CCVZ] (last visited June 30, 2026).

Case: 25-60202 Document: 121 Page: 48 Date Filed: [illegible]



a minimum size for application areas in § 1504(d)(1) and a maximum size in § 1504(d)(2), Congress struck a careful balance between promoting and regulating the construction and operation of deepwater ports. *See id.* § 1501(a)(1), (5). Because we must respect this legislative balance, we hold that the DWPA requires an application area to encompass the entirety of a proposed deepwater port site, including any proposed pipelines. *See id.* §§ 1502(9)(B), 1504(d)(1).

### C

The ROD approving Texas GulfLink's application was based on an application area that was improperly designated under the DWPA, and a properly designated application area would intersect SPOT's pipeline. Thus, MARAD's approval of Texas GulfLink's application was not in accordance with law because the DWPA requires that only one deepwater port be constructed in each application area. *See id.* § 1504(d)(1), (i). Accordingly, we must "hold unlawful and set aside" this agency action. 5 U.S.C. § 706(2).

When setting aside an unlawful agency action, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). We depart from this default rule "only in 'rare cases' satisfying two conditions." *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (footnote omitted).

> *First*, there must be a "serious possibility" that the agency will be able to correct the rule's defects on remand. Remand without vacatur is therefore inappropriate for agency action suffering from one or more serious procedural or substantive deficiencies. *Second*, vacating the challenged action would produce "disruptive consequences."

*Id.* (footnote omitted) (quoting *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022)).

This is not the rare case in which remand without vacatur is the appropriate remedy. MARAD's error took place early in the application process and impacted a fundamental aspect of the licensing procedure. The agency designated an application area that did not comport with the DWPA's requirements, and, as a result, it approved Texas GulfLink's application even though its application area intersected with SPOT's pipeline. This error was a serious procedural deficiency that the agency could neither correct nor justify on remand. *See Tex. Corn Producers v. EPA*, 141 F.4th 687, 711 (5th Cir. 2025) ("To satisfy the first condition, there must be a serious possibility that the agency can 'substantiate its decision given an opportunity to do so.'" (quoting *Texas*, 50 F.4th at 529)). Because Texas GulfLink's application area was improperly designated under the DWPA and there is not a serious possibility that MARAD could correct this defect on remand, the default remedy of vacatur is appropriate here.

## V

The DWPA requires an application area to include a proposed deepwater port's pipelines. MARAD did not comport with this requirement when it excluded Texas GulfLink's pipeline from its application area. Texas GulfLink's application area, properly drawn, would have intersected with SPOT's planned pipeline; thus, MARAD's ROD approving Texas GulfLink's application violated the DWPA's requirement that only one deepwater port be approved per application area. Accordingly, we GRANT the petition for review, VACATE the ROD, and REMAND for further proceedings.