Case No. 25-60202

# In the United States Court of Appeals
# For the Fifth Circuit

---

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S DEPARTMENT OF TRANSPORTATION; UNITED STATES MARITIME ADMINISTRATION, AN AGENCY OF THE U.S DEPARTMENT OF TRANSPORTATION; ADMINISTRATOR, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S MARITIME ADMINISTRATION; UNITED STATES COAST GUARD, AN AGENCY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN E. LUNDAY, IN HIS OFFICIAL CAPACITY AS COMMANDANT OF THE U.S. COAST GUARD,

*Respondents,*

TEXAS GULFLINK, LLC,

*Intervenor*

---

On Petition for Review from Maritime Administration

---

## INTERVENOR'S PETITION FOR PANEL REHEARING

---

W. Scott Hastings
Texas Bar No. 24002241
scott.hastings@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Ste. 2800
Dallas, Texas 75201
Tel.: (214) 740-8000
Fax: (214) 740-8800

Tod J. Everage (#32445)
tod.everage@keanmiller.com
Amanda Howard Lowe (#32507)
amanda.lowe@keanmiller.com
Jeffrey Gelpi (#37130)
jeff.gelpi@keanmiller.com
**KEAN MILLER LLP**
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Tel: 504.585.3050
**Attorneys for Texas GulfLink, LLC**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

1. **Petitioner:**
   a. Citizens for Clean Air & Water in Brazoria County d/b/a Better Brazoria ("Brazoria")
   b. Lone Start Legal Aid – Counsel for Petitioner
2. **Respondents:**
   a. U.S. Department of Transportation
   b. U.S. Secretary of Transportation, Sean Duffy
   c. U.S. Maritime Administration ("MARAD")
   d. MARAD Administrator
   e. U.S. Coast Guard
   f. Commandant of the U.S. Coast Guard, Kevin E. Lunday
   g. U.S. Department of Justice – Counsel for Respondents
3. **Intervenor:**
   a. Texas GulfLink, LLC ("TGL")
   b. Kean Miller LLP – Counsel for Intervenor
   c. Troutman Pepper Locke LLP – Counsel for Intervenor
   d. Texas GulfLink Holdings, LLC – Interested Party in Intervenor
   e. Sentinel Midstream LLC – Interested Party in Intervenor
   f. Cresta Energy Fund I Carry, LP – Interested Party in Intervenor
   g. Cresta Energy Fund I, LP – Interested Party in Intervenor
   h. Texas GulfLink Operating Company, LLC – Interested Party

*/s/ W. Scott Hastings*
*Counsel for Intervenor*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

A. The Panel's Textual Analysis of the Terms "Application Area" and "Deepwater Port" Fails to Address the Purpose for Which Those Terms Are Used in Section 1504(d). ........ 2

B. The Panel's Interpretation Is Contrary to How MARAD Has Used Its Discretion to Designate Application Areas Both Before and Since SPOT ........ 5

C. The Panel's Interpretation Could Also Render a Proposed Project's Minimum Application Area to be Greater than Its Statutory Maximum, which Would Ultimately Result in the Denial of Discretion to the Secretary to Define "Reasonable" Application Areas. ........ 8

D. The Panel Should Correct Its Erroneous Statutory Interpretation ........ 10

CONCLUSION ........ 11

CERTIFICATE OF SERVICE ........ 13

CERTIFICATE OF COMPLIANCE ........ 14

# TABLE OF AUTHORITIES

## Cases

*Fischer v. United States*,
603 U.S. 480 (2024) ........................................ 4

*Gundy v. United States*,
588 U.S. 128 (2019) ........................................ 11

*J. Ray McDermott & Co., Inc. v. Fidelity & Cas. Co. of New York*,
466 F.Supp. 353 (E.D. La. 1979) ........................................ 4

*Jones v. Hendriz*,
599 U.S. 465 (2023) ........................................ 8

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ........................................ 2

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) ........................................ 2, 10

## Statutes and Rules

33 U.S.C. §1504(d) ........................................ *passim*

33 U.S.C. §1520 ........................................ 3, 4, 10

Pub. L. 93-627, 88 Stat. 2176 (Jan. 3, 1975) ........................................ 6

## Other Authorities

S. Rep. 93-1217, 1974 U.S.C.C.A.N 7529 (Oct. 1, 1974) ........................................ 3

41 Fed. Reg. 3768 (January 16, 1976) ........................................ 6

41 Fed. Reg. 3769 (January 16, 1976) ........................................ 6

83 Fed. Reg. 38457 (Aug. 6, 2018) ........................................ 6

84 Fed. Reg. 30298-01 (June 26, 2019) ........................................ 8

84 Fed. Reg. 30301 (June 26, 2019) ........................................ 7

85 Fed. Reg. 70233 (Nov. 4, 2020) ........................................ 7

# INTRODUCTION

The Panel vacated the United States Department of Transportation's ("DOT") Maritime Administration's ("MARAD") Record of Decision ("ROD") approving Texas GulfLink, LLC ("TGL") for issuance of a license to build and operate a deepwater port in the Gulf under the Deepwater Port Act ("DWPA"), 33 U.S.C. §1501, *et seq*. The Panel explained:

> The ROD approving Texas GulfLink's application was based on an application area that was improperly designated under the DWPA, and a properly designated application area would intersect SPOT's pipeline. Thus, MARAD's approval of Texas GulfLink's application was not in accordance with law because the DWPA requires that only one deepwater port be constructed in each application area.

Op. at 20. The Panel concluded that MARAD failed to properly designate the application area for TGL's project under 33 U.S.C. §1504(d) because it "excluded Texas GulfLink's pipeline from its application area." Op. at 21. TGL respectfully disagrees with the Panel's legal analysis and requests rehearing in light of the following points. TGL is also seeking rehearing *en banc* given the exceptional importance of the issue presented because the Panel's interpretation of the DWPA calls into question virtually every application area designated by MARAD over the past 50 years, including several other pending and approved applications. TGL will endeavor not to unduly repeat its arguments from the *en banc* petition.

## ARGUMENT

### A. The Panel's Textual Analysis of the Terms "Application Area" and "Deepwater Port Site" Fails to Address the Purpose for Which Those Terms Are Used in Section 1504(d).

"[R]easonable statutory interpretation must account for both 'the specific context in which ... language is used' and 'the broader context of the statute as a whole.'" *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). A fundamental error in the Panel Opinion is that it does not address the context or purpose for which the terms "application area" and "deepwater port site" are used in 33 U.S.C. §1504(d).

The Panel began by correctly framing the issue as "whether the DWPA requires MARAD to include a proposed deepwater port's pipelines in its application area." Op. at 12. The Panel recognized that "requiring MARAD to include pipelines in deepwater ports' application areas limits the agency's discretion to designate application areas and makes it more likely that application areas might intersect." Op. at 19. After engaging in its technical analysis of the statute, the Panel concluded that Congress drew a "legislative balance" "between promoting and regulating the construction and operation of deepwater ports." Op. at 20. However, the Panel cited no legislative history from the DWPA supporting the conclusion that Congress drew such a legislative balance seeking to prevent overlapping pipelines.

During oral argument, counsel for Better Brazoria admitted there was no recognized purpose to be served by avoiding overlapping pipelines for deepwater ports. At 32:36 of the argument, counsel admitted in her rebuttal that "crossing of pipelines is not a problem from an operational or safety perspective." And she was correct. Indeed, the Panel Opinion recognizes the vastly common occurrence of offshore pipeline crossings in the Gulf. So why then would Congress have written the DWPA in a way to avoid crossing pipelines if MARAD determined crossing pipelines were appropriate and perhaps the safest way to promote deepwater port development? The answer is that it did not. The legislative purpose of an application area was to eliminate piecemeal consideration of proposed deepwater ports—a concern that was particularly germane to regional import projects considered at that time. Congress was primarily focused on preventing monopolistic control over import access in a given region, not the physical crossing of subsea pipelines. *See* S. Rep. 93-1217, 1974 U.S.C.C.A.N. 7529, 7540-41 (Oct. 1, 1974).

Section 1520 of the DWPA (cited by TGL in its Intervenor's Brief at 26) expressly grants MARAD authority to "establish and enforce such standards and regulations as may be necessary to assure the safe construction and operation of oil or natural gas pipelines on the Outer Continental Shelf." *See* 33 U.S.C. §1520(a). Congress did not say that crossing pipelines were an issue of concern Congress was hoping to address through the DWPA. And notably, no other cooperative agency

that is involved in the permitting and regulatory process objected to the crossing of TGL and SPOT's pipelines. The Panel's decision to read the DWPA as imposing a limitation on crossing pipelines limits MARAD's discretion to regulate the construction and operation of pipelines under Section 1520(a). Indeed, the Panel's reading of the DWPA creates a rule that Congress could not have foreseen and did not intend: that one deepwater port's crossing the pipeline of another, which is indistinguishable from crossing any other OCS pipeline, triggers a prohibition on licensing both ports.

Read together, Section 1504(d)(1) & (2) explain Congress's purposes for designating an application area. The purpose is to designate a "reasonable geographical area" within which, according to the Secretary, only one deepwater is needed. Section 1504(d)(1) requires the application area to encompass the deepwater port "site," which is a common term used to address physical structures such as the port's platforms and structures above the seafloor. *See J. Ray McDermott & Co., Inc. v. Fidelity & Cas. Co. of New York*, 466 F.Supp. 353, 363 (E.D. La. 1979) ("The ordinary and common meaning of the term … 'site' implies a precise or fixed position of a building or structure."). The Panel admits that its interpretation of Section 1504(d) gives no meaning to the word "site." Op. at 16-17. Fundamental principles of statutory interpretation provide that words used by Congress should not be rendered meaningless. *See Fischer v. United States*, 603 U.S. 480, 486 (2024)

("we must give effect, if possible, to every clause and word of [the] statute.") (citations omitted).

The best way to give effect to all words used in Section 1504(d) is to conclude that the application area for a deepwater port need only be a "reasonable" area around its "site," and does not need to include the entire underground pipeline connecting the port to the shore. Pipelines are included in the "deepwater port" definition for jurisdictional and licensing consolidation purposes, but the legislative history nowhere connects that definition to the geographic scope of the application area. The Court's reliance on "Congressional intent" to support its textual reading is undermined by the total absence of any such intent in the available legislative record.

### B. The Panel's Interpretation Is Contrary to How MARAD Has Used Its Discretion to Designate Application Areas Both Before and Since SPOT.

Better Brazoria challenged the ROD issued to TGL by arguing that it reflected an arbitrary departure from how MARAD defined application areas in prior applications, particularly focusing on SPOT and Texas COLT. But the application areas in SPOT and Texas COLT in March 2019 were the outliers. For many years before and since, MARAD has consistently designated application areas without including the entire underground pipeline connecting a port to the shore. Accordingly, the Panel decision would have a major impact on how MARAD has historically used its authority when licensing deepwater ports.

The first two notices of deepwater port applications were issued on January 16, 1976, just one year after the DWPA was enacted. *Compare* 41 Fed. Reg. 3768-3769 (January 16, 1976) *with* Pub. L. 93-627, 88 Stat. 2176 (Jan. 3, 1975).

The LOOP, Inc. notice disclosed a proposed port to be built "approximately 20 miles south of Grand Isle, Louisiana." 41 Fed. Reg. 3768. The application area was defined as "a circle having a 14 nautical mile radius" centered at the port. 41 Fed. Reg. 3768. Thus, approximately six miles of the pipeline from the port to shore were outside the application area.

The SEADOCK, Inc. notice disclosed a proposed port to be built "25.8 nautical miles from Freeport Entrance Light." 41 Fed. Reg. 3769. The application area was defined as "a circle having a 21 nautical mile radius" centered at the port. 41 Fed. Reg. 3769. Thus, approximately five miles of the pipeline from the port to shore were outside the application area.

In 2018, MARAD again defined an application area that likely did not include the entirety of the pipeline between the port and shore. MARAD gave notice of an application from Texas Gulf Terminals, Inc. ("TGTI") to build a deepwater port 12.7 nautical miles off the coast of North Padre Island, Texas. 83 Fed. Reg. 38457 (Aug. 6, 2018). The application area was defined as "a circle having a 12.7 nautical mile radius" centered at the port, but the pipelines from the shore to the proposed port were to be 14.71 miles in length. 83 Fed. Reg. 38457.

The notices issued for Bluewater Texas Terminal, LLC ("Bluewater") in 2019 and Blue Marlin LLC ("BMOP") in 2020 show that MARAD continued defining application areas for proposed deepwater ports without including the full pipeline in the application areas. *See* 84 Fed. Reg. 30301 (June 26, 2019) (Bluewater); 85 Fed. Reg. 70233 (Nov. 4, 2020) (BMOP). Both Bluewater and BMOP's application are under still review with MARAD.

The Bluewater notice disclosed a proposed port to be built "15 nautical miles (17.26 statute miles) off the coast of San Patricio County, Texas." 84 Fed. Reg. 30303. The application area was defined as "a circle having a 3.46 nautical mile radius" centered at the port. 84 Fed. Reg. 30302. Accordingly, at least twelve miles of the pipeline from port to shore were outside the application area.

The Blue Marlin notice disclosed a proposed port to be built approximately 99 miles off the coast of Cameron Parish, Louisiana. The application area was defined as "a circle having a 3.3 nautical mile radius" centered at the port. 85 Fed. Reg. 70235. Thus, over 95 miles of pipeline would be outside of the defined application area.

With the exception of the notices for SPOT and Texas COLT, both of which were issued in close succession in early-to-mid 2019, *see* Op. at 6, the deepwater port application areas in the Gulf were drawn not to include the full pipelines from port to shore. Moreover, MARAD quickly amended the SPOT and Texas COLT

applications to make them consistent with TGL's, which was also consistent with MARAD's historical and subsequent practices. *See* 84 Fed. Reg. 30298-01, 30299 (June 26, 2019). A legal determination by this Court that the DWPA prohibits application areas as MARAD used numerous times over the past 50 years has potential implications far beyond TGL's own application.

### C. THE PANEL'S INTERPRETATION COULD ALSO RENDER A PROPOSED PROJECT'S MINIMUM APPLICATION AREA TO BE GREATER THAN ITS STATUTORY MAXIMUM, WHICH WOULD ULTIMATELY RESULT IN THE DENIAL OF DISCRETION TO THE SECRETARY TO DEFINE "REASONABLE" APPLICATION AREAS.

The Panel correctly recognized that "[b]asic principles of statutory interpretation require [the Court to] construe a statute's provisions in harmony, not set them at cross-purposes." Op. at 15-16 (citing *Jones v. Hendriz*, 599 U.S. 465, 478 (2023)). But the Panel's interpretation of Section 1504(d) to include pipelines all the way to shore creates a potential for conflict between the Court's self-described "minimum" application area under Section 1504(d)(1) and the maximum application under Section 1504(d)(2). Such a problem arises where the port applicant has proposed a pipeline route to shore that is not the shortest possible route, perhaps because it has safety, environmental, or business reasons for designating an alternate route.

For example, if a proposed port needed a 32-mile pipeline to reach onshore near Freeport, Texas because of business, safety, or environmental concerns, but was

only 26 miles off the nearest point on the Texas coast, the pipeline may extend beyond the maximum allowed. The following map illustrates this hypothetical:




Here, the *maximum* application area would be a 26-mile radius under 33 U.S.C. §1504(d)(2). However, under the Panel's interpretation setting a "minimum" application area to include the entire 32-mile length of the offshore pipeline, the minimum application area would actually exceed the maximum. How should MARAD establish a compliant application area in this situation? It would either violate Section 1504(d)(2) by having to draw an application area that goes beyond the maximum circular zone, or violate Section 1504(d)(1) by drawing an application area that does not "encompass the deepwater port site."

Notably, this issue potentially arises under the Panel's interpretation anytime a pipeline does not stay within the circular zone because its path is not the shortest, most direct route from port to shore. To the extent the Panel Opinion can be read

always to require the shortest route from port to shore, which more often than not is impossible given the totality of circumstances, the Panel's interpretation would always make the minimum application area under Section 1504(d)(1) equal to the maximum application area under Section 1504(d)(2), thereby eliminating any discretion to define a "reasonable area." This would also strip the Secretary of his discretion when regulating how pipelines should be constructed under 33 U.S.C. §1520. The statutory conflict and the various illogical results that flow from it show that the Panel's interpretation cannot be correct. Read in this light, the words "site" and "reasonable" in Sections 1504(d)(1) and (2), respectively, are practically crying out to be given effect.

### D. THE PANEL SHOULD CORRECT ITS ERRONEOUS STATUTORY INTERPRETATION.

As Justice Scalia explained for the Court in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), the Court "must do our best" even where Congress has enacted a poorly-drafted statute. *Id.* at 319-20. In the August 12, 2026 letter to Congress (which is posted on the Court's docket for this case), the Court Clerk delivered a copy of the Panel Opinion to Congress explaining:

> Pursuant to the judicial conference long range plan for the federal courts, we forward to Congress the opinion in this case that may point out possible technical problems in the statutes.

TGL appreciates that referral and also encourages Congress to revise the DWPA to minimize ambiguities. However, by recognizing "possible technical problems in the

statutes," this Court raises concerns about the correctness of its conclusion in this case.

The DWPA has been in place for over 50 years, and the crude oil import/export market has dramatically evolved during that time. This Court should not strictly construe that statute in a way that renders words meaningless, removes discretion from the Secretary to whom it was expressly granted, and overrides years of agency work encouraging development of deepwater ports. By reading the full length of the offshore pipeline into the definition of application area, the Panel created many more statutory problems for MARAD than it tried to resolve. Deferring to Congress to address technical problems with a statute is no substitute for the Court giving effect to the intent of Congress based on the statute it enacted. *See Gundy v. United States*, 588 U.S. 128, 141 (2019).

## **CONCLUSION**

TGL respectfully requests rehearing of the Panel Opinion. On rehearing, TGL requests that the Court vacate the Panel Opinion and deny Better Brazoria's petition for review.

Dated: September 25, 2026.

Respectfully submitted,

*/s/ W. Scott Hastings*
W. Scott Hastings
Texas Bar No. 24002241
scott.hastings@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Ste. 2800
Dallas, Texas 75201
Tel.: (214) 740-8000
Fax: (214) 740-8800

**KEAN MILLER LLP**
TOD J. EVERAGE (#32445)
AMANDA HOWARD LOWE (#32507)
JEFFREY GELPI (#37130)
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Tel: 504.585.3050
tod.everage@keanmiller.com
amanda.lowe@keanmiller.com
jeff.gelpi@keanmiller.com

ATTORNEYS FOR TEXAS GULFLINK, LLC

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this the 25th day of September, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to those who are non-CM/ECF participants.

*/s/ W. Scott Hastings*
Counsel for Texas GulfLink, LLC

## CERTIFICATE OF COMPLIANCE

1. This Petition complies with the type-volume limitation of FED. R. APP. P. 40(d)(3)(A) because the Petition contains 2,481 words, excluding the parts of this Petition exempted by FED. R. APP. P. 32(f).

2. The Petition complies with the typeface requirements of FED. R.APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this Petition has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman, 14 point.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in FED. R. APP. P. 32(a)(7), may result in the Court's striking the Petition and imposing sanctions against the person signing the Petition.

This 25th day of September, 2026.

*/s/ W. Scott Hastings*
Counsel for Texas GulfLink, LLC